MARCO SIMONS [S.B. #237314]
marco@earthrights.org
RICHARD HERZ
rick@earthrights.org
MICHELLE HARRISON
michelle@earthrights.org
MARISSA VAHLSING
marissa@earthrights.org
EARTHRIGHTS INTERNATIONAL
1612 K Street, Suite 401
Washington, DC 20006
Telephone: (202) 466-5188
Facsimile: (202) 466-5189

Attorneys for Non-Party Movant Amazon Watch

FILED

2013 FEB 25 P 1: 44

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**UNITED STATES DISTRICT COURT**

**CRB**

**FOR THE NOTHERN DISTRICT OF CALIFORNIA**

CV 13 80 038MISC

CHEVRON CORP.,

                    Plaintiff,

        v.

STEVEN DONZIGER, *et al.*,

                    Defendants

Case No. _____TBD_____

**NOTICE OF MOTION AND MOTION OF
NON-PARTY AMAZON WATCH TO
QUASH AND/OR MODIFY SUBPOENA
DUCES TECUM; MEMORANDUM OF
POINTS AND AUTHORITIES**

Date:     April 3, 2013
Time:     1:00 pm
Courtroom:    Hon. Nathanael Cousins
Courtroom A - 15th Floor

MOTION TO QUASH

**NOTICE OF MOTION AND MOTION**

TO PLAINTIFF CHEVRON CORP.:

**PLEASE TAKE NOTICE** that on April 3, 2013, at 1:00 PM at 450 Golden Gate Avenue, Courtroom A, 15th Floor, San Francisco, California, the Non-Party Movant Amazon Watch hereby moves the District Court for the Northern District of California to quash the subpoena issued to it by Plaintiff Chevron Corporation. The subpoena was issued in support of a civil action in the District Court for the Southern District of New York, captioned *Chevron Corp. v. Donziger, et al.,* Case No. 11-cv-0691 (LAK).

As discussed below, Chevron's subpoena should be quashed because it violates Amazon Watch's constitutional rights of freedom of association, expression, and privacy in association, seeks confidential business information and would impose an undue burden. This motion is based on the attached memorandum, all accompanying declarations and exhibits, and on such oral argument as may be heard. Non-Party Amazon Watch respectfully request that this Court grant this motion and quash the subpoena in its entirety or issue an appropriate protective order.

Jurisdiction: This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 in that this matter arises under Federal Rule of Civil Procedure 45(c).

Intradistrict Assignment: The subpoena was issued to Amazon Watch in San Francisco. Pursuant to Civil L.R. 3-2(c) &(d), assignment to the San Francisco Division or the Oakland Division is warranted.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................ iii

I.  INTRODUCTION ....................................................................................................................... 1

II.  BACKGROUND ........................................................................................................................ 2

    A.  The underlying case .......................................................................................................... 2

    B.  Chevron's unprecedented discovery in support of its fraud allegations ............................. 5

    C.  Chevron's subpoena to Amazon Watch ............................................................................. 5

    D.  The meet and confer process ............................................................................................. 6

III.  ARGUMENT ............................................................................................................................ 7

    A.  The meet and confer process has not concluded ................................................................ 7

    B.  The subpoena is invalid due to improper service ............................................................... 8

    C.  The subpoena violates Amazon Watch's First Amendment rights ..................................... 9

        1.  Chevron must justify impairment of Amazon Watch's rights ..................................... 9

        2.  Amazon Watch has made a prima facie showing that the subpoena would violate its First Amendment rights and chill its expressive activities ......................................... 10

            a.  Disclosure of campaign communications, strategies, and tactics would chill the exercise of protected rights by Amazon Watch, its staff, and its partners ............................................................................................................... 11

            b.  Compelled disclosure of funders, contributors, and other supporters would harm Amazon Watch ................................................................................. 13

            c.  Amazon Watch and its supporters have experience harassment and would likely be subject to further harassment should its information be revealed ................................................................................................................. 14

        3.  Chevron cannot meet its high burden of demonstrating a need that is sufficiently compelling to justify the deterrent effect on Amazon Watch's First Amendment rights ........................................................................................................................ 15

            a.  The information sought is not highly relevant ........................................... 15

            b.  The requests are not narrowly tailored to avoid unnecessary interference with protected activity ................................................................................ 16

            c.  Much of the information sought is available from other sources ........... 16

D. The requests call for protected attorney-client documents and work product................. 17

E. The subpoena would subject Amazon Watch to an undue burden ................................... 18

    1. Chevron has not shown that the documents are unavailable elsewhere ................ 18

    2. The time period is overbroad...................................................................................... 19

    3. The requests are overbroad, vague, and seek irrelevant information...................... 19

    4. The burden impose upon Amazon Watch is not justified......................................... 21

        a. Producing the requested documents requires significant time and resources ........................................................................................................................,........ 21

        b. Chevron has not taken reasonable steps to avoid undue burden on Amazon Watch ...........................................................................................................,........ 22

F. Chevron improperly seeks confidential commercial information ....................................... 22

G. Chevron should cover the reasonable costs of production ................................................. 24

H. If documents must be revealed, a robust protective order is warranted .......................... 25

IV. CONCLUSION ..........................................................................................................................,........ 25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION TO QUASH

1

**TABLE OF AUTHORITIES**

2

**FEDERAL CASES**

3

*AFL-CIO v. FEC,*
4      333 F.3d 168 (D.C. Cir. 2003) ........................................................................................................ 13

5   *AFMS LLC v. UPS,*
       No. 12cv1503 JLS, 2012 U.S. Dist. LEXIS 106925 (S.D. Cal. July 27, 2012) ......................... 23

6   *Aguinda v. Texaco, Inc.,*
7      303 F.3d 470 (2d Cir. 2002) ............................................................................................................ 3

8   *Audio Toys, Inc. v. Smart AV Pty Ltd.,*
       2007 WL 1655793 (N.D. Cal. June 7, 2007) ................................................................................. 8

9   *Auto-Owners Ins. Co. v. Southeast Floating Docks, Inc.,*
10     231 F.R.D. 426 (M.D. Fla. 2005) .................................................................................................. 25

11  *Bender v. Nat'l Semiconductor Corp.,*
       2009 WL 2912522 (N.D. Cal. Sept. 9, 2009) ................................................................................. 9

12  *Black Panther Party v. Smith,*
13     661 F.2d 1243 (D.C. Cir. 1981) ........................................................................................ 14, 15, 18

14  *In re Bristol-Myers Squibb Securities Litig.,*
       205 F.R.D. 437 (D.N.J. 2002) ......................................................................................................... 9

15  *Brown v. Socialist Workers '74 Campaign Comm.,*
16     459 U.S. 87 (1982) ......................................................................................................................... 13

17  *Chapman v. U.S. E.E.O.C.,*
       2008 WL 782599 (N.D. Cal. Mar. 24, 2008) ................................................................................. 9

18  *Chevron Corp. v. Allen,*
19     Case No. 2:10-mc-00091, Dkt. 38 (D. Vt. Dec. 2, 2010) ............................................................. 4

20  *Chevron Corp. v. Berlinger,*
       629 F.3d 297 (2d Cir. 2011) ............................................................................................................ 5

21  *Chevron Corp. v. Bonifaz,*
22     Case No. 4:09-05371, Dkt. 71 (N.D. Cal. Oct. 8, 2010) ............................................................. 4

23  *Chevron Corp. v. Bonifaz,*
       Case No 10-mc-30022, Dkt. 47 (D. Mass. Dec. 22, 2010) ....................................................... 4, 5

24  *Chevron Corp. v. Camacho Naranjo,*
25     667 F.3d 232 (2d Cir. 2012) ............................................................................................................ 4

26  *Chevron Corp. v. Champ,*
       Case No. 1:10mc 27, 2010 U.S. Dist. LEXIS 97440 (W.D.N.C. Aug. 28, 2010) ...................... 5

27  *Chevron Corp. v. Donziger,*
28     Case No. 11-cv-0691 (LAK) (S.D.N.Y.) ....................................................................................... 3

iii

*Chevron Corp. v. E-Tech Int'l*,
   Case No. 10cv1146-IEG (WMc), 2010 U.S. Dist. LEXIS 94396 (S.D. Ca. Sept. 10, 2010) ... 5

*Chevron Corp. v. Quarles*,
   Case No. 3:10-cv-00686, Dkt. 108 (M.D. Tenn. Sept. 21, 2010) .................................................. 5

*Chevron Corp. v. Salazar*,
   Case No. 11-0691-LAK (D. Or. Nov. 30, 2011) ........................................................................ 4,18

*Chevron Corp. v. Sheffitz*,
   754 F.Supp. 2d 254 (D. Mass. 2010) ...................................................................................... 4, 5

*Chevron Corp. v. Sheffitz*,
   Case No. 10-mc-10352-JLT, Dkt. 45 (D. Mass. Dec. 7, 2010) ...................................................... 4

*Chevron Corp. v. Stratus Consulting, Inc.*,
   Order, No. 10-cv-00047-MSK-MEH, D.E. 293 (D. Colo. Nov. 15, 2010) ............................... 4

*Chevron Corp. v. Stratus Consulting, Inc.*,
   No. 10-cv-00047-MSK-MEH, 2010 U.S. Dist. LEXIS 110023 (D. Colo. Oct. 1, 2010) ........ 5

*Cohen v. City of New York*,
   255 F.R.D. 110 (S.D.N.Y. 2008) ............................................................................................... 23

*Compaq Computer Corp. v. Packard Bell Elecs., Inc.*,
   163 F.R.D. 329 (N.D. Cal. 1995) ............................................................................................... 24

*Direct Mail Specialists Inc. v. Eclat Computerized Techs., Inc.*,
   840 F.2d 685 (9th Cir. 1988) ....................................................................................................... 8

*Ecuadorian Plaintiffs v. Chevron Corp.*,
   619 F.3d 373 (5th Cir. 2010) ....................................................................................................... 5

*Eilers v. Palmer*,
   575 F. Supp. 1259 (D. Minn. 1983) ........................................................................................... 14

*Exxon Shipping Co. v. U.S. Dep't. of Interior*,
   34 F.3d 774 (9th Cir. 1994) ....................................................................................................... 18

*Falicia v. Advanced Tenant Servs.*,
   235 F.R.D. 5 (D.D.C. 2006) ....................................................................................................... 23

*FEC. v. Hall-Tyner Elec. Campaign Comm.*,
   678 F.2d 416 (2d Cir. 1982) ....................................................................................................... 14

*FEC. v. Larouche Campaign*,
   817 F.2d 233 (2d Cir. 1987) ....................................................................................................... 14

*Gibson v. Fla. Legisl. Investigation Comm.*,
   372 U.S. 539 (1963) ................................................................................................................... 12

*Gonzales v. Google, Inc.*,
   234 F.R.D. 674 (N.D. Cal. 2006) .................................................................................... 18, 21, 24

*Heidelberg Americas, Inc. v. Tokyo Kikai Seisakusho, Ltd.*,
   333 F.3d 38 (1st Cir. 2003) ....................................................................................................... 19

*High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.,*
   161 F.R.D. 86 (N.D. Cal.1995)..................................................................................................21, 22

*In re Chevron Corp.,*
   Order, No. 1:10-mc-00002-LAK (S.D.N.Y Jan. 13, 2011) .............................................................5

*In re Chevron Corp.,*
   Order, No. 1:10-mc-00002-LAK (S.D.N.Y Jan. 21, 2011) .............................................................5

*In re Chevron Corp.,*
   Order, No. 1:10-mc-00002-LAK (S.D.N.Y Aug. 16, 2011) ...........................................................5

*In re Chevron Corp. (Bonifaz),*
   762 F. Supp.2d 242 (D. Mass. 2010) .............................................................................................5

*In re Chevron Corp. (Calmbacher),*
   No. 1:10-MI-0076-TWT-GGB, 2010 U.S. Dist. LEXIS 114724 (N.D. Ga. Mar. 2, 2010) .... 5

*In re Chevron Corp. (Donziger),*
   749 F.Supp.2d 141 (S.D.N.Y. 2010), *aff'd.* 409 Fed. Appx. 393 (2d Cir. 2010) .........................5

*In re Chevron Corp. (Quarles),*
   No. 3:10-cv-00686, 2010 U.S. Dist. LEXIS 120798 (M.D. Tenn. Aug. 17, 2010) ....................5

*In re Chevron Corp. (Rourke),*
   753 F.Supp. 2d 536 (D. Md. 2010) ................................................................................................5

*In re Chevron Corp. (Scardina),*
   Case No. 7:10-mc-00067, 2010 U.S. Dist. LEXIS 125174 (W.D. Va. Nov. 24, 2010) ...........5

*In re Chevron Corp. (Uhl, Baron, Rana & Assocs.),*
   633 F.3d 153 (3d Cir. 2011) .............................................................................................................5

*In re Motor Fuel Temp. Sales Practices Litig.,*
   258 F.R.D. 407 (D. Kan. 2009)......................................................................................................13

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.,*
   09-CV-01967 CW NC, 2012 WL 4846522 (N.D. Cal. Aug. 7, 2012) ...................................18, 19

*In re Silicone Gel Breast Implants Products Liability Litig.,*
   No. 92-P-10000S, 1996 WL 1358526 (N.D. Ala. Apr. 11, 1996) .................................................23

*Int'l Action Ctr. v. United States,*
   207 F.R.D. 1 (D.D.C. 2002)......................................................................................................16, 17

*Int'l Union v. Nat'l Right to Work Legal Def. & Ed. Found., Inc.,*
   590 F.2d 1139 (D.C. Cir. 1978) ................................................................................................10, 13

*Kilopass Tech. Inc. v. Sidense Corp.,*
   C 10-02066 SI, 2011 WL 2470493 (N.D. Cal. June 21, 2011).....................................................25

*Klay v. All Defendants,*
   425 F.3d 977 (11th Cir. 2005)........................................................................................................23

*Moon v. SCP Pool Corp.,*

v

MOTION TO QUASH

232 F.R.D 633 (C.D. Cal. 2005) ................................................................................................... 18, 19, 22, 23

*NAACP v. Alabama,*
357 U.S. 449 (1958) ........................................................................................................................... 10, 12

*NGV Gaming, Ltd. v. Upstream Point Molate, LLC,*
2009 WL 4258550 (N.D. Cal. Nov. 24, 2009) ..................................................................................... 8

*Nidec Corp. v. Victor Co. of Japan,*
249 F.R.D. 575 (N.D. Cal. 2007) ........................................................................................................ 19

*Pallares v. Kohn (In re Chevron Corp.),*
650 F.3d 276 (3d Cir. 2011) ............................................................................................................. 3, 5

*Perry v. Schwarzenegger,*
591 F.3d 1147 (9th Cir. 2010) *cert. dismissed,* 130 S. Ct. 2432, (U.S. 2010) ........................ passim

*Perry v. Schwarzenegger, (Perry II).*
602 F.3d 976 (9th Cir. 2010) ............................................................................................................. 12

*Soto v. Castlerock Farming & Transp., Inc.,*
282 F.R.D. 492 (E.D. Cal. 2012) .................................................................................................. 18, 19

*United States v. CBS., Inc.,*
666 F.2d 364 (9th Cir.1982) ........................................................................................................ 18, 24

*Williams v. City of Dallas,*
178 F.R.D. 103 (N.D. Tex. 1998) ................................................................................................. 19, 20

*Wyoming, v. U.S.D.A.,*
208 F.R.D. 449 (D.D.C. 2002) ..................................................................................................... 12, 13

### FOREIGN CASES

Clarifying Order, Sole Chamber of the Provincial Court of Justice of Sucumbíos, Nueva Loja,
Ecuador, *Maria Aguinda v. Chevron Corp.,* Case No. 2011-0106 (Jan. 13, 2012) ........................ 4

Judgment of the Provincial Court of Justice of Sucumbíos, Nueva Loja, Ecuador, *Maria Aguinda v.
Chevron Corp.,* No. 2003-0002 (Feb. 14, 2011) ................................................................................. 3

Order, Sole Chamber of the Provincial Court of Justice of Sucumbíos, Nueva Loja, Ecuador, *Maria
Aguinda v. Chevron Corp.,* Case No. 2011-0106 (Jan. 3, 2012) ........................................................ 4

### FEDERAL STATUTES

28 U.S.C. § 1782 .......................................................................................................................................... 5

### FEDERAL RULES

Federal Rule of Civil Procedure 4 ............................................................................................................ 8

Federal Rule of Civil Procedure 26 ....................................................................................................... 18

Federal Rule of Civil Procedure 45 .......................................................................... 7, 18, 21, 22, 24

MOTION TO QUASH

1
2

**STATE STATUTES**

3
Cal. Code of Civ. P. § 416.40 ............................................................................................................................. 8

4

**OTHER AUTHORTITIES**

5
Patrick Radden Keefe, *Reversal of Fortune*, The New Yorker (Jan. 9, 2012). ............................................. 5

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MOTION TO QUASH

1       **MEMORANDUM OF POINTS AND AUTHORITIES**

2       **I.     INTRODUCTION**

3           This motion seeks protection from a subpoena of startling breadth issued by Chevron

4       Corporation, one of the world's largest corporations, against Amazon Watch ("AW"), a nonprofit

5       organization with only twelve staff members and limited financial resources. AW has been publicly

6       critical of Chevron's legacy of massive pollution, which has harmed the health and environment of

7       thousands of indigenous villagers in the Ecuadorian Amazon (the "Lago Agrio Plaintiffs," or

8       "LAPs"). AW is not a party to the underlying litigation, in which Chevron alleges that the LAPs and

9       their lawyers ("defendants") fraudulently conspired to obtain a massive court judgment in Ecuador –

10      but in which Chevron is not contesting the validity of the LAPs' pollution claims. Yet Chevron would

11      require AW to review and turn over hundreds of thousands of pages of confidential campaign and

12      strategy files and communications regarding AW's exercise of its First Amendment right to criticize

13      Chevron. The Ninth Circuit has held that such internal documents are protected by the First

14      Amendment, rejecting a similar ploy to obtain a political opponent's strategy engineered by the same

15      counsel who represent Chevron here. *See Perry v. Schwarzenegger*, 591 F.3d 1126 (9th Cir. 2010).

16          According to Chevron, AW deserves no First Amendment protections because, by engaging in

17      a public advocacy campaign against Chevron, AW is part of a global conspiracy that includes, *inter alia*,

18      academics, the New York State Comptroller, environmental consultants, activists, law firms, villagers

19      from communities barely connected by modern communications to the outside world, and Ecuadorian

20      trial and appellate courts. But, to date, Chevron has repeatedly refused to provide any evidence that

21      AW has committed any wrongful acts. In fact, AW has merely conducted the First Amendment

22      activities that constitute its core mission – to call attention to pollution and promote justice for

23      indigenous groups in the Amazon. AW has sought to bring to light and publicly pressure Chevron to

24      provide some redress for the billions of gallons of toxic wastewater and millions of gallons of oil that

25      its predecessor, Texaco, dumped in streams and left in unlined pits. Chevron's allegations amount to

26      nothing more than the assertion that AW at times coordinated its message with the defendants. AW

27      did not engage in criminal conspiracy simply by running a campaign arguing that Chevron is

28      responsible for massive pollution in Ecuador – exactly what the Ecuadorian trial and appellate courts

                                                    1

1   ultimately found to be true, and which Chevron does not dispute in the underlying litigation.

2       Because Chevron refuses to provide evidence of conspiratorial intent, it is left to argue that

3   *mere allegations* against a non-party are enough to deprive AW of the protections afforded by the First

4   Amendment and Rule 45. Fundamental rights are not so easily cast aside. Regardless, Chevron's claim

5   that it needs AW's documents is undercut by the fact that it already has had extensive discovery of the

6   *defendants* and dozens of others, including complete access to the files, hard drive, and emails of

7   attorney Steven Donziger, the alleged architect of the fraud. Chevron thus cannot overcome its burden

8   to show it has unsuccessfully sought the documents from the parties or elsewhere, or that its need is

9   sufficient to overcome AW's First Amendment and Rule 45 rights.

10       The subpoena is also unduly burdensome due to its scope. An under-inclusive initial search

11   turned up nearly 50,000 electronic documents and more than 30,000 emails, in addition to 14 boxes of

12   physical documents, that were potentially responsive to Chevron's requests. Even if some of the

13   evidence sought may be relevant, the subpoena's breadth suggests that it is largely a pretext to gain

14   privileged access to the confidential documents of Chevron's most persistent gadfly.

15       The Court need not even reach the substance of the subpoena, however, because service was

16   not accomplished before the applicable deadline of December 1, 2012. Even if service were valid, the

17   subpoena is overly broad, unduly burdensome, intended to harass, and infringes on AW's First

18   Amendment rights – among other infirmities – and should be quashed in its entirety. In the alternative,

19   the Court should order the parties to continue meeting and conferring over outstanding issues,

20   because the meet and confer process never concluded.

21   **II.    BACKGROUND**

22       Over three decades, Chevron's predecessor, Texaco, caused massive oil contamination in the

23   Ecuadorian Amazon, injuring the LAPs' health and environment. For the past twenty years, the LAPs

24   have waged an advocacy and legal campaign against the company for clean water, health services, and

25   environmental remediation. Since 2002, AW, an indigenous rights nonprofit based in San Francisco,

26   has assisted these affected communities.

27   **A.  The underlying case**

28       In 1993, 30,000 Ecuadorian citizens sued Texaco, Inc. in the Southern District of New York

1   for pollution and other damage caused by its oil extraction activities in the Amazon. *See generally*

2   *Aguinda v. Texaco. Inc.*, 303 F.3d 470 (2d Cir. 2002). For nine years, Texaco and Chevron (which

3   acquired Texaco in 2001) argued that "the Ecuadorian judiciary was impartial and free from corruption

4   and . . . could provide a fair and appropriate forum in which to resolve the dispute" and persuaded the

5   court to dismiss the case on *forum non conveniens* grounds. *Pallares v. Kohn (In re Chevron Corp.),* 650 F.3d

6   276, 280-281 (3d Cir. 2011) (discussing *Aguinda*). After dismissal of *Aguinda*, the Ecuadorian plaintiffs

7   sued Chevron in Ecuador (the "Lago Agrio litigation"). *Id.*

8           On February 14, 2011, an Ecuadorian trial court issued a 188-page opinion ("Judgment"),

9   based upon an approximately 200,000-document record containing scientific evidence submitted by

10  both parties. Judgment of the Provincial Court of Justice of Sucumbíos, Nueva Loja, Ecuador, *Maria*

11  *Aguinda v. Chevron Corp.*, No. 2003-0002 (Feb. 14, 2011).[1] The Court found Chevron liable for

12  approximately $8.6 billion in damages for soil and groundwater remediation, delivery of potable water,

13  healthcare, and damage to the communities' way of life. *Id.* The judgment also included $8.6 billion in

14  punitive damages that Chevron could have avoided if it apologized. It refused. *Id.*

15          "As the Lago Agrio litigation progressed, Chevron's opinion of the Ecuadorian courts changed

16  dramatically." *Pallares*, 650 F.3d at 281-82. As the Third Circuit noted:

17          Chevron now contends that the Ecuadorian judiciary is rife with corruption and that a
            fair trial was not possible in the Lago Agrio litigation. . . . Furthermore, Chevron
18          asserted that there is corruption within the Ecuadorian judiciary and that the
            Ecuadorian government interfered in the judicial process in the Lago Agrio litigation.
19

20  *Id.* Chevron claimed that the Judgment was the result of fraud, and, "somewhat ironically given its past

21  representations . . . [that] the Ecuadorian legal system is not impartial and does not provide litigants

22  due process of law." *Id.* at 282. Just prior to the Judgment, Chevron filed a civil RICO suit in New

23  York against more than 50 lawyers, consultants, LAPs, and other individuals, alleging any judgment in

24  Ecuador would be the product of fraud and extortion. *Chevron Corp. v. Donziger,* No. 11-cv-0691 (LAK)

25  (S.D.N.Y.). The RICO case, before Judge Lewis Kaplan, is the source of the subpoena at issue here.

26          Chevron also raised its fraud allegations on appeal in Ecuador, but the appellate court rejected

27

28  [1] Available at: http://chevrontoxico.com/assets/docs/2011-02-14-Aguinda-v-ChevronTexaco-
    judgement-English.pdf, last accessed February 22, 2013.

3

MOTION TO QUASH

1    Chevron's claim that the Judgment was the product of fraud and upheld the Judgment under a

2    standard similar to *de novo* review. Order, Sole Chamber of the Provincial Court of Justice of

3    Sucumbíos, Nueva Loja, Ecuador, *Maria Aguinda v. Chevron Corp.,* No. 2011-0106, at 3-5 (Jan. 3, 2012)[2];

4    *Chevron Corp. v. Camacho Naranjo,* 667 F.3d 232, 237 (2d Cir. 2012). To be sure, some U.S. courts have

5    found evidence suggesting that certain evidence submitted in the Ecuador litigation was tainted. But

6    that is a far cry from the notion that the *judgment* was the *result* of fraud, let alone a massive conspiracy.

7    Indeed, the appellate court "concluded that the indications provided by Chevron Corporation lead

8    nowhere without a good dose of imaginative inventiveness." Clarifying Order, Sole Chamber of the

9    Provincial Court of Justice of Sucumbíos, Nueva Loja, Ecuador, *Maria Aguinda v. Chevron Corp.,* No.

10   2011-0106, at 3-5 (Jan. 13, 2012).[3] The Ecuadorian appellate court admonished Chevron for, among

11   other things, its "evident attempt[s] to abuse the legal process and with the clear intent to obstruct the

12   administration of justice[,]" *id.* at 2, 3-5, 14-15, and for its "manifest . . . bad faith." *Id.* at 16. At least

13   three U.S. district courts have also sanctioned, admonished, or questioned Chevron and/or its counsel

14   for its tactics, including for targeting a nonprofit similar to AW with a harassing subpoena.[4] Still more

15   U.S. courts have squarely rejected or questioned the same allegations that Chevron raises here for the

16   purpose of overriding otherwise applicable privileges in order to obtain discovery.[5]

17

18   [2] Order available at: http://chevrontoxico.com/assets/docs/2012-01-03-appeal-decision-english.pdf.
     Last accessed February 22, 2013.
19   [3] Order available at: http://chevrontoxico.com/assets/docs/2012-01-13-appeal-
     clarificationenglish.pdf. Last accessed January 2, 2013.
20   [4] *See, e.g.,* Order, *Chevron Corp. v. Stratus Consulting Inc.,,* No. 10-cv-00047-MSK-MEH, D.E. 293 (D.
     Colo. Nov. 15, 2010) (ordering counsel to stop asking the Ecuadorian Plaintiffs' environmental
21   consultants harassing questions during depositions); Order, *Chevron Corp. v. Salazar,* No. 11-0691-LAK,
     at 9 (D. Or. Nov. 30, 2011) (ordering Chevron to pay $32,945.20 to E-LAW, a nonprofit
22   environmental organization that filed an amicus brief in the Lago Agrio Litigation, because Chevron's
     subpoena "was, at least in part, meant to harass"); *Chevron Corp. v. Bonifaz,* Case No. 4:09-05371, Dkt.
23   71 (N.D. Cal. Oct. 8, 2010) (dismissing for lack of credible evidence Chevron's SLAPP (strategic
     lawsuit against public participation) suit alleging that one of the LAPs' counsel engaged in malicious
24   prosecution).
     [5] *Chevron Corp. v. Allen,* No. 2:10-mc-00091, Dkt. 38 at 13 (D. Vt. Dec. 2, 2010)("[T]he Court is
25   satisfied that no evidence of fraud, false pretenses or undue influence appears."); *Chevron Corp. v.
     Bonifaz,* No 10-mc-30022, Dkt. 47 at 20-21 (D. Mass. Dec. 22, 2010) ("To the extent Chevron and the
26   Individual Applicants assert that the crime-fraud exception should overcome any privilege, the court
     finds that they have not met their heavy burden in establishing that narrow exception. More
27   particularly, the court concludes that the applicants have not made a prima facie showing[.]"
     Furthermore, "several other district courts have expressly denied the applicants' requests to invoke the
28   crime-fraud exception with respect to other respondents."); *Chevron Corp. v. Shefftz,* No. 10-mc-10352-

                                                          4
MOTION TO QUASH

**B. Chevron's unprecedented discovery in support of its fraud allegations**

Chevron has already engaged in a discovery expedition "unique in the annals of American judicial history." *Pallares*, 650 F.3d at 295. This has included use of 28 U.S.C. § 1782 to bring "at least 25 requests to obtain discovery from at least 30 different [individuals or entities]," *In re Chevron Corp. (Uhl, Baron, Rana & Associates)*, 633 F.3d 153, 159 (3d Cir. 2011), through which it has successfully petitioned for discovery in courts in at least nine circuits.[6] Judge Kaplan has granted extensive discovery from the defendants, including Steven Donziger, the alleged mastermind of the alleged conspiracy – including nearly unfettered access to Donziger's hard drive[7] and email accounts[8], and even his personal diary.[9] Chevron also has any responsive documents located through searches of all of Donziger's electronically stored information using Chevron's search terms. *In re Chevron Corp.*, Order (S.D.N.Y Jan. 13, 2011). Judge Kaplan also ordered production of all documents under Donziger's control from interns and attorneys with whom he worked in connection with the Ecuadorian litigation and who could have documents responsive to Chevron's search terms. *In re Chevron Corp.*, Order, No. 1:10-mc-00002-LAK (S.D.N.Y Aug. 16, 2011).

**C. Chevron's subpoena to Amazon Watch**

On December 7, 2012, AW accepted service of a subpoena from Chevron with 25 requests for documents relating to Chevron and Ecuador, over an eight- to nearly ten-year period.[10] Chevron initially attempted to serve AW on November 28, 2012, by hand-delivering the subpoena to Leila

---

JLT, Dkt. 45 (D. Mass. Dec. 7, 2010) (Chevron "has not shown Respondent engaged in or intended any criminal or fraudulent activity."); *Chevron Corp. v. Quarles*, No. 3:10-cv-00686, Dkt. 108, Order at 2 (M.D. Tenn. Sept. 21, 2010) (Chevron's allegations are "quickly spiraling out of control").
[6] *E.g. Id.*; *Chevron Corp. v. Berlinger*, 629 F.3d 297 (2d Cir. 2011); *Ecuadorian Plaintiffs v. Chevron Corp.*, 619 F.3d 373 (5th Cir. 2010); *In re Chevron Corp. (Calmbacher)*, No. 1:10-MI-0076-TWT-GGB, 2010 U.S. Dist. LEXIS 114724 (N.D. Ga. Mar. 2, 2010); *In re Chevron Corp. (Scardina)*, No. 7:10-mc-00067, 2010 U.S. Dist. LEXIS 125174 (W.D. Va. Nov. 24, 2010); *Chevron Corp. v. E-Tech Int'l*, No. 10cv1146-IEG (WMc), 2010 U.S. Dist. LEXIS 94396 (S.D. Ca. Sept. 10, 2010); *In re Chevron Corp. (Bonifaz)*, 762 F. Supp.2d 242 (D. Mass. 2010); *In re Chevron Corp. (Quarles)*, No. 3:10-cv-00686, 2010 U.S. Dist. LEXIS 120798 (M.D. Tenn. Aug. 17, 2010); *Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-cv-00047-MSK-MEH, 2010 U.S. Dist. LEXIS 110023 (D. Colo. Oct. 1, 2010); *In re Chevron Corp. (Rourke)*, 753 F.Supp. 2d 536 (D. Md. 2010); *Chevron Corp. v. Shefftz*, 754 F.Supp. 2d 254 (D. Mass. 2010); *In re Chevron Corp. (Donziger)*, 749 F.Supp.2d 141 (S.D.N.Y. 2010), *aff'd.* 409 Fed. Appx. 393 (2d Cir. 2010); *Chevron Corp. v. Champ*, No. 1:10mc 27, 2010 U.S. Dist. LEXIS 97440 (W.D.N.C. Aug. 28, 2010).
[7] *In re Chevron Corp.*, Order, No. 1:10-mc-00002-LAK (S.D.N.Y Jan. 21, 2011).
[8] *In re Chevron Corp.*, Order, No. 1:10-mc-00002-LAK (S.D.N.Y Jan. 13, 2011).
[9] Patrick Radden Keefe, *Reversal of Fortune*, The New Yorker (Jan. 9, 2012).
[10] Chevron seeks a cutoff date of February 14, 2011 for some requests, and a cutoff date of July 10, 2012 for requests 4, 11, 13, and 14. Ex. N ¶5.

5

1  Salazar-Lopez at AW's office in San Francisco. Salazar-Lopez Decl.¶¶ 5-9. Ms. Salazar-Lopez is neither
2  an officer nor director of AW, *id.* ¶3; Soltani Decl. ¶¶5-6, and did not consider herself authorized to
3  accept the subpoena at the time. Salazar-Lopez Decl. ¶¶4, 8. AW's counsel disputed that service was
4  valid, Simons Decl. ¶¶ 6-7; apparently recognizing that service had not been effected, Chevron
5  continued its service attempts. *See* Ex. A.[11] A process server again visited AW's office on December 5,
6  2012. Paz y Miño Decl. ¶ 6. Then, on December 7, 2012, the process server visited the house of AW's
7  Operations Director Paul Paz y Miño and told him that he was served. *Id.* ¶ 7. At this point, AW
8  offered to accept service as of that day, in order to moot the dispute and avoid "wasting resources on
9  service of process fights." Simons Decl. ¶ 7; Ex. B. Counsel for AW spoke via telephone with Mark
10 Doerr, counsel for Chevron, and counsel expressly agreed to accept service of the subpoena as of that
11 date, and confirmed this agreement by email. Simons Decl. ¶¶ 6-10; Ex. C; Ex. D.

12 **D. The meet and confer process**

13     Through January 8, 2013, counsel engaged in a meet and confer process and, although reaching
14 an impasse on certain issues, continued to make meaningful progress on a number of important issues.
15 Ex. F; Ex. G; Ex. H; Ex. I; Ex. J; Ex. K; Ex. L; Ex. M; Ex. N; Ex. O. On January 8, AW received an
16 email from Ethan Dettmer, counsel for Chevron, extending the return date to January 24, 2013. Ex. P.
17 That same day, AW learned that Judge Kaplan had set December 1, 2012, as the cutoff date for service
18 of document requests and that Chevron had taken the position that this applied to third-party
19 document subpoenas. Ex. CC at n.45; Ex. DD at n.8. Since counsel for Chevron had previously agreed
20 to December 7, 2012, as the date of service, AW believed the subpoena was void. This was confirmed
21 by a protective order issued by Judge Kaplan on January 23, 2013. Ex. T.

22     Efforts to meet and confer were thus put on hold until Judge Kaplan reconsidered his order
23 with respect to AW and reinstated the subpoena, only six days ago, on February 19, 2013. Ex. X. At
24 that time, AW sought to re-open the meet and confer process, Ex. Z, but Chevron refused, and
25 instead insisted that AW produce documents or else file this Motion by Monday, February 25, 2013 –
26 only three business days later. Simons Decl. ¶¶ 35, 37-39, 45; Ex. W; Ex. Y. Contrary to Chevron's

28 [11] Unless otherwise specified, the cited exhibits are attached to the Declaration of Marco Simons.

6

1  claim that AW had refused to produce documents, Simons Decl. ¶ 39; Ex. T; Ex. U., AW had in fact

2  indicated it was willing to begin rolling production, if and when Chevron presented a proposal. Simons

3  Decl. ¶¶ 39-40, 43; Ex. M; Ex. N; Ex. O; Ex. Z. Rather than presenting a proposal, Chevron instead

4  decided to abandon the meet and confer process. Because Chevron would not agree to continue

5  meeting and conferring, AW was given no choice but to move the Court for relief before Chevron's

6  newly imposed February 25, 2013, return date, a date that was never agreed to. Simons Decl. ¶¶ 38, 41-

7  45; Ex. Y; Ex. Z. This was so even though AW's lead counsel, Richard Herz, with whom Chevron had

8  been meeting and conferring, is on a previously scheduled family vacation. Simons Decl. ¶¶ 12-13, 32.

9  When AW requested that Chevron extend the return date by four days to allow Mr. Herz to meet and

10  confer after his vacation, Chevron refused.[12] Simons Decl. ¶¶ 39-40, 43; Ex. Y; Ex. Z.

11  **III.   ARGUMENT**

12  The subpoena here was not properly served before the applicable deadline. Furthermore, a

13  court must quash a subpoena that requires "disclosure of privileged or other protected matter" or that

14  "subjects a person to undue burden." F.R.C.P. 45(c)(3)(A)(iii), (iv). The subpoena here fails in both

15  respects. First, it seeks internal campaign and other information that is clearly protected by the First

16  Amendment, as well as confidential business information. Second, although the subpoena would be

17  burdensome under any standard, Chevron cannot meet Rule 45, which imposes a higher standard on

18  parties serving subpoenas on non-parties.

19  **A.   The meet and confer process has not concluded.**

20  AW and Chevron were in the midst of a meet and confer process, and close to concluding it,

21  when Chevron aborted that process due to motion practice over this and other subpoenas in the

22  underlying case. Those motions resulted in this subpoena being invalidated, and then revived. Upon its

23  revival, Chevron demanded immediate production of documents and refused to continue meeting and

24  conferring. Chevron's counsel took the position that the meet and confer process had led to impasse

25

26  [12] Chevron's counsel also has refused to provide any time accommodation to AW with respect to a
new deposition subpoena issued to AW on February 12, 2013, noticing a deposition on February 26,

27  2013; Chevron's counsel similarly refused an extension to allow Mr. Herz to meet and confer over the
deposition subpoena, and has not responded to AW's substantive objections to the subpoena, forcing

28  AW to seek more time from the Court. Simons Decl. ¶¶ 29-32; Ex. U; Ex. V.

7

1    on "most issues" – but not all. Ex. Y; *see also* Ex. W. After identifying the outstanding issues, AW

2    requested an additional four days to conclude this process, but Chevron refused. Simons Decl. ¶¶ 39-

3    40, 43, 47; Ex. Z; Ex. W.

4    **B. The subpoena is invalid due to improper service.**

5    The operative deadline for service of document subpoenas in the underlying litigation is

6    December 1, 2012. Ex. BB ¶ 2(b). The subpoena is therefore invalid because it was not properly

7    served before this date, and in any case because the December 7, 2012, agreement as to service

8    superseded any prior service attempts.

9    Judge Kaplan adopted Chevron's own argument that the December 1 deadline for document

10   requests applied to third parties.[13] Ex.CC at n.45; Ex. DD at n.8; Ex. BB ¶ 2(b). The subpoena was not

11   validly served before this date. Ms. Salazar-Lopez is neither "an officer, a managing or general agent,

12   [nor an] agent authorized by appointment or by law" to accept service on behalf of AW. Fed R. Civ. P.

13   4(h)(1)(B); *see also* Cal. Code of Civ. P. § 416.40. Therefore, the "burden is on [Chevron] to

14   demonstrate effective service." *Audio Toys, Inc. v. Smart AV Pty Ltd.*, 2007 WL 1655793 (N.D. Cal. June

15   7, 2007); since it has not done so, service on Ms. Salazar-Lopez was not effective.

16   Service is improper where an individual lacks "sufficient authority to accept personal service on

17   behalf of her company" and informs the process server that she is not a designated agent for service.

18   *NGV Gaming, Ltd. v. Upstream Point Molate, LLC*, 2009 WL 4258550, at *3 (N.D. Cal. Nov. 24, 2009)

19   (citing *Direct Mail Specialists Inc. v. Eclat Computerized Techs., Inc.*, 840 F.2d 685, 688 (9th Cir. 1988)). "The

20   determination of whether an individual holds sufficient authority within a corporation is a factual

21   question." *Id.* at *2-3. Ms. Salazar-Lopez is not an officer,[14] Salazar-Lopez Decl. ¶ 3, and has never

22   represented to anyone that she has the authority to sign legal documents; *id.* ¶¶ 4, 8; although AW has

23

24   [13] Chevron chose not to inform AW of the Court's order or its own contradictory positions before the court, *see* Ex. Q, all the while pushing AW to turn over documents immediately, presumably before

25   AW could learn the subpoena was out of time. AW did not even learn of the Order, or Chevron's position, until January 8, 2013.

26   [14] Ms. Salazar-Lopez is AW's Program Director. Although her position has the word "director" in it, half of AW's staff have the title of director, which does not indicate authority to sign for legal

27   documents. Soltani Decl. ¶ 9; Soltani Decl. Ex. A (bylaws). "Ms. Salazar-Lopez is not authorized to sign legal papers or accept legal documents on behalf of [AW]" nor is she authorized to sign checks or

28   sign contracts on behalf of AW. Soltani Decl. ¶¶ 6-7.

8

1    been represented by counsel for years, Ms. Salazar-Lopez has never been among the AW staff

2    interacting with legal counsel. *Id.* ¶ 10; Simons Decl. ¶ 3; Soltani Decl. ¶ 10. *See Chapman v. U.S.*

3    *E.E.O.C.*, 2008 WL 782599, at \*3 (N.D. Cal. Mar. 24, 2008) (finding insufficient service when plaintiff

4    served defendant's employee who later declared she was unauthorized to receive process). Moreover,

5    Chevron's repeated attempts to serve the subpoena *after* the purported service, Simons Decl. ¶¶ 4-5;

6    Paz y Miño Decl. ¶¶ 6-7, belie their claims that Salazar-Lopez was authorized to accept service. *See, e.g.,*

7    *Bender v. Nat'l Semiconductor Corp.*, 2009 WL 2912522, at \*3 (N.D. Cal. Sept. 9, 2009) (finding "first

8    attempt" a major factor in determining plaintiff did not effect proper service).

9        The Court need not wade into this difficult service of process fight, however, because counsel

10   came to an agreement to avoid just such a fight, agreeing that service would be effective on December

11   7. Chevron now claims that it never agreed to the December 7 date, *see e.g.* Ex. R, but has never

12   presented evidence to dispute AW's counsel's account. Because Chevron did in fact agree – to avoid a

13   dispute over the validity of its initial service attempts – its belated claim that the original service was

14   valid is moot. Chevron may now regret that it previously agreed to the December 7 service date, but

15   that does not permit Chevron to vitiate its bargain. *See e.g., In re Bristol-Myers Squibb Securities Litig.,* 205

16   F.R.D. 437, 44 (D.N.J. 2002) (stressing in enforcing discovery costs agreement that "[i]t is essential to

17   our system of justice that lawyers and litigants, above all, abide by their agreements.").

18   **C. The subpoena violates Amazon Watch's First Amendment rights.**

19        Even if service were timely, the subpoena should be quashed because it violates AW's First

20   Amendment rights to free speech and association. Chevron seeks to compel disclosure of the internal

21   workings of one of its most vocal critics, chilling advocacy and political speech about environmental

22   damage, as well as the associational rights of AW, its partners, and supporters.

23       **1. Chevron must justify impairment of Amazon Watch's rights.**

24        Discovery requests may violate the First Amendment if disclosure of the requested

25   information could deter the exercise of protected activities. *Perry,* 591 F.3d at 1139. Requests that

26   infringe First Amendment rights of expression and association are subject to heightened discovery

27   standards. *Id.* at 1144.

28        The First Amendment protects the freedom to associate and express views as a group, because

9

1    "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is

2    undeniably enhanced by group association[.]" *NAACP v. Alabama*, 357 U.S. 449, 460 (1958). These

3    protections "extend[] not only to the organization itself, but also to its staff, members, contributors,

4    and others who affiliate with it." *Int'l Union v. Nat'l Right to Work Legal Defense and Ed. Found., Inc.*, 590

5    F.2d 1139, 1147 (D.C. Cir. 1978). The First Amendment protects precisely the advocacy, protests, and

6    other campaign activities organized and carried out by AW.

7         A party seeking discovery that implicates First Amendment rights must show that (1) the

8    "information sought is *highly relevant* to the claims or defenses in the litigation," (2) the request is

9    "carefully tailored to avoid unnecessary interference with protected activities," and, (3) the information

10   sought is "otherwise unavailable." *Perry*, 591 F.3d at 1141 (emphasis added).

11        To claim First Amendment privilege, the movant must make a "prima facie showing of arguable

12   first amendment infringement." *Id.* at 1140 (quotations omitted). The burden then shifts to the

13   requesting party to show that the discovery is "the least restrictive means of obtaining the desired

14   information," *id.* (internal quotations omitted), and to "'demonstrate[] an interest in obtaining the

15   disclosures . . . sufficient to justify the deterrent effect . . . on the free exercise . . . of [the]

16   constitutionally protected right of association.'" *Id.* (quoting *NAACP v. Alabama*, 357 U.S. at 463).

17        **2. Amazon Watch has made a prima facie showing that the subpoena would**
             **violate its First Amendment rights and chill its expressive activities.**
18

19        Compelled disclosure of non-public documents pertaining to advocacy campaigns, including

20   the internal communications of core members of that campaign, implicate a broad range of First

21   Amendment protections, including freedom of speech and expressive association. Requiring an

22   advocacy organization to hand over to the target of its campaign activities documents concerning its

23   campaign strategies, partnerships, and contributors would be justified only in exceptional

24   circumstances simply not present in this case.

25        To establish a prima face case, the moving party must show that enforcement of the discovery

26   request could result in "(1) harassment, membership withdrawal, or discouragement of new members,

27   or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members'

28   associational rights." *Perry*, 591 F.3d at 1140 (internal quotation marks omitted). The existence of a

10

MOTION TO QUASH

1    prima facie case "turns not on the type of information sought, but on whether disclosure of the

2    information will have a deterrent effect on the exercise of protected activities." *Id.* at 1141. The

3    standard is not onerous: the objecting party need only show that "disclosure *could* have a chilling effect

4    on protected activities." *Id.* at 1143 (emphasis added). AW has done so here.

5              *a. Disclosure of campaign communications, strategies, and tactics would chill
              the exercise of protected rights by Amazon Watch, its staff, and its
6              partners.*

7

8    Chevron demands that AW disclose internal campaign communications and advocacy

9    strategies to its political opponent.[15] Request 17 seeks "[a]ll documents concerning any protests, rallies,

10   marches, demonstrations, petitions, or similar events," and Request 18 demands "[a]ll documents

11   concerning any activities organized, created, or held on social media[.]" Ex. E. Request 8 seeks all

12   documents concerning six major advocacy campaigns. *Id.* These disclosures would chill the exercise of

13   core First Amendment rights. Requests 1-3, 5-7, 15, and 21-23 implicate similar concerns. *Id.*

14   Compelled disclosure of internal campaign communications can chill protected activities by

15   deterring participation in current and future advocacy campaigns, and deterring "the free flow of

16   information within campaigns." *Perry,* 591 F.3d at 1141-42. The right to associate with others to

17   advance shared beliefs includes "the right to exchange ideas and formulate strategy and messages, and

18   to do so in private[,]" and "[c]ompelling disclosure of internal campaign communications can chill the

19   exercise of these rights." *Id.* at 1142. If these documents are disclosed, it will infringe on AW's First

20   Amendment rights in at least four ways.

21   First, it would chill AW staff and constituent participation in advocacy campaigns. Many of

22   AW's campaigns "share a common strategy blueprint[,]" Paz y Miño Decl. ¶ 21, which if revealed,

23   "would . . . divulge [AW's] campaign playbook to those it is trying to influence, greatly compromising

24   the effective execution of [AW's] strategy." *Id.* ¶ 23. Disclosure, particularly to those about whom AW

25   has raised the strongest criticism, would put at risk not only AW's campaigns, but also the safety of its

26   staff, *id.* ¶ 23; *see also* Koenig Decl. ¶ ¶ 9-12, 15, 16, particularly "when traveling in foreign countries by

27   ---
     [15] To avoid the harms from revealing protected information to a political opponent, AW proposed a
     protective order under which disclosures would not be distributed beyond Chevron's outside counsel,
28   at least until they were introduced as relevant evidence in the litigation. *See* Ex. K; Ex. M. Chevron
     refused, Ex. N ¶ 6, belying any claim that it seeks these disclosures solely for litigation purposes.
                                                    11

1    revealing the how, when, where, and what [AW] does, to governments (many of whom are the targets

2    of its campaigns) and third-party actors with questionable human rights records in often lawless

3    areas[,]" Paz y Miño Decl. ¶ 22; *see also id.* ¶ 39; Koenig Decl. ¶ 15. The possibility that information

4    given to AW could be turned over to Chevron would also deter communities with whom AW works

5    from "sharing information with [AW], and even . . . from speaking up and denouncing rights abuses in

6    the first place." Paz y Miño Decl. ¶ 25.

7         Second, disclosure of communications and strategy would deter the free flow of information

8    within AW campaigns. *See Perry,* 591 F.3d at 1142. It would "severely chill the debate and the exchange

9    of information on the industrial threats to the Amazon and human rights abuses often associated with

10   said threats." Paz y Miño Decl. ¶ 21. Disclosure would also restrict "the open, free communication and

11   exchange of ideas" among staff, *id.* ¶¶ 26, 38, and "severely limit [their] ability to speak out and educate

12   the general public about Amazon issues as per [their] mission." Koenig Decl. ¶ 14.

13        Third, Chevron's demand for campaign communications with other advocacy groups and

14   activists, *see e.g.* Ex. E, Request 7, would infringe AW's associational rights. The First Amendment

15   privilege extends to communications formulating strategy and message among "core persons" engaged

16   in an advocacy campaign, *Perry,* 591 F.3d at 1144 n.12, "whether or not they are members of a single

17   organization or entity." *Perry v. Schwarzenegger,* 602 F.3d 976, 981 (9th Cir. 2010) ("*Perry II*"); *accord*

18   *Wyoming, v. U.S.D.A.,* 208 F.R.D. 449, 455 (D.D.C. 2002).[16]

19

20   [16] AW's collaboration with some in the core groups is public knowledge; for others, it is not public.
     Chevron has nonetheless demanded a list of each individual. Ex. M; Ex. N ¶ 1. But disclosing those

21   identities to Chevron would infringe some of the very First Amendment rights AW seeks to protect.
     *See e.g. NAACP v. Alabama,* 357 U.S. at 462 ("[C]ompelled disclosure of affiliation with groups engaged

22   in advocacy may constitute [an] effective ... restraint on freedom of association."); *Gibson v. Fla. Legisl.
     Investigation Comm.,* 372 U.S. 539, 544 (1963) (right of association includes protection of privacy of

23   association). Unlike Chevron, AW does not read *Perry II* to require AW to renounce some First

24   Amendment protections in order to vindicate others. *See* 602 F.3d at 981 (party claiming the First
     Amendment privilege need only provide sufficient information "from which a functional

25   interpretation of [an inter-organizational] core group . . . [can] be derived."); *see also Perry,* 591 F.3d at
     1144, n.12 (finding redaction of names may be required even for communications outside the

26   privilege). AW therefore offered to identify categories of persons within the core group, which should
     be sufficient under the circumstances. *See* Ex K; Ex.M; *Compare with Perry v. Schwarzenegger,* 602 F.3d

27   976, 981 (9th Cir. 2010) (upholding magistrate's focus on individuals on the grounds that the parties
     opposing discovery had provided "no suggestion concerning how the court should implement... [a]

28   functional approach and in any event failed to furnish . . . information from which a functional

                                        12

1    Revealing AW's communications with partner advocacy groups and activists "would open up

2    private strategy discussions, donor information, even internal disagreements that could be unfairly

3    exploited" by those AW's advocacy campaigns have targeted. Paz y Miño Decl. ¶ 26. Such disclosure

4    would infringe the First Amendment rights of AW and its partners by discouraging current and future

5    participation in campaigns, and deterring "open, free communication and exchange of ideas" between

6    AW and its partners, *id.*; *see also* Koenig Decl. ¶ 14.

7    Fourth, the disclosure Chevron seeks would reveal AW's activities and strategies to its political

8    opponent, thereby frustrating its policy goals and giving Chevron an unfair advantage. *See Perry,* 591

9    F.3d at 1142 n.10 (citing *AFL-CIO v. FEC,* 333 F.3d 168, 176-77 (D.C. Cir. 2003); *In re Motor Fuel*

10   *Temp. Sales Practices Litig.,* 258 F.R.D. 407, 415 (D. Kan. 2010)). These concerns are precisely why

11   "[c]ourts have held that the threat to First Amendment rights may be more severe in discovery than in

12   other areas because a party may try to gain advantage by probing into areas an individual or a group

13   wants to keep confidential." *Wyoming,* 208 F.R.D. at 454.

14
                    *b.  Compelled disclosure of funders, contributors, and other supporters would*
15                  *harm Amazon Watch.*

16   The disclosures sought would further stifle protected activities because the subpoena seeks

17   documents pertaining to financial support to AW. *See especially* Ex. E., Requests 1-3 & 15.[17] The First

18   Amendment protects organizations against compelled disclosure of their contributors and sources of

19   funding. *See e.g., Brown v. Socialist Workers '74 Campaign Comm.,* 459 U.S. 87, 95 (1982); *Int'l Union,* 590

20   F.2d at 1147. Nonprofit advocacy organizations like AW depend on contributions from individuals

21
     interpretation of the core group . . . could be derived"). AW was prepared to disclose categories of

22   persons with Chevron once counsel came to an agreement on the most appropriate way to protect that
     information. But Chevron had not yet agreed to an appropriate protective order during the meet and

23   confer, Ex. N, and ended the meet and confer process before this issue could be resolved. AW is
     willing to continue meeting and conferring with Chevron in order to provide this list by category.

24   Should the Court conclude that AW is required to submit a list of individuals by name, AW
     respectfully submits that the Court should review such list *in camera.*

25   [17] Although Chevron indicated it may no longer seek the identities of *all* of AW's donors and potential

26   donors, and that it might consider accepting redactions, Chevron never followed up about its position
     when asked for clarification, and, in any event, still demands a wide range of confidential

27   communications with and information about AW donors. Thus Chevron's requests continue to
     unreasonably infringe First Amendment protections, *see* Ex. M; Ex. N; Ex. O, but the meet and confer

28   process as to this issue never concluded.

                                                13
                                        MOTION TO QUASH

1   and organizations that may wish to remain anonymous. *See* Miño Decl. ¶ 29-30. Courts have thus

2   recognized that disclosure of contributors' names could chill support. *See e.g., Eilers v. Palmer,* 575 F.

3   Supp. 1259, 1261 (D. Minn. 1983); *F.E.C. v. Hall-Tyner Elec. Campaign Comm.,* 678 F.2d 416, 420 (2d

4   Cir. 1982). This is simply another means of "compelled disclosure of affiliation with groups engaged in

5   advocacy[,]" which "may constitute [an] effective . . . restraint on freedom of association[.]'" *Black*

6   *Panther Party v. Smith,* 661 F.2d 1243, 1265 (D.C. Cir. 1981); *see also F.E.C. v. Larouche Campaign,* 817

7   F.2d 233, 234-35 (2d Cir. 1987).

8       Disclosure of AW's communications with and information about its donors would likely cause

9   many current supporters to "cease to donate to or fund" AW and chill future financial support for

10  AW. Paz y Miño Decl. ¶ 32. Such an impact on funding "could be fatal to . . . the organization as a

11  whole." *Id.* ¶ 43. Furthermore, because AW uses Chevron's involvement in Ecuador as a "case study"

12  and an example in many campaigns, *id.* ¶ 16, the request for all communications that "discuss" the

13  underlying litigations, *see* Ex. N ¶ 1, would include the vast majority of AW's donor communications

14  concerning the majority of its campaigns. The impact that such disclosure would have on funding

15  would be particularly damaging to AW's Chevron Ecuador campaign, which has been less popular and

16  uncertain in terms of funding, but is nevertheless critical to AW's mission. Paz y Miño Decl. ¶ 43.

17      AW also depends on supporters who contribute to its campaigns in other critical, non-

18  monetary ways, such as petitions and online actions. *Id.* ¶¶ 33-34. Since 2002, AW has collected over

19  100,000 signatures in petitions and online actions related to Chevron. *Id.* ¶ 34. Many ask that their

20  contact information be kept private. *Id.* ¶ 33. If they knew their support might become public, or

21  known to Chevron, this would "significantly reduce the number of people who support [AW's]

22  campaigns and take action." *Id.* ¶ 35. Notably, AW's petitions and actions have been joined by some of

23  Chevron's own employees who "would not want their identities to be revealed to their employer, and

24  would withdraw, or rethink future support, if they knew their support could become known." *Id.*

25              *c.   Amazon Watch and its supporters have experienced harassment and will*
26              *likely be subjected to further harassment should its information be*
                *revealed.*

27      AW staff, donors, and ally organizations, as well as communities with which AW works, have

28  already been harassed by Chevron. *See* Paz y Miño Decl. ¶¶ 36, 40, 41; Koenig Decl. ¶¶ 9-12, 14, 16.

14

MOTION TO QUASH

1     Indeed, AW staff already feel that they are "living and working under Chevron's microscope." *Id.* ¶ 14.

2     The forced disclosure to Chevron of AW's internal, non-public documents and strategy information

3     would only increase Chevron's ability to continue to harass and intimidate AW and its supporters, Paz

4     y Miño Decl. ¶¶ 37, 40, 41; Koenig Decl. ¶¶ 16, and potentially be used against AW in an effort to

5     restrict its ability to obtain funding, Paz y Miño Decl. ¶ 42.

6
7
### 3. Chevron cannot meet its high burden of demonstrating a need that is sufficiently compelling to justify the deterrent effect on Amazon Watch's First Amendment rights.

8     Chevron cannot show that its request meets First Amendment strict scrutiny. *See Perry,* 591 F.3d

9     at 1144. The Court must balance the "burdens imposed on individuals and associations against the . . .

10     interest in disclosure" to determine whether the latter "outweighs the harm" to the organization's

11     associational rights. *Id.* at 1140. A request is proper only if:

12
13
14
> the information sought is *highly relevant* to the claims or defenses in the litigation – a more demanding standard of relevance than that under Federal Rule of Civil Procedure 26(b)(1). . . . [and is] carefully tailored to avoid unnecessary interference with protected activities, and the information must be otherwise unavailable.

15     *Id.* at 1141 (emphasis added). Chevron can show none of these things.

16
#### *a. The information sought is not highly relevant.*

17     Chevron asserts the information it seeks from AW is relevant to claims against the defendants

18     based on its allegation that AW participated in a conspiracy. But Chevron expressly refuses to provide

19     any evidence, Simons Decl. ¶46-47; Ex. J at ¶7; Ex. K; Ex. M; Ex. Y; it appears to believe that by

20     simply alleging that AW conspired, the protections of the First Amendment cease to apply. *See* Simons

21     Decl. ¶ 46-47; Ex. H ¶2; Ex. I; Ex. J ¶7; Ex. Y.[18] Absent such evidence, there is no basis for a finding

22     that the discovery is highly relevant. "Mere speculation that information might be useful will not

23     suffice" to make the information sufficiently relevant. *Black Panther Party,* 661 F.2d at 1268.

24     Furthermore, Chevron has substantially changed its position in the underlying action since

25     issuing this subpoena; it no longer argues that the underlying claims in the Ecuador litigation were

26
27
28     [18] Should Chevron seek to introduce any such evidence now, AW respectfully submits that the meet and confer process was not done in good faith.

... 

1    fraudulent, nor does it deny that Chevron was responsible for toxic pollution in the region.[19] Ex. EE.

2    In light of this position, it is difficult to see how information about AW's campaigns drawing attention

3    to oil pollution in Ecuador is within the scope of relevant discovery, let alone *highly* relevant. At the

4    very least, it undercuts Chevron's claim that AW is somehow a "co-conspirator." Chevron has refused

5    to meet and confer on the implications of this shift, and continued to refuse to demonstrate any

6    evidence of wrongdoing on the part of AW, Simons Decl. ¶¶ 46-67; Ex. Z; Ex. Y. Instead, Chevron

7    merely asserts, without any basis, that AW's participation in wrongful conduct is "fact." Ex. Y.

8
### *b. The requests are not tailored to avoid unnecessary interference with protected activity.*
9

10   Chevron has not tailored the subpoena to avoid infringing AW's First Amendment rights. On

11   the contrary, it asserted that the First Amendment does not apply, and that therefore it had no

12   obligation to limit the First Amendment impact of producing documents concerning the organization's

13   main advocacy campaigns. *See* Ex. H ¶¶ 1, 5; Ex. J; Ex. M. Chevron indiscriminately seeks material

14   covering all activities of the organization remotely touching on Chevron in Ecuador without any

15   reasonable tailoring – including all documents concerning six major AW advocacy campaigns, *see* Ex.

16   E, Request 7, and all documents "concerning any protests, rallies, marches, demonstrations, petitions,

17   or other similar events" relating to Chevron, *id.,* Request 17, without any effort to avoid interfering

18   with First Amendment-protected activities. The subpoena is far from the least restrictive means of

19   obtaining the information and would impermissibly burden AW's rights.

20
### *c. Much of the information sought is available from other sources.*

21   The party seeking discovery must show that the information requested is otherwise unavailable.

22   *Perry,* 591 F.3d at 1144-45 (plaintiffs did not show sufficient need to justify intrusion on First

23   Amendment interests where information sought was available from other sources); *Int'l Action Ctr. v.*

24   ───────────────────────────────
[19] In his January 8, 2013, Order, Judge Kaplan quoted Chevron's filings stating its position with respect
25   to the "sham" allegations, stating in relevant part: "Chevron's case is not about whether there is any
     good-faith dispute among scientists about environmental conditions in the Oriente, or TexPet's
26   operations there. . . . Chevron does not intend here to relitigate the environmental conditions existing
     in the Oriente or the relative, substantive merit of the scientists' expert opinions on that subject." Ex.
27   EE. In his January 23, 2013 protective order, Judge Kaplan ordered limits on some of the subpoenas
     based on the relevance of the material in light of the January 8 Order regarding the "sham litigation,"
28   Ex. T, and those implications should apply with equal force here.

1    *United States,* 207 F.R.D. 1, 3-4 (D.D.C. 2002)(First Amendment precluded discovery of information

2    regarding plaintiffs' political activities and affiliates where defendant did not show relevance or that it

3    had pursued alternative sources). Chevron likely already has obtained much of the requested

4    information through discovery from defendants. *See supra* Part II.B. For example, Requests 7 seeks

5    "[a]ll communications with" any of the Lago Agrio plaintiffs, RICO defendants, and alleged co-

6    conspirators, among others, concerning Chevron or the litigations. Ex. E. Similarly, Requests 9-13, 16,

7    and 19-20, are likely either already in Chevron's possession or available to Chevron from a more

8    appropriate source, including defendants. *Id.* Indeed, except for noting that internal AW

9    communications (whose relevance is questionable at best) can only be obtained from AW, Chevron

10   has ignored AW's repeated requests that it meet its initial burden by identifying the categories of

11   documents it seeks that are otherwise unavailable. In fact, Chevron denied any responsibility to limit its

12   requests from a non-party in such a way. *See* Ex J ¶6; Ex. M; *see also infra* Part III.E.1. Nor could it meet

13   its burden if it had tried. AW is not a defendant; the information most relevant to the liability of the

14   *defendants* is discoverable from other sources.[20]

15

16       Chevron cannot establish that the information sought is highly relevant, it has not tailored its

17   requests to avoid unnecessary interference with protected activities, and it has refused to show that the

18   information is otherwise unavailable to it. Chevron has not met its burden of demonstrating a

19   sufficiently compelling need to infringe AW's First Amendment rights.

20       **D. The requests call for protected attorney-client documents and work product.**

21       As drafted, Chevron's requests seek AW's communications with its own counsel.[21] During the

22   meet and confer process, counsel had begun to discuss whether a privilege log was required and the

23   mechanics for creating such a log. Because Chevron terminated the meet and confer process, *see supra*

24   ───────────────────────────────

25   [20] Given that Chevron's argument is that AW was part of a conspiracy spearheaded by others, it cannot
     show that internal AW communications are highly relevant. This is particularly true in light of its new
     position regarding the "sham litigation" allegations. Ex. EE.

26   [21] For example, Request 7 seeks all communications with "LAGO AGRIO PLAINTIFF LAW
     FIRMS," which is defined to include law firms that provide services to alleged "CO-

27   CONSPIRATORS," which in turn is defined to include AW. Ex. E. Request 8, which calls for "all
     documents" concerning six different campaigns, *id.,* is similarly problematic; it is not uncommon for

28   AW to seek legal advice regarding its campaign activities.

                                        17

1     Part II.D, AW seeks the Court's protection should Chevron truly insist upon disclosure of AW's

2     communications with its counsel, or, in the alternative, an order to continue conferring.

3     **E. The subpoena would subject Amazon Watch to an undue burden.**

4     Throughout the meet and confer process, AW vigorously challenged the burden presented by

5     Chevron's subpoena. Now that Chevron has terminated that process before meaningful agreement

6     could be reached to limit the burden of this subpoena, *see supra* Part II.D, AW is left with little choice

7     but to seek relief from this Court.

8     Rule 45 explicitly provides for discovery limitations in cases such as this. F.R.C.P. 45(c)(3)(A).

9     District courts have "ample discretion" to quash or modify subpoenas causing "undue burden." *Exxon*

10     *Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 779 (9th Cir. 1994). A court determining the

11     appropriateness of a subpoena "balances the relevance of the discovery sought, the requesting party's

12     need, and the potential hardship to the party subject to the subpoena." *Gonzales v. Google, Inc.*, 234

13     F.R.D. 674, 680 (N.D. Cal. 2006). A court considers "the breadth of the document request, the time

14     period covered by it, the particularity with which the documents are described and the burden

15     imposed." *Moon v. SCP Pool Corp.*, 232 F.R.D 633, 637 (C.D. Cal. 2005) (internal citations omitted).

16     None of these considerations weighs in favor of Chevron.

17     Indeed, courts afford special protections to non-parties like AW since they "are powerless to

18     control the scope of litigation and discovery, and should not be forced to subsidize an unreasonable

19     share of the costs of litigation." *United States v. C.B.S., Inc.,* 666 F.2d 364, 371-72 (9th Cir. 1982)

20     (footnotes omitted); *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 09-CV-01967 CW

21     NC, 2012 WL 4846522 (N.D. Cal. 2012); *see also Chevron Corp. v. Salazar,* No. 11-cv-0691 LAK, 2011

22     WL 7112979, at *3-4 (D. Or. 2011). This is especially true where, as here, the party seeking discovery

23     refuses to show that it sought and failed to obtain the documents from the defendants. *Soto v. Castlerock*

24     *Farming & Transp., Inc.,* 282 F.R.D. 492, 505 (E.D. Cal. 2012); *see also supra* Parts II.B.; III.C.3.c.

25     **1. Chevron has not shown that the documents are unavailable elsewhere.**

26     A court must limit discovery if it "can be obtained from some other source that is more

27     convenient, less burdensome, or less expensive[.]" F.R.C.P. 26(b)(2)(C); *accord Black Panther Party,* 661

28     F.2d at 1268 ("Even when the information sought is crucial to a litigant's case, disclosure should be

18

1  compelled only after the litigant has shown that he has exhausted every reasonable alternative source

2  of information."). In particular, Chevron must show it attempted and could not obtain the documents

3  from the defendants. *Nidec Corp. v. Victor Co. of Japan,* 249 F.R.D. 575, 577 (N.D. Cal. 2007); *Soto,* 282

4  F.R.D. at 505; *Moon,* 232 F.R.D at 637-8.

5      As noted above, Chevron refused to describe the categories of documents it has obtained or

6  unsuccessfully attempted to obtain from defendants or others. Thus, for all documents other than

7  AW's internal communications, Chevron simply has not met its burden. As noted above, Chevron

8  seeks many documents – Requests 7, 9-13, 16 and 19-20, Ex. E – that are likely either already in their

9  possession or are available to Chevron from a more appropriate source, including defendants.

10          **2. The time period is overbroad.**

11      A subpoena that is not limited by reasonable time restrictions is overbroad. *Williams v. City of*

12  *Dallas,* 178 F.R.D. 103, 110 (N.D. Tex. 1998); *Moon v. SCP Pool Corp.,* 232 F.R.D. 633, 638 (C.D. Cal.

13  2005). Chevron's subpoena seeks documents for a period of eight to nearly ten years. Courts have

14  considered similar discovery periods to be overbroad when not justified. *See In re NCAA.,* 2012 U.S.

15  Dist. LEXIS 24347 at 15; *Moon,* 232 F.R.D. at 638. Such timeframes are particularly excessive when

16  imposed upon a non-party. *Heidelberg Americas, Inc. v. Tokyo Kikai Seisakusho, Ltd.,* 333 F.3d 38, 41-42

17  (1st Cir. 2003). And this timeframe is unjustified here; Chevron cannot demonstrate a need for

18  information from prior to the fall of 2004 – the earliest date at which Chevron alleges *any* fraud

19  occurred – or subsequent to the filing date of the underlying litigation in February 2011. Moreover,

20  Chevron has not provided AW with sufficient information to determine if the July 10, 2012, cutoff it

21  seeks for certain documents is consistent even with Chevron's obligations in the underlying litigation.

22  AW is therefore unable to determine whether Chevron seeks to impose a greater burden on non-party

23  AW than is required of itself.[22]

24          **3. The requests are overbroad, vague and seek irrelevant information.**

25      A subpoena is likewise overbroad when it is not limited "by particular documentary

26

27  _____
   [22] During the meet and confer, Chevron's only proposal was to narrow the cutoff date to February 14,
28  2011, for most requests (still a period of more than eight years), and to narrow the cutoff date to July
   10, 2012, for Requests 4, 11, 13, and 14 (still a period of nearly ten years). Ex. N ¶5.

1  descriptions." *Williams*, 178 F.R.D. at 110. Chevron has made little effort to tailor its requests to the

2  claims set forth in the underlying litigation or to provide clear definitions delimiting the universe of

3  information it seeks. The subpoena makes twenty-five separate document requests to AW, spanning a

4  period of eight to nearly ten years. *See* Ex. E. Taken together, the requests seek, or would require AW

5  to review, virtually every "document" in AW's possession that has anything to do with Chevron's

6  activities in Ecuador.[23] Moreover, the requests call for a large volume of material that might relate to

7  Chevron's activities in Ecuador but that would have little relevance to the underlying litigation – *e.g.*,

8  internal AW communications about clean water initiatives for the affected communities, discussions of

9  drafts for AW's website that were never discussed with anyone outside the organization, and material

10 for other campaigns that happen to use the Chevron litigation as a case study. Paz y Miño Decl. ¶ 16.

11     Chevron's overbroad definitions also make identifying responsive documents an enormously

12 burdensome task. For example, Request 21 calls for "[a]ll communications with stock market analysts,

13 investment professionals, energy industry analysts, journalists, or any MEDIA professional or

14 organization concerning the CHEVRON LITIGATIONS[.]" Ex. E. Without any guidance on the

15 meaning of "journalists" or "investment professionals," the request is excessively burdensome. There

16 is simply no way to identify individual emails with "journalists," other than by reviewing *every single*

17 *communication* regarding the litigations covered by Chevron's broad definition of "CHEVRON

18 LITIGATIONS," which themselves are similarly unsearchable by keyword.

19     Chevron's definitions are also similarly troublesome. For example, Definition 33 defines

20 "LAGO AGRIO PLAINTIFF ACTIVISTS" as any persons who "plan, organize, fund, or carry out

21 protests, rallies, MEDIA events, campaigns, or other activities intended to promote awareness of the

22 LAGO AGRIO LITIGATION and related issues." *Id.* This definition casts such a wide net that it

23 could potentially encompass anyone who posts a link about the Lago Agrio litigation on Facebook.[24]

24 In turn, any communications by such "activists" that were posted on websites to which AW also

25

26 [23]At AW's request, Chevron clarified that the requests concerning "CHEVRON or the CHEVRON
   LITIGATIONS," may be read as "CHEVRON LITIGATIONS." Ex. N ¶ 8. But "Chevron

27 Litigations" are defined broadly, and it is not clear what search terms could be used to locate such
   documents, or the extent to which Chevron expects AW to review documents that do not contain

28 certain search terms.
   [24] It would also include the undersigned counsel, who has blogged about the RICO lawsuit.

1  happens to contribute would be included per Request 23.[25] AW repeatedly asked Chevron to clarify

2  this particular definition. Chevron refused. Ex. N ¶ 8.[26]

3      Likewise, Requests 5, 8, 18, and 21-23 would require AW to canvass all of its emails and

4  documents related to topics such as shareholder advocacy, at least six distinct campaigns, all social

5  media postings, communications with "media," and communications with other NGOs, that relate to

6  the Chevron Litigations. Ex. E. For at least six staff members, this would likely require they review,

7  document-by-document, their entire hard drives and email archives. Paz y Miño Decl. ¶ 45.

8          **4. The burden imposed upon Amazon Watch is not justified.**

9      The protections due AW as a non-party weigh heavily against Chevron in a burden analysis.

10  *High Tech Medical Instrumentation, Inc. v. New Image Industries, Inc.,* 161 F.R.D. 86, 88 (N.D. Cal.1995)

11  (awarding sanctions against party who failed to avoid burden to non-party). Courts are "particularly

12  concerned any time enforcement of a subpoena imposes an economic burden on a non-party."

13  *Gonzales,* 234 F.R.D at 683. Underlying the protections of Rule 45 is the recognition that "the word

14  non-party serves as a constant reminder of the reasons for the limitations that characterize third-party

15  discovery." *Id.* at 680.

16          *a. Producing the requested documents requires significant time and resources.*

17      The breadth of the subpoena would require AW's staff and counsel to spend thousands of

18  hours to search for, review, and produce hundreds of thousands of pages of documents and

19  Electronically Stored Information (ESI). During initial scans,[27] AW found that the universe of

20  potentially responsive documents includes 46,878 documents and files, more than 32,727 emails,

21  fourteen boxes of papers and additional hard drives that contained at least five terabytes of data. Paz y

22  _____

23  [25] During the meet and confer process, Chevron defended this lack of definition for "Lago Agrio
   Activists" against AW's protest that it could potentially "encompass anyone who re-tweets information

24  about activities intended to promote awareness of the Lago Agrio Litigation" by stating that this
   concern was "theoretical" since AW was "only required to produce documents within its possession,

25  custody, or control." Ex. N ¶ 8. But under Chevron's definition, AW would need to hand over its *own*
   communications with these "Activists," so broadly defined, or even materials AW posts on websites

26  where these "Activists" also happen to post anything related to the Chevron Litigations. Chevron has
   not explained the relevance of such communications, nor how it expects AW to search for them.

27  [26] *See supra* n. 23, for discussion of Chevron's proposed limitation to "Chevron Litigations."

28  [27] These scans were conducted using the keywords "Chevron" or "Trillium" or "Cabrera" or "Frente
   "or "cvx" or "Selva Viva." Paz y Miño Decl. ¶ 46.

21

1      Miño Decl. ¶¶ 47-49. These totals do not include older computers and hard drives no longer in use

2      that contain an unknown quantity of related files and other back-ups of older systems on spindles of

3      CDs in AW's Malibu office, which could not be reviewed in the time available. *Id.* ¶ 50.

4          Even assuming that it would take AW staff just thirty seconds to a minute to review each

5      potentially responsive email, one minute to review each potentially responsive document, ten minutes

6      to review each potentially responsive electronically stored file, and five hours to review each storage

7      box, AW staff would spend *at least* 5,000[28] hours reviewing documents potentially responsive to just a

8      handful of the many terms sought by Chevron. Precisely because Chevron's subpoena fails to

9      meaningfully define key terms such as "journalist," it would be necessary to review each document

10     page-by-page or email-by-email. AW estimates that actually producing these documents would, in turn,

11     take up to six months. Paz y Miño Decl. ¶ 44. This would be an enormous burden on a nonprofit with

12     only twelve staff members. *Id.* ¶ 9. Much of AW's work would come to a virtual standstill as staff

13     diverted time from their usual duties. Chevron surely must do more to justify making such a

14     burdensome request of a non-party.

15          ***b. Chevron has not taken reasonable steps to avoid undue burden on Amazon Watch.***

16      A party issuing a subpoena "must take reasonable steps to avoid imposing undue burden or

17     expense on a person subject to the subpoena." F.R.C.P. 45(c)(1); *High Tech Med. Instrumentation, Inc.,*

18     161 F.R.D. at 88. Far from seeking to avoid undue burden, Chevron has embraced the extreme

19     breadth of its requests and largely disavowed its duty to narrow the timeframe of the requests or

20     provide clearer definitions for key terms. When Chevron did propose a few modest limitations to the

21     subpoena, it only narrowed the overbroad ten-year timeframe by a few months for some requests and

22     by one year for the remainder. *See supra* n.22. Chevron's proposed narrowed definitions were similarly

23     unhelpful. *See supra* n.23. This was hardly a reasonable effort.

24         **F. Chevron improperly seeks confidential commercial information.**

25      The Court may quash a subpoena that calls for confidential research, development or

26     commercial information. F.R.C.P. 45(c)(3)(B); *Moon,* 232 F.R.D. at 637. Important proprietary

27

28     [28] Calculations were made assuming that half of the nearly 50,000 potentially responsive documents and/or files were documents and half were files.

1   information is "information that the nonparty has historically sought to maintain confidential." *AFMS*

2   *LLC v. UPS*, 2012 U.S. Dist. LEXIS 106925, *9 (S.D. Cal. July 27, 2012). Important proprietary

3   information need not be commercial in the strict sense; the protection also applies to the benefit of

4   nonprofit organizations. *Klay v. All Defendants*, 425 F.3d 977 (11th Cir. 2005) (reports of the American

5   Medical Association); *In re Silicone Gel Breast Implants Products Liability Litig.*, No. 92-P-10000S, 1996 WL

6   1358526 (N.D. Ala. 1996) (reports from the Nurses Health Study research project funded primarily by

7   the National Institutes of Health).

8       Courts recognize that "information may be subject to protection from discovery because of its

9   commercial value" where (1) dissemination of confidential information will place a non-party at a

10  competitive disadvantage, (2) "the producing party has accumulated [the information] through its own

11  time and effort" and therefore "it is unjust to require a party to turn over the fruit of its labor in

12  discovery without receiving adequate compensation," or (3) "where the dissemination of that

13  information will damage the producing party's business in some way other than providing a competitor

14  with an advantage." *Cohen v. City of New York*, 255 F.R.D. 110, 118-19 (S.D.N.Y. 2008) (discussing

15  enforcement of subpoena issued to both the National Lawyer's Guild and a primarily volunteer-run

16  activist film organization). Were this subpoena enforced, AW would suffer injuries in all three respects.

17  Requests 1-3, 5-8, 12, and 15-24, Ex. E, call for the disclosure of confidential campaign blueprints,

18  strategies, tactics, work plans, and relationships with anonymous donors that AW takes pain to keep

19  confidential. *See e.g.*, Paz y Miño Decl. ¶ 21, 22, 24, 31.

20      AW would be placed at a competitive disadvantage if forced to directly disclose its confidential

21  campaign blueprint to a frequent target of its campaigns. Courts "presume[] that disclosure to a

22  competitor is more harmful than disclosure to a noncompetitor." *Falicia v. Advanced Tenant Servs.*, 235

23  F.R.D. 5, 7 (D.D.C. 2006) (citations omitted). Disclosure to Chevron would unfairly disadvantage

24  AW's advocacy by divulging private strategy discussions, donor information, and even internal

25  disagreements that Chevron could exploit. Paz y Miño Decl. ¶ 26.[29]

26

27  [29] While Chevron may not be a "competitor" in the economic sense, it competes directly with AW in
28  the marketplace of ideas – both are trying to convince the public, media and policymakers of their
    opposing points of view.

1    AW could also suffer substantial economic loss if Chevron gained the confidential business

2    information sought in Requests 1-3, 5-8, 12 and 15-24, Ex E. As a nonprofit organization dependent

3    on the goodwill of donors who support only those organizations that they believe to be both effective

4    and meritorious, and to whom they can donate in privacy, AW could potentially suffer yearly losses of

5    many thousands of dollars. For an organization with net assets of $608,274, this loss would be more

6    than burdensome.[30]

7    AW would also suffer a loss of goodwill. Courts may quash a subpoena when it seeks

8    confidential information that would impair a business's goodwill. *Gonzales,* 234 F.R.D. at 674.

9    Communities confide in AW to advocate for their cause. Disclosure of confidential information would

10   dissuade them from sharing information with AW, and even "from speaking up and denouncing

11   human rights abuses in the first place[,]" Paz y Miño Decl. ¶ 25, imperiling AW's core mission to bring

12   attention to human rights abuses and to help communities seek justice.

13   Once the non-party shows that the requested information is confidential commercial

14   information, the burden shifts to the requesting party to show a "substantial need . . . that cannot be

15   otherwise met without undue hardship and assures that the person to whom the subpoena is addressed

16   will be reasonably compensated." *Gonzales,* 234 F.R.D. at 684. Chevron can show no such need here.

17   **G. Chevron should cover the reasonable costs of production.**

18   If AW is required to comply with any part of the subpoena, Chevron should cover the costs of

19   doing so. "Although party witnesses must generally bear the burden of discovery costs, the rationale

20   for the general rule is inapplicable where the discovery demands are made on non-parties." *C.B.S., Inc.,*

21   666 F.2d at 371; *Compaq Computer Corp.*, 163 F.R.D. at 339. AW is a nonprofit advocacy organization

22   with twelve staff members, a shoestring budget, and no in-house counsel. The subpoena will cause

23   AW to incur significant expense. *See supra* Part III.E.4.a. And, given AW's limited financial resources,

24   costs should be provided in the interim; Rule 45 has been used "to require interim reimbursement and

25   reimbursement of costs at the conclusion of discovery." *C.B.S., Inc.,* 666 F.2d at 368.

26

27   [30] In 2011, AW had a total income of $2,109,598, total expenses of $1,957,597 and net assets of
$608,274. Paz y Miño Decl. ¶ 28. About thirty-five percent of AW's income comes from individual
28   donors; some of whom wish to remain anonymous, and about sixty-five percent of AW's income
comes from foundations, several of which require anonymity in their grant agreements. *Id.* ¶ 29, 30.

1   **H. If documents must be revealed, a robust protective order is warranted.**

2        Courts may "issue an order to protect a . . . person from . . . undue burden," including

3   "requiring that a trade secret or other confidential research, development or commercial information

4   not be revealed or be revealed only in a specified way." *Kilopass Tech. Inc. v. Sidense Corp.*, C 10-02066 SI,

5   2011 WL 2470493 (N.D. Cal. June 21, 2011). Protective orders can be appropriate to prevent

6   annoyance, embarrassment, oppression, undue burden or expense. *See Auto-Owners Ins. Co. v. Southeast*

7   *Floating Docks, Inc.* 231 F.R.D. 426, 428 (M.D. Fla. 2005). Because Chevron seeks from a non-party

8   information protected by the First Amendment, as well as confidential business information, AW

9   respectfully requests an order from the Court that any documents AW may be commanded to produce

10  be handled confidentially, and not be distributed beyond Chevron's outside counsel, at least until

11  Chevron makes a showing that they are needed as exhibits in the litigation. This is necessary because

12  Chevron seeks the internal strategies of campaigns that were directed against it, and whose efficacy

13  would be impaired by disclosure of internal discussions.[31]

14  **IV. CONCLUSION**

15       For the foregoing reasons, the December 7, 2012, subpoena should be quashed in its entirety.

16  DATED: February 25, 2013                    Respectfully submitted,

17                                               EARTHRIGHTS INTERNATIONAL

18

19                                               Marco Simons
20                                               marco@earthrights.org
                                                 Richard Herz
21                                               rick@earthrights.org
                                                 Michelle C. Harrison
22                                               michelle@earthrights.org
                                                 Marissa A. Vahlsing
23                                               marissa@earthrights.org
                                                 1612 K Street NW, Suite 401
24                                               Washington, DC 20006
                                                 Telephone: (202) 466-5188
25                                               Facsimile: (202) 466-5189

26                                               *Counsel For Non-Party Amazon Watch*

27

28  _____
    [31] The protective order applicable to third parties in the underlying litigation would be insufficient for
    AW's needs as it does not address First Amendment protections, among other things. Ex. FF.

25

MOTION TO QUASH