ETHAN D. DETTMER, SBN 196046
  edettmer@gibsondunn.com
ENRIQUE A. MONAGAS, SBN 239087
  emonagas@gibsondunn.com
AIMEE M. HALBERT, SBN 279144
  ahalbert@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, California 94105-0921
Telephone: 415.393.8200
Facsimile:  415.393.8306

*Attorneys for Plaintiff Chevron Corporation*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CHEVRON CORPORATION,<br><br>               Plaintiff,<br><br>    v.<br><br>STEVEN DONZIGER, *et al.*,<br><br>               Defendants. | Case No. 3:13-mc-80038-CRB<br><br>**CHEVRON CORPORATION'S REPLY IN SUPPORT OF ITS MOTION TO TRANSFER** |

1
2

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

3    I.    INTRODUCTION ............................................................................................. 1

4    II.   BACKGROUND ............................................................................................... 1

5    III.  ARGUMENT .................................................................................................... 5

6         A.   This Court Has The Discretion To Transfer This Action To Judge Kaplan. ................ 5

7         B.   Judge Kaplan Is Steeped In The Facts Of This Complex Case And Thus Better
8              Situated To Resolve This Discovery Dispute. ............................................ 7

9         C.   Amazon Watch Already Has Appeared Before Judge Kaplan Regarding This
          Subpoena. .............................................................................................. 9

10   IV.   CONCLUSION ................................................................................................ 10

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

CHEVRON'S REPLY IN SUPPORT OF ITS MOTION TO TRANSFER                    NO. 3:13-MC-80038-CRB

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Bank of Tex. v. Computer Statistics, Inc.*,
   60 F.R.D. 43 (S.D. Tex. 1973) ................................................................................................. 5

*Cent. States, Se. & Sw. Areas Pension Fund v. Quickie Transp. Co.*,
   174 F.R.D. 50 (E.D. Pa. 1997) ............................................................................................ 5, 8

*Devlin v. Transp. Commc'ns Int'l Union*,
   2000 WL 249286 (S.D.N.Y. Mar. 6, 2000) ............................................................................ 6

*Global Dev. Strategies, Inc. v. Mobile Motion, Inc.*,
   2011 WL 1899792 (E.D. Cal. May 19, 2011) ................................................................. 6, 7, 8

*Hartford Fire Ins. Co. v. Evergreen Org., Inc.*,
   410 F. Supp. 2d 180 (S.D.N.Y. 2006) ................................................................................... 10

*Heroic Era, Ltd. v. Evony, LLC*,
   2011 WL 308468 (W.D. Wash. Jan. 27, 2011) ....................................................................... 8

*In re Digital Equip. Corp.*,
   949 F.2d 228 (8th Cir. 1991) ................................................................................................... 7

*In re Gell*,
   2010 WL 4942215 (2d Cir. Dec. 7, 2010) .............................................................................. 9

*In re MTBE Prods. Liab. Litig.*,
   269 F.R.D. 360 (S.D.N.Y. 2010) ............................................................................................ 6

*In re Sealed Case*,
   141 F.3d 337 (D.C. Cir. 1998) ................................................................................................ 7

*In re Subpoena to Schneider Nat'l Bulk Carriers*, *Inc.*,
   918 F. Supp. 272 (E.D. Wis. 1996) ........................................................................................ 8

*Io Grp. v. J.W.*,
   2011 WL 237673 (N.D. Cal. Jan 24, 2011) ............................................................................ 6

*Io Grp., Inc. v. Does 1-19*,
   2010 WL 5071605 (N.D. Cal. Dec. 7, 2010) .......................................................................... 6

*Marine Midland Trust Co. v. Irving Trust Co.*,
   56 F.2d 385 (S.D.N.Y. 1932) ............................................................................................... 10

*Petersen v. Douglas Cnty. Bank & Trust Co.*,
   940 F.2d 1389 (10th Cir. 1991) ........................................................................................... 6, 7

*SEC v. CMKM Diamonds, Inc.*,
   656 F.3d 829 (9th Cir. 2011) ................................................................................................... 7

*Socialist Workers Party v. Att'y Gen.*,
   73 F.R.D. 699 (D. Md. 1977) ................................................................................................... 6

Gibson, Dunn & Crutcher LLP

*United States v. Cameron Constr. Co.*,
246 F. Supp. 869 (S.D.N.Y. 1965)............................................................................ 10

*United States v. Star Scientific, Inc.*,
205 F. Supp. 2d 482 (D. Md. 2002) ....................................................................... 6, 9

*Wells v. GC Servs., LP*,
2007 WL 1068222 (N.D. Cal. Apr. 10, 2007) ....................................................... 5, 6

**Statutes**

28 U.S.C. § 1404(a) ...................................................................................................... 5

**Other Authorities**

9A Wright & Miller, Fed. Prac. & Proc. § 2463.1 ....................................................... 6

**Rules**

Fed. R. Civ. P. 26(c)(1) ......................................................................................... 1, 5, 6

Gibson, Dunn &
Crutcher LLP

CHEVRON'S REPLY IN SUPPORT OF ITS MOTION TO TRANSFER                    NO. 3:13-MC-80038-CRB

## I.      INTRODUCTION

In 2006, the Executive Director of Amazon Watch ("AW"), Atossa Soltani, asked in a videotaped meeting with Steven Donziger whether the videotape could be subpoenaed, and expressed her concern that "it's illegal to conspire to break the law." Dettmer Decl. Ex. 5 at 2.  Nevertheless, AW continued to do Donziger's bidding as a "critical" player in this long-running conspiracy. *Id.* Ex. 13 at 2.  AW's current efforts to avoid discovery are consistent both with Soltani's expressed concern in 2006, and with what Judge Kaplan has described as Donziger's and his other allies' "resist[ing] discovery to an astonishing degree." *See* Dkt. 14, Ex. 22 at 1.  Because of his great familiarity with the record and the players in this long-running conspiracy, and because of his expressed willingness to resolve discovery disputes regarding this subpoena, Chevron seeks to transfer this miscellaneous action to Judge Kaplan in the interest of judicial economy. *See id.*, Ex. 3 at 2; *see also id.* Ex. 20.

AW's legal arguments are erroneous.  There is no question that this action "might have been brought" before Judge Kaplan, since the Federal Rules expressly provide that AW could have sought the same relief there. *See* Fed. R. Civ. P. 26(c)(1).  In fact, AW already has appeared before Judge Kaplan to litigate the merits of legal issues and seek affirmative relief related to this subpoena, without raising any jurisdictional or "hardship" objection.  Judge Kaplan's familiarity with the extensive evidentiary record and the subpoena at issue means he can more easily rule on this matter quickly.  This is a significant consideration for Chevron given that the close of discovery in the underlying action is less than three months away.  Requiring this Court to familiarize itself with the record in the underlying action (including several thousand exhibits and a docket containing over 880 entries) and consider the same issues already decided by Judge Kaplan would not further judicial economy or the efficient resolution of this matter.

## II.      BACKGROUND

AW's portrayal of its involvement in the conspiracy demonstrates why familiarity with the record is important to efficient and expeditious determination of this discovery dispute.  AW says its involvement is political advocacy, protected by the First Amendment (Dkt. 37 at 2-5), rather than the "critical" player in the Lago Agrio Plaintiffs' ("LAPs") extortionate pressure campaign that the evidence submitted in the Southern District of New York shows it was.

Gibson, Dunn &
Crutcher LLP

CHEVRON'S REPLY IN SUPPORT OF ITS MOTION TO TRANSFER                    NO. 3:13-MC-80038-CRB

Judge Kaplan's management of this case—including more than 200 substantive orders—means that he already knows the record and the relevant actors in this conspiracy, and can efficiently assess AW's claims. This is particularly important because, consistent with its allies' tactics and as described below, AW misleads to avoid producing relevant evidence. *See, e.g.,* Dkt. 14, Ex. 22 at 1 ("Defendants and/or their allies have resisted discovery to an astonishing degree . . . ."); Dettmer Decl. Ex. 1 at 1 (appointing special masters to oversee discovery because "the Donziger Defendants, and their Ecuadorian allies have been remarkably obstructive" by "utterly refus[ing] to comply with court orders" and "[t]he likelihood of further attempts to preclude or disrupt discovery is palpable").

AW's efforts to distance itself from Donziger and his other allies' wrongdoing are based on falsehoods. As background, Judge Kaplan recently noted that he had "concluded, on a record less complete than now is before [him], that there was no genuine issue of fact as to at least the following:

- Donziger and Fajardo, the LAPs' principal Ecuadorian lawyer, coerced an Ecuadorian judge to (1) terminate the judicial inspections that previously had been ordered, (2) substitute a single global inspection to determine the extent of the alleged environmental damage, and (3) select a 'global expert' chosen by the LAPs, Richard Cabrera, to conduct it. They did so by threatening the judge with the filing of a misconduct complaint if he failed to comply with their wishes.

- The report that Cabrera ultimately rendered: 'was not entirely or even predominantly his own work or that of any assistants or consultants working only for him. There is no genuine issue with respect to the facts that the LAP team secretly prepared his work plan, worked closely with him in carrying it out, and drafted most of the report and its annexes.… This uncontradicted evidence demonstrates that the report and subsequent responses filed in Cabrera's name were tainted by fraud.'"[1]

Dettmer Decl. Ex. 2 at 9-10. Although AW claims it is not a participant in the extortion scheme because it "has never 'submitted any evidence or findings to the court' and it has never 'assist[ed] the

---

[1]   Judge Kaplan also noted his earlier holding that there is no genuine issue of material fact that "[p]ortions of the judgment, which supposedly had been written by Judge Zambrano [the judge overseeing the Ecuadorian litigation], in fact were substantially identical to an internal memo prepared for the LAPs that was not part of the Ecuadorian court record." Dettmer Decl. Ex. 2 at 10; *see id.* Ex. 3 at 57:22-24 ("Chevron has shown to anyone with common sense that this is a blatant cut and paste exercise."). This was before Chevron introduced a declaration from a former Ecuadorian judge (and corroborating evidence) that Donziger and his cohorts "bribed the judge who signed the Ecuadorian Judgment to obtain their desired result and, in fact, supplied him with the decision, which the LAPs had written in all important respects." *Id.* Ex. 2 at 5. Finally, in answer to AW's question about whether the Ecuadorian appellate court "was part of the 'conspiracy' too?" (Dkt. 37 at 3 n.3): the evidence shows that it was. *See* Dkt. 14, Ex. 1 at ¶ 327.

CHEVRON'S REPLY IN SUPPORT OF ITS MOTION TO TRANSFER          NO. 3:13-MC-80038-CRB

court appointed expert in preparing his submissions to the court" (Dkt. 37 at 3-4), AW was a knowing participant in the LAPs' wrongdoing, and in the plan to pressure the judge to appoint the corrupt court "expert," Cabrera.

In June 2006, Soltani had a videotaped meeting in Ecuador with Kevin Koenig, AW's Ecuador Program Coordinator, Donziger, and an Ecuadorian representative of the LAPs.  During that meeting, Donziger discussed raising a "private army" to "send a message to the court . . . , 'don't f[**]k with us anymore—not now, and not—not later, and never.'"  Dettmer Decl. Ex. 4.[2]  Soltani asked, "[d]o you guys know if anybody can, uh, subpoena these videos?"  *Id*. Ex. 5.  Donziger said, "[w]e don't have the power of subpoena in Ecuador," and Soltani asked, "[w]hat about U.S.?"  *Id*.  She noted, "I just want you to know that it's—it's illegal to conspire to break the law."  *Id*.

About a year after this videotaped meeting, Donziger e-mailed AW employees after the Lago Agrio court swore in the corrupt global "expert," saying:  "The perito [Cabrera] got sworn in after all those visits to the court."  Dkt. 14, Ex. 15.  Congratulating AW, Donziger said "that visit to the judge last week was a huge help."  *Id*.  AW's former Associate Director Jennifer Ciplet replied:  "YAY!  Guess getting smooched by the smarmy judge was worth it."  *Id*., Ex. 16.  AW claims that its "huge help" in getting Cabrera appointed was unremarkable because "both sides" were permitted to meet with judges.  Dkt. 37 at 5.  But the LAPs' *ex parte* meetings were part of a concerted effort to "control the court, to pressure the court" to have Cabrera appointed.  Dettmer Decl. Ex. 4; *id*. Ex. 2 at 20.  Donziger said these efforts worked because the judge "never would have [appointed Cabrera] had we not really pushed him."  *Id*. Ex. 6.  AW was part of this effort.[3]

AW further denies that it acted at Donziger's direction, quoting Soltani's sworn statement that AW "'explicitly decided not to use [the discredited "30 times the Exxon Valdez" figure] after the first quarter of 2006.'"[4]  Dkt. 37 at 4.  But that figure is cited on AW's website *today*.  *Id*. Ex. 7.  It is also

---

[2]  This video, along with others memorializing the fraud, is publicly available on Chevron's website, at http://www.chevron.com/ecuador/videos/?videoId=EcuadorBreakLaw.

[3]  AW says that Ms. Ciplet's comments referred to a common greeting in Ecuador.  Dkt. 37 at 4.  But the e-mail in question is clear that "getting smooched" was "worth it" because it helped achieve the conspirators' plan of having the corrupt "expert" appointed by the Ecuadorian court.

[4]  AW's claim that Powers' testimony "affirmed" this figure (Dkt. 37 at 5) is false.  Powers' testimony regards "production water," which is essentially salt water, and comparing it to crude oil is,

*(Cont'd on next page)*

on the AW-run Chevroninecuador.com website *today*.[5] *See id.* Exs. 8, 9. Soltani also admits that the false and disavowed $6 billion figure is still on AW's website. Dkt. 37, Soltani Decl. ¶¶ 23-24, 27.[6] And the SEC letters that Soltani signed and AW claims were part of its "good faith advocacy" were mostly written by Donziger, and contain knowing falsehoods. Dkt. 14, Ex. 14 (Donziger to AW: "I think u should [send] the SEC letter in ASAP, making that slight change that another report will be coming with a multi-billion damage figure, without disavowing or mentioning Russell's report.").[7]

AW nevertheless claims it is "merely exercis[ing] its First Amendment right," "based on extensive evidence and first hand experience" in the Amazon. Dkt. 37 at 1. But AW points to no legitimate "evidence," and it is undisputed that Donziger and his cohorts had to fabricate "evidence," and the judgment itself, in order to "prove" Chevron's responsibility for contamination in Ecuador. None of the AW declarants say they have any scientific expertise, but simply say they have observed pollution in the area. But even the LAPs' own lawyers have recognized that the Ecuadorian state oil company, Petroecuador, is responsible for the pollution in the Oriente. Dettmer Decl. Ex. 10 at 77 (LAPs' counsel admits that "Petro[ecuador] has inflicted more damage and many more disasters than Texaco itself . . . [b]ut since it's a state-owned company, since it's the same people involved in the laws and all, no one says a thing"); *see also id.* Ex. 11 (Soltani acknowledges that Petroecuador is responsible for continuing contamination, but says Chevron should be held liable because it purportedly "designed [the] system"); Dkt. 14 Ex. 1 at ¶¶ 61-62 (the LAPs agreed not to pursue claims against Petroecuador in exchange for the government's support of their lawsuit).

---

*(Cont'd from previous page)*

in the words of one of Donziger's other consultants, comparing "apples and oranges." Dettmer Decl. Ex. 20.
[5] AW claims its websites are "jointly managed" with the Amazon Defense Front ("ADF"), and therefore it did not control the websites' content. Dkt. 37, Soltani Decl. ¶ 21. While AW is the "registrant" for this website, this joint management further proves AW's enmeshment with the LAPs and Donziger, as the ADF is controlled by Donziger and his Ecuadorian agents. *See, e.g.,* Dettmer Decl. Ex. 2 at 7 n.23 (noting that RICO Defendant Luis Yanza is a co-founder of the ADF). In any event, the article featuring the statistic was written by Han Shan, coordinator of AW's Clean Up Ecuador Campaign. And an article on Amazonwatch.org itself refers to the statistic. *See id.* Ex. 7.
[6] *See, e.g.,* http://amazonwatch.org/news/2005/0128-in-historic-6-billion-case-chevrontexaco-resorts-to (last visited Mar. 6, 2013).
[7] The February 28, 2006 letter that Soltani signed and Donziger largely drafted did not mention Russell's repudiated report, but it attached and incorporated the earlier letter, which did. Dkt. 14, Ex. 12.

Gibson, Dunn & Crutcher LLP

4

Finally, AW was paid for its participation in the scheme, receiving not only Donziger's payments for "propaganda," but also more than $184,000 from the law firm of Joseph Kohn, who funded the LAPs—payments which Kohn said "launched [AW's] involvement in the case." Dettmer Decl. Ex. 12 at 1. AW's cooperation with the LAPs is ongoing. Chevron recently learned that AW improperly obtained Chevron's confidential, litigation work product from "an anonymous source," and rather than inform Chevron or return the materials, AW gave the videos to the LAPs' lead Ecuadorian counsel. *See id.* Exs. 14, 15.

### III.     ARGUMENT

**A.     This Court Has The Discretion To Transfer This Action To Judge Kaplan.**

Courts have held that motions to transfer discovery disputes from the issuing court to the court presiding over the underlying action "are governed by the 'convenience of parties and witnesses' and 'interest of justice' standard of 28 U.S.C. § 1404(a)." *Cent. States, Se. & Sw. Areas Pension Fund v. Quickie Transp. Co.*, 174 F.R.D. 50, 52 n.4 (E.D. Pa. 1997) (citing *Bank of Tex. v. Computer Statistics, Inc.*, 60 F.R.D. 43, 45 (S.D. Tex. 1973)). Section 1404(a) provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it *might* have been brought." 28 U.S.C. § 1404(a) (emphasis added).

AW could have sought the same relief from Judge Kaplan that is seeks here, and therefore this miscellaneous action "might have been brought" there.[8] *See* Fed. R. Civ. P. 26(c)(1) ("A party or any person from whom discovery is sought may move for a protective order in the court where the action is pending[.]"); *see also, e.g.*, *Wells v. GC Servs., LP*, No. 06-cv-3511, 2007 WL 1068222, at *1 (N.D. Cal. Apr. 10, 2007) (noting that, as the court presiding over the underlying action, it "could properly address a motion for a protective order" and "has the right to define the scope of discovery"). AW's motion to quash seeks the same relief as a motion for a protective order; indeed, the Advisory Committee Notes to Rule 45 "instruct courts that Rule 45(c)(3) [governing motions to

---

[8] Chevron seeks to transfer this entire miscellaneous action to Judge Kaplan, including AW's motion to quash the instant subpoena, Chevron's motion to enforce it, as well as all motion practice regarding the deposition subpoena Chevron issued to AW. *See* Dkt. 18 at 1 & n.2. AW's argument that only "'actions,' not motions, can be transferred" (Dkt. 37 at 9-10) is therefore irrelevant.

quash] and Rule 26(c) [governing motions for a protective order] should be read in conjunction with one another" because Rule 45(c)(3) "tracks the provisions of Rule 26(c)." *In re MTBE Prods. Liab. Litig.*, 269 F.R.D. 360, 364 n.14 (S.D.N.Y. 2010).[9]

A district court that issued a subpoena has the discretion to transfer discovery disputes to the court presiding over the underlying action even where a party "ha[s] not formally filed any motion to transfer" but has indicated its intent to transfer, or even on its own motion. *See, e.g.*, *Petersen v. Douglas Cnty. Bank & Trust Co.*, 940 F.2d 1389, 1390-92 (10th Cir. 1991) (affirming issuing court's *sua sponte* transfer "without notice to [the non-party] or a hearing" where it "determined that the [presiding court] more properly understood the issues of the case and could therefore rule more intelligently on a motion to quash or for a protective order"); *Socialist Workers Party v. Att'y Gen.*, 73 F.R.D. 699, 699-700 (D. Md. 1977). Courts addressing the relationship of third-party subpoenas to the underlying action have explained that an "ancillary discovery proceeding is, by its very terms, an extension of the underlying proceeding and the subject matter jurisdiction of the ancillary proceeding is derived from the jurisdiction in the underlying case." *United States v. Star Scientific, Inc.*, 205 F. Supp. 2d 482, 486 (D. Md. 2002) (quotation marks and citation omitted). Thus, it "is within the discretion of the court that issued the subpoena to transfer motions involving the subpoena to the district in which the action is pending." 9A Wright & Miller, Fed. Prac. & Proc. § 2463.1.[10]

Unlike other Courts of Appeals, "the Ninth Circuit has not decided whether Rule 45 motions may be transferred." *Global Dev. Strategies, Inc. v. Mobile Motion, Inc.*, No. 11-mc-0038, 2011 WL 1899792, at *2 (E.D. Cal. May 19, 2011). The Ninth Circuit case that AW claims "rules out a section

---

[9]   The court in *Io Grp. v. J.W.* noted that even where a motion to quash is improperly brought in the first instance before the court presiding over the underlying litigation as opposed to the issuing court, "at least two courts in this district have cured [this] procedural defect by treating a motion to quash as a motion for a protective order," which the presiding court "can properly address pursuant to Federal Rule of Civil Procedure 26(c)(1)." No. 10-cv-5821, 2011 WL 237673, at *2 (N.D. Cal. Jan 24, 2011) (citing *Wells*, 2007 WL 106822; *Io Grp., Inc. v. Does 1-19*, No. 10-cv-3851, 2010 WL 5071605 (N.D. Cal. Dec. 7, 2010)). In *Wells*, for example, the court "deem[ed] plaintiff's motion to be a motion for a protective order" in order to address it on the merits. 2007 WL 1068222, at *1.

[10]   *See, e.g.*, *Devlin v. Transp. Commc'ns Int'l Union*, No. 95-cv-0742, 2000 WL 249286, *1 (S.D.N.Y. Mar. 6, 2000) ("There is substantial support in the caselaw, among the commentators, and in the Advisory Committee Note to Rule 26(c) of the Federal Rules of Civil Procedure for the proposition that the court from which a subpoena has issued has the authority to transfer any motion to quash or for a protective order to the court in which the action is pending.").

Gibson, Dunn & Crutcher LLP

1404(a) transfer" (Dkt. 37 at 8) does not address transfer at all, holding only that Rule 45 motions must be brought in the first instance to the issuing court.  *SEC v. CMKM Diamonds, Inc.*, 656 F.3d 829, 831-32 (9th Cir. 2011).  Here, Chevron brought its Rule 45 motion in the first instance to the issuing court, and now seeks to transfer this entire miscellaneous action to the Southern District of New York in the interests of justice and judicial economy.  This is proper.  In fact, one of the cases cited approvingly in *CMKM* recognized that, although the issuing court "initially has exclusive jurisdiction" to entertain a Rule 45 motion, "it may in its discretion remit the matter to the court in which the action is pending."  *In re Digital Equip. Corp.*, 949 F.2d 228, 229 (8th Cir. 1991); *see also Petersen*, 940 F.2d at 1391 (holding that a transfer of discovery matters to the court presiding over the underlying case was "not improper simply because the transferred matter involved a motion to quash under Rule 45").

The other case cited in *CMKM* and upon which AW relies (Dkt. 37 at 8)—a D.C. Circuit opinion that is not controlling here—was a split opinion in which the concurring judge "stop[ped] short . . . of deciding, as does the majority, that a district court lacks authority to order a transfer."  *In re Sealed Case*, 141 F.3d 337, 343 (D.C. Cir. 1998) (Henderson, J., concurring).  In Judge Henderson's view, transfer "should be reserved for the extraordinary, complex case in which the transferee court is plainly better situated to resolve the discovery dispute."  *Id.*[11]

**B.      Judge Kaplan Is Steeped In The Facts Of This Complex Case And Thus Better Situated To Resolve This Discovery Dispute.**

Numerous district courts—including courts within the Ninth Circuit—have exercised their discretion to transfer actions involving motion practice related to Rule 45 subpoenas where, as here, the transferee court is better situated to resolve the discovery dispute.  For example, in *Global Development*, the court transferred a motion to quash subpoenas where the subpoenaed party "contend[ed] that the subpoenas violate an order issued by the" court presiding over the underlying

---

[11]  AW's claim that Chevron is "chang[ing] its arguments" (Dkt. 37 at 13) is baseless.  Chevron is replying to the arguments AW made in its opposition brief, as is appropriate in a reply brief.  The fact that Chevron sent AW a detailed letter on February 28, 2013, previewing the case law and arguments in this reply brief, only emphasizes the inappropriateness of AW's request that these arguments be "stricken" or that AW be given the right to file a surreply.  *Id.*; *see* Dettmer Decl. Ex. 16.

Gibson, Dunn &
Crutcher LLP

1  action, because that court was "better suited . . . to interpret its own orders."  2011 WL 1899792, at

2  *2-3.  Likewise here, AW continues to claim that the subpoena at issue violates Judge Kaplan's

3  scheduling order regarding discovery (*e.g.*, Dkt. 3 at 8)—ignoring that Judge Kaplan already has

4  ruled against it on this issue[12]—and Judge Kaplan is better suited than this Court to interpret his own

5  scheduling order as well as his two orders related to the subpoena at issue here.  The issuing court in

6  *Global Development* further noted that the presiding court was "the best court to determine whether

7  the information sought by the subpoenas constitutes confidential and proprietary information,"

8  because "resolution of that issue may have a significant bearing on the scope of discovery in this

9  action generally, may require weighing of the overall course and merits of the case, and may

10  ultimately affect the case's outcome."  *Id.* at *3; *see also Heroic Era, Ltd. v. Evony, LLC*, No. 2:10-

11  cv-2062, 2011 WL 308468, at *3 (W.D. Wash. Jan. 27, 2011) (transferring motion to quash to the

12  Northern District of California, where the underlying action was pending, "[b]ecause ruling on the

13  motion requires familiarity with the case as a whole" such that the Northern District was "'more

14  plainly suited' to deciding it than a court whose involvement with the case begins and ends with

15  issuing a subpoena").[13]

16      Similarly here, resolution of the various issues raised by AW—including whether and to what

17  extent the First Amendment, attorney-client privilege, or confidential business information

18  protections apply to the subpoenaed documents, whether the time period of the requests is reasonable,

19  and whether a further protective order is necessary—requires familiarity with the record, involves

---

[12]  AW's improper attempt to relitigate issues that have been decided by Judge Kaplan is further evidence of why transfer of this action is appropriate.  For example, in its motion to quash, AW argues that "[t]he subpoena is invalid because it was not properly served before [December 1, 2012], and in any case because the December 7, 2012, agreement as to service superseded any prior service attempts."  Dkt. 3 at 8.  But AW does not inform this Court that Judge Kaplan has already ruled that "[t]he undisputed evidence" demonstrates that the subpoena was timely served before December 1, 2012, and has rejected the argument that the alleged agreement by which AW would accept service as of December 7 "somehow rendered the November 28 service a nullity."  Dkt. 14, Ex. 2 at 2.

[13]  *See also, e.g.*, *Cent. States*, 174 F.R.D. at 51 (granting plaintiffs' motion to transfer where the "underlying action is factually complex, and the [transferee] court is more familiar with the issues involved," including where "the resolution of whether the crime-fraud exception to the attorney-client privilege applies would require this court to delve into the merits of the underlying action"); *In re Subpoena to Schneider Nat'l Bulk Carriers, Inc.*, 918 F. Supp. 272, 273 (E.D. Wis. 1996) ("In light of the Court's discretionary authority to transfer this matter to the court where the underlying litigation is pending, the Court believes that in the interest of uniformity and judicial economy, it is appropriate to transfer this case [to the judge] presiding over the litigation.").

1    weighing the overall course and merits of the case, and may ultimately affect the case's outcome.

2    Further, Judge Kaplan's stated willingness to decide discovery disputes related to this subpoena (Dkt.

3    14, Ex. 3 at 2) is a relevant consideration, particularly given the complexity of the underlying

4    litigation.  *See, e.g.*, *Star Scientific*, 205 F. Supp. 2d at 487-88 (transferring a motion to compel a

5    third party to produce documents not only because the underlying litigation was "complex," such that

6    the "materials submitted to [the issuing court] thus necessarily represent but one piece of a much

7    bigger puzzle," but also because the presiding court had "entered an order . . . expressing a

8    'willingness' to decide nonparty discovery disputes").

9         Given Judge Kaplan's familiarity with the extensive evidentiary record in general and with

10   this subpoena in particular, he is better suited to resolve the issues regarding this subpoena in an

11   expedited fashion.  This is an important consideration for Chevron given the fast-approaching close

12   of discovery.  Judge Kaplan is also familiar with the efforts of the RICO Defendants and their co-

13   conspirators to obstruct and delay discovery.  *See, e.g.*, Dkt. 14, Ex. 22 at 1; Dettmer Decl. Ex. 1 at 1.

14   AW's claim that counsel for Chevron stated that transfer was appropriate in part because they

15   "believed that Judge Kaplan would rule in Chevron's favor" (Dkt. 37 at 6) is false.  During the phone

16   call referred to, counsel for Chevron stated their belief that Chevron would succeed on the merits in

17   either venue, but that Judge Kaplan's familiarity with the record would allow him to reach that

18   conclusion quickly.  Dettmer Decl. ¶ 21.  Since that call, Chevron has informed AW three times in

19   writing that its representation of statements by Chevron's counsel during that call is false (*id.*; *see*

20   *also id.* Exs. 16, 17, 19), yet AW continues to make that claim here.[14]

21   **C.    Amazon Watch Already Has Appeared Before Judge Kaplan Regarding This Subpoena.**

22        AW has appeared before Judge Kaplan by submitting letter briefs and declarations that

23   litigated the merits of legal issues and sought affirmative relief related to this subpoena.  "'[A]n

24   attorney may appear on behalf of a party either by filing a formal notice of appearance or filing

25   pleadings on behalf of that party.'"  *In re Gell*, No. 07-9054-am, 2010 WL 4942215, at *3 n.3 (2d

26   Cir. Dec. 7, 2010) (quoting *Chums, Ltd. v. Always in Mind, Inc.*, 110 F.3d 67, 1997 WL 133267, at

27

28   _____
     [14]  This is the only subpoena Chevron has sought to transfer to Judge Kaplan (Dkt. 37 at 13-14)
     because this is the only subpoena that Judge Kaplan has specifically invited to be transferred.

1   *2 (9th Cir. 1997)).  For example, Judge Kaplan has applied "the familiar rule that a voluntary

2   appearance made without objection to the court's personal jurisdiction constitutes submission to

3   jurisdiction" to hold that parties "appeared by counsel in opposition to [a] motion for provisional

4   relief" where their attorney "filed an affidavit in opposition to that application" and "ma[de] no

5   objection to the Court's personal jurisdiction."  *Hartford Fire Ins. Co. v. Evergreen Org., Inc.*, 410 F.

6   Supp. 2d 180, 184 (S.D.N.Y. 2006); *see also, e.g.*, *Marine Midland Trust Co. v. Irving Trust Co.*, 56

7   F.2d 385, 387 (S.D.N.Y. 1932) (holding that a corporation's "argument to the merits" of defendant's

8   motion to join the corporation as a defendant "constituted an appearance"); *United States v. Cameron*

9   *Constr. Co.*, 246 F. Supp. 869, 871 (S.D.N.Y. 1965) ("The general rule in New York is that a party

10   submits to the jurisdiction of the court when he becomes an actor in a suit to the extent of

11   participating in the merits.").

12        AW filed two letter briefs and two sworn declarations in the underlying litigation, seeking

13   affirmative relief over this subpoena.  *See* Dkt. 14, Exs. 17, 21.  AW has thus appeared before Judge

14   Kaplan by seeking affirmative relief from that court, without objecting to its jurisdiction.  *See, e.g.*,

15   *id.* Ex. 17 at 1-2 (arguing that the subpoena was not served before December 1, 2012 and

16   "respectfully request[ing] the opportunity to brief these questions"); *id.* Ex. 21 at 1-3 (arguing the

17   merits of Chevron's motion for reconsideration of Judge Kaplan's protective order with respect to

18   this subpoena and requesting that "Chevron's Motion for Partial Reconsideration . . . be denied").

19        Given that AW has already appeared before Judge Kaplan, its claim that transfer would be

20   inconvenient (Dkt. 37 at 10) is unpersuasive.  Its counsel is located in Washington, D.C., and Richard

21   Herz—"the lead attorney representing Amazon Watch" in connection with this subpoena (Dkt. 26,

22   Simons Decl. ¶ 2)—is a member of the New York Bar and lives in driving distance to Judge Kaplan's

23   courtroom.  Dkt. 14, Ex. 18.  And AW's speculation that transfer would be inconvenient for

24   *Chevron's* counsel (Dkt. 37 at 10) is not true.

25                                    **IV.    CONCLUSION**

26        For the foregoing reasons and those stated in Chevron's Motion to Transfer, Chevron

27   respectfully requests that the Court transfer this action to the Southern District of New York, and that

28   the Court specify that the transfer be effective immediately, pursuant to Civil Local Rule 3-14.

Dated: March 6, 2013

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By:             /s/ Ethan D. Dettmer
                    Ethan D. Dettmer

*Attorneys for Plaintiff Chevron Corporation*