1  MARCO SIMONS [S.B. #237314]
2  marco@earthrights.org
   RICHARD HERZ
3  rick@earthrights.org
   MICHELLE HARRISON
4  michelle@earthrights.org
   MARISSA VAHLSING
5  marissa@earthrights.org
6  EARTHRIGHTS INTERNATIONAL
   1612 K Street, Suite 401
7  Washington, DC 20006
   Telephone: (202) 466-5188
8  Facsimile: (202) 466-5189

9  Jose Luis Fuentes
   jlf@siegelyee.com
10 Siegel & Yee
   499 14th Street Ste 300
11 Oakland, CA 94612
   Tele: (510) 839-1200
12 Facsimile: (510) 444-6698

13

14 Attorneys for Non-Party Movant Amazon Watch

15              **UNITED STATES DISTRICT COURT**

16          **FOR THE NOTHERN DISTRICT OF CALIFORNIA**

17

18                                    )  Case No. Case No. C 13-80038-MISC CRB
                                       )
19 CHEVRON CORP.,                      )  **OPPOSITION OF NON-PARTY AMAZON**
                                       )  **WATCH TO CHEVRON**
20              Plaintiff,             )  **CORPORATION'S MOTION TO**
                                       )  **ENFORCE AMAZON WATCH**
21      v.                             )  **SUBPOENA TO PRODUCE**
                                       )  **DOCUMENTS; DECLARATION OF**
22 STEVEN DONZIGER, et al.,            )  **RICHARD HERZ; DECLARATION OF**
                                       )  **ATOSSA SOLTANI; DECLARATION OF**
23              Defendants             )  **PAUL PAZ Y MIÑO; DECLARATION OF**
                                       )  **KEVIN MICHAEL KOENIG**
24                                     )
                                       )
25                                     )
                                       )
26                                     )
                                       )
27                                     )
                                       )
28                                     )

---

Case No. C 13-80038-MISC        OPPOSITION TO CHEVRON'S MOTION TO
CRB                             ENFORCE DOCUMENT SUBPOENA

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................. ii

I.   INTRODUCTION AND SUMMARY OF THE ARGUMENT ...................................... 1

II.  BACKGROUND ................................................................................................................ 3

    A.  The underlying case ................................................................................................. 3

    B.  Chevron's subpoena to Amazon Watch ................................................................. 4

    C.  The unfinished meet-and-confer process ............................................................... 4

III. ARGUMENT ...................................................................................................................... 5

    A.  Amazon Watch did not participate in a "conspiracy" by exercising its First Amendment
        rights to speak out against Chevron ...................................................................... 5

    B.  Enforcement of the subpoena would violate Amazon Watch's First Amendment rights ..... 8
        1.  *Discovery requests that infringe First Amendment rights are subject to heightened discovery standards* 9
        2.  *Disclosure would chill protected activity* ............................................................. 10
        3.  *Chevron has not, and cannot, justify the deterrent effect on First Amendment*
            *rights* ...................................................................................................................... 11

    C.  Chevron's document demands would unduly burden Amazon Watch ................. 13

        Chevron's proposed time period is unreasonable ................................................. 14

    D.  The parties have not finished conferring over the form of a privilege log ........... 14

    E.  Chevron improperly seeks confidential commercial information ......................... 14

    F.  Chevron should pay the reasonable costs of production ....................................... 15

    G.  A robust protective order is warranted if any documents are to be revealed ....... 15

IV. CONCLUSION .................................................................................................................. 16

Case No. C 13-80038-MISC CRB    OPPOSITION TO CHEVRON'S MOTION TO ENFORCE

1

## TABLE OF AUTHORITIES

2

### FEDERAL CASES

3

*AFMS LLC v. UPS,*
    No. 12cv1503 JLS, 2012 U.S. Dist. LEXIS 106925 (S.D. Cal. July 27, 2012)..........................13

4

5

*Aguinda v. Texaco, Inc.,*
    303 F.3d 470 (2d Cir. 2002) ...................................................................................................... 3 n.2

6

*Black Panther Party v. Smith,*
    661 F.2d 1243 (D.C. Cir. 1981) ........................................................................................................11

7

8

*Brown v. Socialist Workers '74 Campaign Comm.,*
    459 U.S. 87 (1982) ...........................................................................................................................10

9

*Chevron Corp. v. Allen,*
    Case No. 2:10-mc-00091, Dkt. 38 (D. Vt. Dec. 2, 2010) ...................................................... 6 n.14

10

11

*Chevron Corp. v. Berlinger,*
    629 F.3d 297 (2d Cir. 2011).................................................................................................... 4 n.5

12

*Chevron Corp. v. Bonifaz,*
    Case No. 4:09-05371, Dkt. 71 (N.D. Cal. Oct. 8, 2010) ........................................................ 1 n.1

13

*Chevron Corp. v. Bonifaz,*
    Case No 10-mc-30022, Dkt. 47 (D. Mass. Dec. 22, 2010)........................................ 4 n.5, 6 n.14

14

15

*Chevron Corp. v. Camacho Naranjo,*
    667 F.3d 232 (2d Cir. 2012) ................................................................................................... 3 n.4

16

*Chevron Corp. v. Champ,*
    Case No. 1:10mc 27, 2010 U.S. Dist. LEXIS 97440 (W.D.N.C. Aug. 28, 2010) .............. 4 n.5

17

18

*Chevron Corp. v. Donziger,*
    Case No. 11-cv-0691 (LAK) (S.D.N.Y.) ....................................................................................3

19

*Chevron Corp. v. E-Tech Int'l,*
    2010 U.S. Dist. LEXIS 94396 (S.D. Cal. Sept. 10, 2010) ...................................................... 4 n.5

20

21

*Chevron Corp. v. Quarles,*
    Case No. 3:10-cv-00686, Dkt. 108 (M.D. Tenn. Sept. 21, 2010) ....................................... 7 n.14

22

*Chevron Corp. v. Salazar,*
    Case No. 11-0691-LAK (D. Or. Nov. 30, 2011) .................................................................. 1 n.1

23

24

*Chevron Corp. v. Shefftz,*
    754 F.Supp. 2d 254 (D. Mass. 2010) ...................................................................................... 4 n.5

25

*Chevron Corp. v. Shefftz,*
    Case No. 10-mc-10352-JLT, Dkt. 45 (D. Mass. Dec. 7, 2010)........................................... 6 n.14

26

27

*Chevron Corp. v. Stratus Consulting, Inc.,*
    Order, No. 10-cv-00047-MSK-MEH, D.E. 293 (D. Colo. Nov. 15, 2010) ...................... 1 n.1

28

ii

*Chevron Corp. v. Stratus Consulting, Inc.*,
    2010 U.S. Dist. LEXIS 110023 (D. Colo. Oct. 1, 2010) ........................................................ 4 n.5

*Cohen v. City of New York*,
    255 F.R.D. 110 (S.D.N.Y. 2008) ................................................................................................15

*Compaq Computer Corp. v. Packard Bell Elecs., Inc.*,
    163 F.R.D. 329 (N.D. Cal. 1995).................................................................................................15

*Ecuadorian Plaintiffs v. Chevron Corp.*,
    619 F.3d 373 (5th Cir. 2010) ................................................................................................. 4 n.5

*Gonzales v. Google, Inc.*,
    234 F.R.D. 674 (N.D. Cal. 2006).................................................................................................15

*Heidelberg Americas, Inc. v. Tokyo Kikai Seisakusho, Ltd.*,
    333 F.3d 38 (1st Cir. 2003) ........................................................................................................14

*High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*,
    161 F.R.D. 86 (N.D. Cal.1995)...................................................................................................13

*In re Chevron Corp.*,
    Order, No. 1:10-mc-00002-LAK (S.D.N.Y Jan. 13, 2011) ..................................................... 4 n.6

*In re Chevron Corp.*,
    Order, No. 1:10-mc-00002-LAK (S.D.N.Y Jan. 21, 2011) ..................................................... 4 n.6

*In re Chevron Corp.*,
    Order, No. 1:10-mc-00002-LAK (S.D.N.Y Aug. 16, 2011) .........................................................4

*In re Chevron Corp. (Calmbacher)*,
    2010 U.S. Dist. LEXIS 114724 (N.D. Ga. Mar. 2, 2010) ....................................................... 4 n.5

*In re Chevron Corp. (Donziger)*,
    749 F.Supp.2d 141 (S.D.N.Y. 2010), *aff'd*. 409 Fed. Appx. 393 (2d Cir. 2010).................. 4 n.5

*In re Chevron Corp. (Quarles)*,
    No. 3:10-cv-00686, 2010 U.S. Dist. LEXIS 120798 (M.D. Tenn. Aug. 17, 2010) ............ 4 n.5

*In re Chevron Corp. (Rourke)*,
    753 F.Supp. 2d 536 (D. Md. 2010) ........................................................................................ 4 n.5

*In re Chevron Corp. (Scardina)*,
    Case No. 7:10-mc-00067, 2010 U.S. Dist. LEXIS 125174 (W.D. Va. Nov. 24, 2010) ..... 4 n.5

*In re Chevron Corp. (Uhl, Baron, Rana & Assocs.)*,
    633 F.3d 153 (3d Cir. 2011) ................................................................................................... 4 n.5

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
    09-CV-01967 CW NC, 2012 WL 4846522 (N.D. Cal. Aug. 7, 2012)........................................13

*Int'l Action Ctr. v. United States*,
    207 F.R.D. 1 (D.D.C. 2002) .......................................................................................................12

iii

*Int'l Union v. Nat'l Right to Work Legal Def. & Ed. Found., Inc.,*
    590 F.2d 1139 (D.C. Cir. 1978) ................................................................................10

*Klay v. All Defendants,*
    425 F.3d 977 (11th Cir. 2005) .................................................................................15

*Moon v. SCP Pool Corp.,*
    232 F.R.D 633 (C.D. Cal. 2005) .............................................................................14

*NAACP v. Claiborne Hardware Co.,*
    458 U.S. 886 (1982) ...............................................2, 6, 7, 8, 8 n.18, 8 n.21, 9

*Nidec Corp. v. Victor Co. of Japan,*
    249 F.R.D. 575 (N.D. Cal. 2007)............................................................................13

*Org. For a Better Austin v. Keefe,*
    402 U.S. 415 (1971) .................................................................................................7

*Pallares v. Kohn (In re Chevron Corp.),*
    650 F.3d 276 (3d Cir. 2011) ....................................................................................4

*Perry v. Schwarzenegger,*
    591 F.3d 1147 (9th Cir. 2010) *cert. dismissed,* 130 S. Ct. 2432, (U.S. 2010)........................passim

*Soto v. Castlerock Farming & Transp., Inc.,*
    282 F.R.D. 492 (E.D. Cal. 2012) ...........................................................................14

*United States v. CBS., Inc.,*
    666 F.2d 364 (9th Cir. 1982) ............................................................................13, 15

*United States v. Sattar,*
    395 F. Supp. 2d 79 (S.D.N.Y. 2005) ...................................................................8 n.21

*Wyoming, v. U.S.D.A.,*
    208 F.R.D. 449 (D.D.C. 2002).............................................................................9 n.22

# FOREIGN CASES

Judgment of the Provincial Court of Justice of Sucumbíos, Nueva Loja, Ecuador, *Maria Aguinda v. Chevron Corp.*, No. 2003-0002 (Feb. 14, 2011) ...................................................3 n.3

Order, Sole Chamber of the Provincial Court of Justice of Sucumbíos, Nueva Loja, Ecuador, *Maria Aguinda v. Chevron Corp.,* Case No. 2011-0106 (Jan. 3, 2012) .............................................3 n.4

# FEDERAL STATUTES

18 U.S.C. § 1951 ......................................................................................................7 n.16

28 U.S.C. § 1782 .......................................................................................................4 n.5

# FEDERAL RULES

Federal Rule of Civil Procedure 45..........................................................................14, 15

iv

# OTHER AUTHORTITIES

J. Handler, Social Movements and the Legal System (1978) ............................................. 8 n.20

Patrick Radden Keefe, *Reversal of Fortune*, The New Yorker (Jan. 9, 2012)........................................ 4 n.6

Arthur Kinoy, Rights on Trial: The Odyssey of a People's Lawyer
    (Harvard University Press 1983) ......................................................................................... 8 n.20

1    Chevron's Civil Local Rule 37-1(a) certification fails to mention that it declared an end to the

2    meet and confer process despite the fact that there are a number of issues outstanding. *See* Motion to

3    Enforce Amazon Watch Subpoena to Produce Documents ("MTE"), Dkt. 13 at 1. This includes basic

4    issues—most notably rolling production and burden. There was no impasse on these topics, since the

5    meet and confer was ongoing, Chevron had promised to provide a proposal, and AW continues to

6    await that proposal. Thus, Chevron's representation that Amazon Watch (AW) "refuses to produce a

7    single document" is false. Dkt. 13 at 1.

8    **MEMORANDUM OF POINTS AND AUTHORITIES**

9    **I.    INTRODUCTION AND SUMMARY OF THE ARGUMENT**

10   Chevron seeks to enforce a subpoena of startling breadth against AW, a nonprofit organization

11   with only twelve staff members and limited financial resources. AW has been publicly critical of

12   Chevron's legacy of massive pollution, which has harmed the health and environment of thousands of

13   indigenous villagers in the Ecuadorian Amazon (the "Lago Agrio Plaintiffs," or "LAPs"). AW is not a

14   party to the underlying litigation, in which Chevron alleges that the LAPs and their lawyers

15   ("defendants") fraudulently conspired to obtain a massive court judgment in Ecuador—but in which

16   Chevron is *not* contesting the validity of the LAPs' pollution claims. Yet Chevron would require AW to

17   review and turn over tens if not hundreds of thousands of pages of confidential campaign and strategy

18   files and communications regarding AW's exercise of its First Amendment right to criticize Chevron.

19   The Ninth Circuit has held that such internal documents are protected by the First Amendment,

20   rejecting a similar ploy to obtain a political opponent's strategy engineered by the same counsel who

21   represent Chevron here. *See Perry v. Schwarzenegger*, 591 F.3d 1126 (9th Cir. 2010).[1]

22   Chevron argues that AW has no First Amendment rights at issue here because, by engaging in

23   a public advocacy campaign against Chevron, AW has "participated" in a global "conspiracy" against

---

[1] At least three U.S. district courts have sanctioned, admonished, or questioned Chevron and/or its counsel for its tactics, including for targeting a nonprofit environmental organization critical of its policies with a subpoena that "was, at least in part, meant to harass." *Chevron Corp. v. Salazar,* 2011 U.S. Dist. LEXIS 153066 *8-9, No. 11-0691-LAK (D. Or. Nov. 30, 2011) (sanctioning Chevron); *see also,* Order, *Chevron Corp. v. Stratus Consulting Inc.,* No. 10-cv-00047-MSK-MEH, D.E. 293 (D. Colo. Nov. 15, 2010) (ordering counsel to stop asking the Ecuadorian Plaintiffs' environmental consultants harassing questions during depositions); *Chevron Corp. v. Bonifaz,* Case No. 4:09-05371, Dkt. 71 (N.D. Cal. Oct. 8, 2010) (dismissing for lack of credible evidence Chevron's SLAPP (strategic lawsuit against public participation) suit alleging that one of the LAPs' counsel engaged in malicious prosecution).

1    Chevron that includes, *inter alia*, academics, the New York State Comptroller, environmental

2    consultants, activists, law firms, villagers from communities barely connected by modern

3    communications to the outside world, and Ecuadorian trial and appellate courts. Dkt. 13 at 1-3. But

4    the Supreme Court has expressly held that First Amendment rights do not vanish merely because

5    "some members of the group may have participated in conduct or advocated doctrine that itself is not

6    protected." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 908(U.S. 1982).

7         Regardless, Chevron's own "evidence" shows that AW has merely conducted the First

8    Amendment activities that constitute its core mission—to call attention to pollution and promote

9    justice for indigenous groups in the Amazon affected by billions of gallons of toxic wastewater and

10   millions of gallons of oil that Chevron's predecessor, Texaco, dumped in streams and left in unlined

11   pits. AW did not engage in criminal conspiracy simply by running a campaign arguing that Chevron is

12   responsible for massive pollution in Ecuador—exactly what the Ecuadorian trial and appellate courts

13   ultimately found to be true, and which Chevron does not dispute in the underlying litigation.

14        Chevron cannot establish that the information sought is highly relevant, it has not tailored its

15   requests to avoid unnecessary interference with protected activities, and it has refused to show that the

16   information is otherwise unavailable to it. Chevron has not met its burden of demonstrating a

17   sufficiently compelling need to infringe AW's First Amendment rights.

18        Nor can the protections of Rule 45 be cast aside. The subpoena is unduly burdensome in its

19   scope. An under-inclusive initial search turned up nearly 50,000 electronic documents and more than

20   30,000 emails, in addition to 14 boxes of physical documents, and additional hard drives that contained

21   at least five terabytes of data that are potentially responsive to Chevron's requests. Dkt. 6 ¶¶ 47-49.

22   Chevron's claim that it needs AW's documents is undercut by the fact that it has already had extensive

23   discovery from the *defendants* and dozens of others. Chevron cannot overcome its initial burden to

24   show it has unsuccessfully sought the documents from the parties or elsewhere, or that its need is

25   sufficient to overcome AW's Rule 45 rights. Even if some of the evidence sought may be relevant, the

26   subpoena's breadth suggests that it is largely a pretext to harass and gain privileged access to the

27   confidential documents of Chevron's most persistent gadfly.

28        The subpoena is overly broad, unduly burdensome, intended to harass, and infringes on AW's

2

1   First Amendment rights—among other infirmities—and should not be enforced. In the alternative, the

2   Court should order the parties to finish the meet and confer over outstanding issues.

3   **II.   BACKGROUND**

4        Over three decades, Chevron's predecessor, Texaco, caused massive oil contamination in the

5   Ecuadorian Amazon, injuring the surrounding communities' health and environment. Chevron no

6   longer contests this claim in the underlying litigation. Dkt. 4, Ex. EE; Dkt 3 at 15-16 and n.19. Since

7   2002, AW, an indigenous rights nonprofit based in California, has assisted the affected communities in

8   their struggle for clean water, health services, and environmental remediation.

9       **A.  The underlying case.**

10       AW assumes this court's familiarity with the factual background of the underlying case, in

11  which 30,000 Ecuadorian citizens sued Chevron (then Texaco), in the Southern District of New York

12  for pollution and other damage caused by its oil extraction activities in the Amazon. *See* Dkt. 3 at 2-5.

13  After Chevron argued for nine years that the case should be heard in Ecuador and persuaded the court

14  to dismiss the suit,[2] an Ecuadorian trial court issued a 188-page opinion ("Judgment"),[3] based upon an

15  approximately 200,000-document record containing scientific evidence submitted by both parties

16  finding Chevron liable for approximately $8.6 billion in damages for soil and groundwater remediation,

17  delivery of potable water, healthcare, and damage to the communities' way of life. *See* Dkt. 3 at 3-4.

18  Just prior to the Judgment, Chevron filed a civil RICO suit in New York against more than 50 lawyers,

19  consultants, LAPs, and other individuals, alleging any judgment in Ecuador would be the product of

20  fraud and extortion. *Chevron Corp. v. Donziger,* No. 11-cv-0691 (LAK) (S.D.N.Y.).[4] The RICO case,

21  before Judge Lewis Kaplan, is the source of the subpoena at issue here.

22       Chevron has engaged in a discovery expedition "unique in the annals of American judicial

23

24  [2] *See generally Aguinda v. Texaco. Inc.*, 303 F.3d 470 (2d Cir. 2002).
    [3] Judgment of the Provincial Court of Justice of Sucumbíos, Nueva Loja, Ecuador, *Maria Aguinda v.*
25  *Chevron Corp.*, No. 2003-0002 (Feb. 14, 2011). Available at:
    http://chevrontoxico.com/assets/docs/2011-02-14-Aguinda-v-ChevronTexaco-judgement-
26  English.pdf, last accessed February 22, 2013.
    [4] Chevron also raised its fraud allegations on appeal in Ecuador, but the appellate court rejected
27  Chevron's claim that the Judgment was the product of fraud and upheld the Judgment under a
    standard similar to *de novo* review. Order, Sole Chamber of the Provincial Court of Justice of
28  Sucumbíos, Nueva Loja, Ecuador, *Maria Aguinda v. Chevron Corp.,* No. 2011-0106, at 3-5 (Jan. 3, 2012);
    *Chevron Corp. v. Camacho Naranjo,* 667 F.3d 232, 237 (2d Cir. 2012).

1    history." *Pallares v. Kohn (In re Chevron Corp.)*, 650 F.3d 276, 295 (3d Cir. 2011).[5] Judge Kaplan has

2    already granted extensive discovery from the defendants, including nearly unfettered access to

3    documents and electronically stored information held by attorney Steven Donziger,[6] the supposed

4    mastermind of the conspiracy, and documents under his control from interns and attorneys with

5    whom he worked. *In re Chevron Corp.*, Order, No. 1:10-mc-00002-LAK (S.D.N.Y Aug. 16, 2011).

6       **B.  Chevron's subpoena to Amazon Watch**

7       On December 7, 2012, AW accepted service[7] of a subpoena from Chevron with 25 requests

8    for documents relating to Chevron and Ecuador, over an eight- to nearly ten-year period.

9       **C.  The unfinished meet and confer process.**

10      Through January 8, 2013, counsel engaged in a meet and confer process and, although reaching

11   an impasse on certain issues, continued to meet and confer on others. Dkt. 4, Ex. F; Ex. G; Ex. H; Ex.

12   I; Ex. J; Ex. K; Ex. L; Ex. M; Ex. N; Ex. O. AW's counsel expressly noted that he thought a motion to

13   quash was premature, given the outstanding issues. Dkt. 4, Ex. O at 1. Nonetheless, AW agreed to file

14   its motion to quash regarding issues about which impasse had been reached, to accommodate

15   "[Chevron's] desire to tee up certain issues as soon as possible." *Id.* Chevron and AW "also agreed . . .

16   to continue to meet and confer regarding burden and rolling production." *Id.*

17      Later on January 8, Chevron extended the return date to January 24, 2013, Dkt. 4, Ex. P,

18   pursuant to an order from Judge Kaplan. The subpoena remained on hold until a February 19, 2013,

---

19   [5] This has included use of 28 U.S.C. § 1782 to bring "at least 25 requests to obtain discovery from at

20   least 30 different [individuals or entities]," *In re Chevron Corp. (Uhl, Baron, Rana & Associates)*, 633 F.3d
     153, 159 (3d Cir. 2011). It has successfully petitioned for discovery in courts in at least nine circuits.

21   *E.g. Id.*; *Chevron Corp. v. Berlinger*, 629 F.3d 297 (2d Cir. 2011); *Ecuadorian Plaintiffs v. Chevron Corp.*, 619
     F.3d 373 (5th Cir. 2010); *In re Chevron Corp. (Calmbacher)*, No. 1:10-MI-0076-TWT-GGB, 2010 U.S.

22   Dist. LEXIS 114724 (N.D. Ga. Mar. 2, 2010); *In re Chevron Corp. (Scardina)*, No. 7:10-mc-00067, 2010
     U.S. Dist. LEXIS 125174 (W.D. Va. Nov. 24, 2010); *Chevron Corp. v. E-Tech Int'l*, No. 10cv1146-IEG

23   (WMc), 2010 U.S. Dist. LEXIS 94396 (S.D. Ca. Sept. 10, 2010); *In re Chevron Corp. (Bonifaz)*, 762 F.
     Supp.2d  242 (D. Mass. 2010); *In re Chevron Corp. (Quarles)*, No. 3:10-cv-00686, 2010 U.S. Dist. LEXIS

24   120798 (M.D. Tenn. Aug. 17, 2010); *Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-cv-00047-MSK-
     MEH, 2010 U.S. Dist. LEXIS 110023 (D. Colo. Oct. 1, 2010); *In re Chevron Corp. (Rourke)*, 753 F.Supp.

25   2d 536 (D. Md. 2010); *Chevron Corp. v. Shefftz*, 754 F.Supp. 2d 254 (D. Mass. 2010); *In re Chevron
     Corp. (Donziger)*, 749 F.Supp.2d 141 (S.D.N.Y. 2010), *aff'd.* 409 Fed. Appx. 393 (2d Cir. 2010); *Chevron*

26   *Corp. v. Champ*, No. 1:10mc 27, 2010 U.S. Dist. LEXIS 97440 (W.D.N.C. Aug. 28, 2010).
     [6] This included access to Donziger's hard drive, *In re Chevron Corp.*, Order, No. 1:10-mc-00002-LAK

27   (S.D.N.Y Jan. 21, 2011), email accounts, *In re Chevron Corp.*, Order, No. 1:10-mc-00002-LAK (S.D.N.Y
     Jan. 13, 2011), and personal diary. Patrick Radden Keefe, *Reversal of Fortune*, The New Yorker (Jan. 9,

28   2012).
     [7] AW has elsewhere raised the issue of service before this Court. *See* Dkt. 3 at 8-9.

4

1    order by Judge Kaplan reinstated it. Dkt. 4, Ex. X.[8] At that time, AW sought to re-open the meet and

2    confer on the outstanding issues. Dkt. 4, Ex. Z. Chevron refused, and instead insisted that AW

3    produce documents or it would move to enforce the subpoena on February 25, 2013—three business

4    days later. Dkt. 4, Simons Decl. ¶¶ 35, 37-39, 45; Ex. W; Ex. Y.

5         Chevron's claim that AW had refused to produce documents is false. Dkt. 13 at 1. At the time

6    Chevron cut off the meet and confer, it had promised to send, and AW had agreed to consider, a

7    proposal regarding rolling production and means to lessen AW's burden. Dkt. 4, Simons Decl. ¶¶ 39-

8    40, 43; Ex. M; Ex. N; Ex. O; Ex. Z. But Chevron never did so. *See* Dkt. 4, Ex. W; Ex. Z. Moreover,

9    Chevron insisted on a new return date of February 25, 2013, a date that was never agreed to. Dkt. 4,

10   Simons Decl. ¶¶ 38, 41-45; Ex. Y; Ex. Z. AW was thus given no choice but to move to quash, which it

11   did. Dkt. 3. Later that day, Chevron filed this Motion to Enforce the same subpoena. Dkt. 13.[9]

12   **III.    ARGUMENT**

13        **A.   AW did not participate in a "conspiracy" by exercising its First Amendment rights to
          speak out against Chevron.**

14

15        Chevron's subpoena seeks internal campaign documents that are protected from disclosure by

16   the First Amendment. *See Perry*, 591 F.3d 1126; *see also* Section III.B. Chevron tries to strip AW of its

17   rights by claiming that AW was part of an alleged global conspiracy to obtain a fraudulent judgment

18   against Chevron that is the subject of the underlying case. But what Chevron calls "conspiracy" is in

     fact First Amendment protected activity.

19        The new exhibits[10] Chevron points to in making its allegations against AW involve campaign

20   activities in which AW spoke out against Chevron for its contamination of the Ecuadorian Amazon,

21   and are thus an exercise of AW's core First Amendment rights.[11] Thus, even if Chevron's specific

22

23   ─────────────────────────

     [8] The relevant proceedings before Judge Kaplan are described at Dkt. 3 at 6-7.
     [9] Chevron's decision to file a Motion to Enforce when it knew AW was simultaneously filing a Motion
24   to Quash can be explained only as an attempt to harass AW.
     [10] Although Chevron refused repeated requests during the meet and confer to present AW with *any*
25   evidence that implicated AW in Chevron's global conspiracy theory, Dkt. 4, Simons Decl. ¶¶ 46-67;
     Ex. Z; Ex. Y, Chevron has consistently sandbagged AW with new exhibits with each new brief it files.
26   [11] AW's campaign and organizing activities arise from AW's institutional commitment to support
     communities in the Amazon Basin whose rights and livelihoods are affected by resource extraction. *Id.*;
27   Dkt. 37 at 50-51 ¶ 4-5; *Id.* at 55-58 ¶¶ 4, 8-9, 12-14. AW participates in this campaign because
     members of the indigenous communities harmed by Chevron explicitly asked them to do so, Dkt. 37
28   at 56 ¶ 9; and because they have seen the contamination for themselves, Dkt. 37 at 41 ¶5; *Id.* at 50 ¶4;
     *Id.* at 55 ¶5, and talked to dozens of victims. Dkt. 37 at 42 ¶8; *Id.* at 50 ¶4; *Id.* at 55 ¶5. AW also

1    allegations against AW were true, Chevron cannot show that AW acted in furtherance of anything

2    other than an advocacy campaign that drew attention to the contamination and sought justice and

3    remediation for those affected. Under *Claiborne Hardware*, where a campaign involves both protected

4    expression and illegal activity, courts must carefully distinguish between the two, and cannot infringe

5    upon the former, which remains protected. 458 U.S. at 915-18.

6         But Chevron's allegations are false. AW did not take part in the legal case in Ecuador. AW

7    never "submitted any evidence or findings to the court" and it has never "assist[ed] the court

8    appointed expert in preparing his submissions to the court." Dkt. 37 at 43 ¶15; *see also Id.* at 51 ¶ 6, 59

9    ¶19. AW did not participate in obtaining any fraudulent judgment.[12] Knowing this, Chevron cites to

10   alleged instances of the *LAPs and RICO defendants'* fraud in an effort to taint AW merely for its

11   association with those defendants. *See e.g.,* Dkt. 13 at 2.[13] But AW's "right to associate does not lose all

12   constitutional protection merely because some members of the group may have participated in

13   conduct or advocated doctrine that itself is not protected." *Claiborne Hardware*, 458 U.S. at 908.

14        Chevron also claims that the defendants "directed" a public advocacy campaign through AW

15   to "extort" a settlement of the Lago Agrio litigation. Dkt. 13 at 1. But the defendants did not direct

16   ────────────────────────────────────

17   believes, based on documents, photos, and analyses that it has viewed, that Chevron/Texaco is primarily to blame for the contamination. Koenig Decl. ¶¶ 5-13.
[12] Chevron's only allegation regarding AW's involvement with the Ecuadorian court is its claim that

18   AW was involved in "unlawful" *ex parte* communication with a judge and AW assisted with the *appointment* of a court expert who later submitted a report Chevron challenges. Dkt. 13 at n.2. But *ex*

19   *parte* meetings of this nature are permitted under Ecuadorian law and the judge also met with Chevron. Dkt. 37 at 44 ¶17. Moreover, AW never advocated for that particular expert to be appointed; it

20   advocated for *an expert* to be appointed to move the case along because Chevron/Texaco had been holding up the process to cause delays. Soltani Decl. ¶ 5. Chevron's *own* video submitted in the

21   underlying litigation, No. 11-cv-0691 (LAK) (S.D.N.Y.), at Dkt. 356, ¶ 71, video CRS-347-00-CLIP-01 shows this. In that video, Ms. Soltani, along with about ten other people, attend a question and answer

22   session in which they merely ask the judge why the appointment of "an" expert is taking so long, and the Judge replies that "Texaco" is delaying the process. *Id.*

23   [13] Chevron fails to mention that numerous courts have squarely rejected or questioned the same kinds of allegations that Chevron raises here for the purpose of overriding otherwise applicable privileges in

24   order to obtain discovery. *Chevron Corp. v. Allen*, No. 2:10-mc-00091, Dkt. 38 at 13 (D. Vt. Dec. 2, 2010)("[T]he Court is satisfied that no evidence of fraud, false pretenses or undue influence appears.");

25   *Chevron Corp. v. Bonifaz*, No 10-mc-30022, Dkt. 47 at 20-21 (D. Mass. Dec. 22, 2010) ("To the extent Chevron … assert[s[ that the crime-fraud exception should overcome any privilege, the court finds

26   that they have not met their heavy burden in establishing that narrow exception." Furthermore, "several other district courts have expressly denied the applicants' requests to invoke the crime-fraud

27   exception with respect to other respondents."); *Chevron Corp. v. Shefftz*, No. 10-mc-10352-JLT, Dkt. 45 (D. Mass. Dec. 7, 2010) (Chevron "has not shown Respondent engaged in or intended any criminal or

28   fraudulent activity."); *Chevron Corp. v. Quarles*, No. 3:10-cv-00686, Dkt. 108, Order at 2 (M.D. Tenn. Sept. 21, 2010) (Chevron's allegations are "quickly spiraling out of control").

1    AW's campaign. Dkt. 13 at 1-2; *see also* Dkt. 37 at 47 ¶30 (addressing Chevron's "propaganda"

2    argument); *Id.* at 52 ¶12 (addressing Chevron's "propaganda" and "press release" arguments).[14]

3    Regardless, a public advocacy campaign is nothing if not protected speech. And "[s]peech does not

4    lose its protected character . . . simply because it may . . . coerce [others] into action." *Claiborne*

5    *Hardware*, 458 U.S. at 910; *accord Org. For a Better Austin v. Keefe*, 402 U.S. 415 (1971) (holding that

6    petitioners' purpose in distributing literature to "'force' respondent to sign a no-solicitation agreement.

7    . . does not remove them from the reach of the First Amendment"). Indeed "threats of vilification or

8    social ostracisim," even if resulting in business losses, are "constitutionally protected." *See Claiborne*

9    *Hardware*, 458 U.S. at 926.[15]

10          Chevron's other central claim is that AW "declined to correct or retract" misrepresentations in

11   documents prepared by the RICO defendants. Dkt. 13 at 1-2. But that is not participation in a

12   conspiracy.[16] Indeed, Chevron shows little more than that AW has failed to redact old news stories

13   archived on its website.[17] Dkt. 38 at 4 n.6. This does not nullify an advocacy organization's First

14   ────────────────────

15   [14] AW does not, and never has, undertaken any campaign and organizing activities because it was
     "directed" to do so by Donziger. Dkt. 37 at 43 ¶13. AW staff has always had every reason to believe in
     the truth of their campaign's claim that Chevron has caused catastrophic damage in the Ecuadorian
16   Amazon. *Id.* at 41-43 ¶¶ 5-11, 50-51 ¶¶ 4-5, 56-57 ¶¶ 10-13; Koenig Decl. ¶¶ 3-13. Indeed, an
     Ecuadorian trial court and an Ecuadorian appellate court have so found. *See* Dkt 3 at 3-4. Chevron's
17   attempts to question AW's campaign motives because AW at times received donations from law firms
     that also supported the LAPs in no way means that those individuals, or the LAPs ever "directed"
18   AW's work on the Ecuador campaign. The donations Chevron cites accounted for less than 10% of
     AW's total expenditure on the campaign. Soltani Decl. ¶ 6; Paz y Miño Decl. ¶¶ 4-5.
19   [15] The fact that Chevron calls the public advocacy campaign against it "extort[ion]" changes nothing.
     Extortion, under the Hobbs Act, requires "wrongful use of actual or threatened force, violence, or
20   fear." 18 U.S.C. § 1951(b)(2). If public statements made in the hopes that it would encourage a party to
     settle were extortion, attorneys in almost every high profile case would be guilty.
21   [16]  Nor is it fraud; not least because fraud requires that the victim (who suffers pecuniary loss) relied to
     his detriment on the perpetrator's misrepresentations. *See* Restatement (Second) of Torts § 531 (1977).
22   Chevron does not claim that *it* was misled by AW's speech.
     [17]  Chevron points to David Russell's expert report, which he later disavowed. But Chevron also
23   introduces an email from Donziger that criticizes AW for *acting too quickly* to stop using the Russell
     Report's $6 billion damages estimate once it came under question. Dkt. 13 at 2; Dkt. 14, Ex. 8. Despite
24   the fact that AW stopped using the estimate, at the request of Russell, in February 2006, Dkt. 37 at 46
     ¶ 25, Chevron submits exhibits where AW used the $6 billion figure in SEC filings made in January
25   2006, *before* AW received the request from Russell. Dkt. 14, Ex. 11; Dkt. 37 at 46 ¶ 25. Chevron also
     inexplicably cites to later SEC letters, which *lack any direct citation to the Russell estimate. See* Dkt. 14, Ex.
26   12 & 14; Dkt. 37 at 47 ¶ 28-9. Even if the latter SEC letter referenced the earlier 2006 letter, Dkt. 38 at
     4 & n.7, it was not for the purpose of citing Russell. When AW pointed these deficiencies out to
27   Chevron, Dkt. 37 at 2-5, Chevron countered that AW continues to cite to the Russell figure "today"
     on its website—but Chevron merely cites to a news story written *eight years ago* which remains archived
28   and searchable on the website. Dkt. 38 at 4 n.6.

1  Amendment rights, let alone constitute criminal behavior. Paz y Miño Decl. ¶ 5.[18]

2        Charges as serious as Chevron's should be supported by actual evidence of wrongdoing.

3  Chevron's evidence shows nothing more than that AW at times coordinated its message with the

4  defendants. There is nothing unusual about that; lawyers and campaigners seeking justice for the same

5  people often do so.[19] AW's campaign in support of the thousands of indigenous farmers that Chevron

6  harmed over three decades of oil pollution is no different. Dkt. 37 at 59 ¶18; *Id.* at 43-45 ¶¶ 13, 19-20;

7  *Id.* at 50-51 ¶¶ 5,7. And since AW engaged in this protected speech based upon its good faith (and

8  correct) belief in Chevron's responsibility, its activities are protected under *Claiborne Hardware*.[20]

9    **B. Enforcement of the subpoena would violate Amazon Watch's First Amendment rights.**

10       Chevron's overbroad subpoena would compel disclosure of the internal workings of one of

11  Chevron's most vocal critics, chill advocacy and political speech concerning environmental damage

12

13  Equally unpersuasive is Chevron's "evidence" that AW continues to cite to Bill Powers's "30-times Exxon Valdez" statement. Chevron's Exhibits 8 & 9 deal with a 2010 web story posted by AW in which Powers affirms, *under oath in a deposition by Chevron*, that "Both the produced water and the crude oil are toxic. . . . the amount of toxic liquids that should not have been in the environment in Ecuador was at least 30 times the quantity or the volume of crude that was spilled in the Exxon-Valdez disaster." Dkt. 38, Ex. 9. Chevron claims these "toxic liquids" are mere "salt water", but Powers himself said otherwise. Dkt. 38 at n.4.

[18] Chevron also suggests that AW was part of a conspiracy because it did not disassociate itself from the defendants. Dkt. 13 at 2 n.2. It cites Ms. Soltani's participation in a 2007 meeting in which the RICO defendants spoke about finding citizens groups to monitor the court to ensure that Chevron did not corrupt the judicial process. During that conversation, the RICO defendants joked about the need to raise a "private army." Dkt. 13 at 2 n.2. But even Donziger said that these groups would be "unarmed." Dkt. 38-6. Regardless, no "private army" was ever raised. Peaceful, unarmed groups of campesinos and indigenous peoples stood outside the court in peaceful vigils, but they were outnumbered by people affiliated with Chevron. Koenig Decl. ¶¶ 14-19. And the constitution requires more than presence in a meeting where *other* individuals make comments that might have unlawful ends. *Claiborne Hardware*, 458 U.S. at 926 n.68 & 69 (holding that "a legal duty to 'repudiate'—to disassociate oneself from the acts of another—cannot arise unless, absent the repudiation, an individual could be found liable for those acts"). Moreover, during that meeting, which Chevron offers as evidence of AW's participation in a conspiracy, Ms. Soltani does not adopt, but rather *repudiates* the statements of the RICO defendant. Soltani Decl ¶ 4.

[19] *See* Arthur Kinoy, Rights on Trial: The Odyssey of a People's Lawyer 233 (Harvard University Press 1983) ("one of the underlying precepts of the functioning of a people's lawyer, that the legal activity must stimulate and be totally interrelated with the development of mass action by the people themselves."); J. Handler, Social Movements and the Legal System 109 (1978) (discussing how social movements were necessary for the implementation of *Brown v. Board of Education*).

[20] Chevron cites cases holding that fraud or conspiracy are not protected, Dkt. 13 at 2 (citing *Illinois ex. rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003) and *U.S. v. Sattar*, 395 F.Supp. 2d 79, 101 (S.D.N.Y. 2005)). But those cases are unavailing, both because without evidence that AW had specific intent, its exercise of its right to expression and association are not criminal and remain protected, *Claiborne Hardware*, 458 U.S. at 919-20, and because even if it had intent to deceive, AW's acts are not fraud. *See supra* n.17

8

and serious human rights abuses, and infringe upon the associational rights of AW, its partners, and its supporters. Requiring an advocacy organization to hand over to the target of its campaign activities internal documents outlining its campaign strategies, partnerships, and contributors would be justified only in exceptional circumstances simply not present in this case.[21]

Chevron makes two arguments to strip AW's documents of First Amendment protection; the first is wrong, the second moot. Chevron's assertion that the First Amendment does not protect fraudulent activity or associations that further a conspiracy fails for all of the reasons noted above. But even if the Court were to agree with Chevron that AW was part of a conspiracy with the defendants, its claim that *none* of AW's documents are entitled to protection is a non-sequitur. The central holding of *Claiborne Hardware* is that, where a campaign involves both protected expression and illegal activity, courts must carefully distinguish between the two, and cannot infringe upon the former. Any suggestion by Chevron that *all* of AW's campaign communications and activities are illegal cannot be squared with that holding. Indeed, AW partnered in its campaign with a number of other organizations that even Chevron does not claim are co-conspirators. *See* Herz Decl. Ex. A (listing partners).

Chevron's further claim that *Perry* does not apply because AW has not told Chevron the names of the members of the core group fails because AW has sent counsel a list of the core group of persons engaged in formulating strategy and messaging. *See* Herz Decl ¶4, Ex. A.

### 1. Discovery requests that infringe First Amendment rights are subject to heightened discovery standards.

Where the objecting party shows that "disclosure *could* have a chilling effect on protected activities[,]" *Perry*. 591 F.3d at 1143 (emphasis added),[22] the party seeking discovery must show that (1) the "information sought is *highly relevant* to the claims or defenses in the litigation," (2) the request is

---

[21] Revealing AW's activities and strategies to its political opponent would frustrate its policy goals and give Chevron an unfair advantage. *See Perry*, 591 F.3d at 1142 n.10. These concerns are precisely why "[c]ourts have held that the threat to First Amendment rights may be more severe in discovery than in other areas because a party may try to gain advantage by probing into areas an individual or a group wants to keep confidential." *Wyoming v. USDA*, 208 F.R.D. 449, 454 (D.D.C. 2002).

[22] For example, by resulting in "'(1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights." *Perry*, 591 F.3d at 1140 (internal quotation marks omitted).

9

1    "carefully tailored to avoid unnecessary interference with protected activities," and, (3) the information

2    sought is "otherwise unavailable." *Id.* at 1141 (emphasis added). Chevron can show none of these.

3                    **2.       *Disclosure would chill protected activity.***

4          Disclosure of internal campaign communications can chill protected activities by deterring

5    participation in advocacy campaigns, and deterring "the free flow of information within campaigns."

6    *Perry*, 591 F.3d at 1141-42. Chevron seeks to do precisely that[23]; it demands that AW disclose internal

7    campaign communications and advocacy strategies to its political opponent.[24]  Such disclosures would

8    chill the exercise of core First Amendment rights in at least the following ways.

9          The disclosure sought would put AW's campaigns at risk; many "share a common strategy

10   blueprint[,]" Dkt. 6 ¶21, which if revealed, "would . . . divulge [AW's] campaign playbook to those it is

11   trying to influence, greatly compromising the effective execution of [AW's] strategy." *Id.* ¶23.

12   Disclosure would also place the safety of AW staff at risk, *id.* ¶¶22, 23, 29; *see also* Dkt. 8 ¶¶9-12, 15, 16,

13   and the possibility that information given to AW could be turned over to Chevron would deter

14   communities from "sharing information with [AW], and even . . . from speaking up and denouncing

15   rights abuses in the first place." Dkt. 6 ¶25.

16         Disclosure of communications and strategy would also deter "the open, free communication

17   and exchange of ideas" among AW staff and between AW and it campaign partners, Dkt. 6 ¶¶26, 38,

18   and "severely limit [their] ability to speak out and educate the general public about Amazon issues as

19   per [their] mission." Dkt. 8 ¶14.

20         Compelled disclosure of communications with AW's contributors is also inconsistent with the

21   First Amendment. *See e.g., Brown v. Socialist Workers '74 Campaign Comm.,* 459 U.S. 87, 95 (1982); *Int'l*

22   *Union, Etc. v. Nat'l Right to Work Comm.,* 590 F.2d 1139, 1147 (D.C.Cir. 1978). Chevron seeks

23   communications with and information about AW's donors, which may cause many current supporters

24
_____

25   [23] *See especially* Request 7 (all documents concerning "any protests, rallies, marches, demonstrations,
     petitions, or similar events"), Request 18 ("any activities organized, created, or held on social media"),
26   and Request 8 (all documents concerning six major advocacy campaigns). Dkt. 4, Ex. E. *See also*
     Requests 1-3, 5-7, 15, and 21-23. *Id.*
27   [24] To avoid the harms from revealing protected information to a political opponent, AW proposed a
     protective order under which disclosures would be limited to Chevron's outside counsel, at least until
28   they were introduced as relevant evidence in the litigation. *See* Dkt 4, Ex. K; Ex. M. Chevron refused,
     *id.,* Ex. N ¶ 6, belying any claim that it seeks these disclosures solely for litigation purposes.

to "cease to donate to or fund" AW, Dkt. 6 ¶ 32, causing severe impacts to the organization, *id.* ¶ 43.[25]

AW staff, donors, and ally organizations, as well as communities with which AW works, have already been harassed by Chevron. *See* Dkt. 6 ¶¶ 36, 40, 41; Dkt. 8 ¶¶ 9-12, 14, 16. Forced disclosure to Chevron of AW's internal, non-public documents and strategy information would only increase Chevron's ability to continue to harass and intimidate AW and its supporters, Dkt. 6 ¶¶37, 40, 41; Dkt. 8 ¶16, and could be used against AW to restrict funding, Dkt. 6 ¶42.

### 3. Chevron has not, and cannot, justify the deterrent effect on First Amendment rights.

First, Chevron cannot show the information it seeks is relevant, let alone *highly* relevant. Its "evidence" that AW was involved in the conspiracy it alleges does not withstand scrutiny. *See supra* Part III.A. Without such evidence, Chevron is left with "[m]ere speculation that information might be useful," but that does not suffice. *Black Panther Party v. Smith*, 661 F.2d 1243, 1268 (D.C. Cir. 1981).

Indeed, the breadth of Chevron's requests exceeds anything that might be relevant to the alleged conspiracy. For example, Chevron seeks information about public opposition to, and advocacy against, Chevron. But that is irrelevant to whether the judgment in Ecuador was fraudulent. And Chevron cannot claim that the exercise of First Amendment rights is participation in or evidence of a conspiracy.  Indeed, it seeks communications between AW, a non-party, and its campaign partners, other non-parties, many of whom are not even alleged to be co-conspirators.

Furthermore, in the underlying litigation, Chevron no longer contests the fact that oil pollution occurred on the project it operated nor does it deny the Lago Agrio plaintiffs' factual claims about Chevron's operations.[26] Dkt. 4, Ex. EE. It is difficult, then, to see how AW's campaigns about the oil pollution in Ecuador is within the scope of relevant discovery, when AW simply sought to inform the public of facts Chevron does not deny.

Second, Chevron has not only failed to tailor the subpoena to avoid infringing AW's First

---

[25] *See especially* Requests 1-3 & 15. Chevron indicated that it does not seek fundraising lists and is "open to discussing" redaction of names in individualized fundraising communications, unless they involve alleged co-conspirators. Dkt. 4, Ex. N. Chevron, however, never followed up when asked for clarification, and, in any event, still demands confidential communications with AW donors. *See* Dkt. 4, Ex. O; Herz Decl. Ex. A at 2.

[26] As a result of Chevron's changed position, Judge Kaplan ordered limits on some of Chevron's subpoenas. Ex. T. Although this shift is equally significant here, Chevron refused to meet and confer on the implications of its position in the RICO suit. Dkt. 4, Simons Decl. ¶¶ 46-67, Ex. Z, Ex. Y.

11

Amendment rights, but also disavowed any obligation to do so. *See* Dkt. 4, Ex. H ¶¶1, 5; Ex. J; Ex. M. Chevron indiscriminately seeks material covering all AW's activities remotely touching on Chevron in Ecuador—including all documents concerning six major AW advocacy campaigns, *see* Ex. E, Request 7, and all documents "concerning any protests, rallies, marches, demonstrations, petitions, or other similar events" relating to Chevron, *id.,* Request 17. Chevron's own footnote suggesting it offered to tailor its requests, Dkt. 13 at n.4, demonstrates just how little Chevron was willing to do to avoid unnecessary infringement of First Amendment rights.[27]

Finally, Chevron has failed to show that the information requested is otherwise unavailable. *See Perry,* 591 F.3d at 1144-45 (sufficient need to justify intrusion on First Amendment interests not shown where information sought was available from other sources); *Int'l Action Ctr. v. U.S.,* 207 F.R.D. 1, 3-4 (D.D.C. 2002) (First Amendment precluded discovery of information regarding plaintiffs' political activities and affiliates where defendant did not show relevance or that it had pursued alternative sources). Chevron likely already has obtained much of the requested information through discovery from defendants or could obtain it from a more appropriate source.[28] *See* Part II.A. Indeed, other than noting that internal AW communications can only be obtained from AW, Chevron has ignored AW's repeated requests that identify categories of documents it seeks that are otherwise unavailable, and denied it had any responsibility to limit its requests from a non-party in such a way. *See* Dkt. 4, Ex J ¶6; Ex. M; *see also infra* Part III.E. AW is not a defendant; and the information most relevant to the liability of the *defendants* is discoverable from other sources. To the extent it seeks internal AW documents, or intra-organizational campaign documents, it has not shown that they are relevant, given that Chevron's argument is that AW was part of a conspiracy spearheaded by others.

Chevron has not tailored its requests to avoid unnecessary interference with protected activities, nor met its burden to show a need to infringe AW's First Amendment rights.

### C.  Chevron's document demands would unduly burden AW.

AW is a non-party, "powerless to control the scope of litigation and discovery" and reliant on

---

[27] As explained elsewhere, Dkt. 3 at 20 & n 23, limiting document requests concerning "Chevron" or the "Chevron litigations" to "the Chevron Litigations" does little in the way of meaningful limitation.
[28] For example, Requests 7 seeks "[a]ll communications with" any of the Lago Agrio plaintiffs, RICO defendants, and alleged co-conspirators, among others, concerning Chevron or the litigations. *See also* Requests 9-13, 16, and 19-20. Dkt. 4, Ex. E.

12

the special protections for non-parties afforded by the court. *U.S. v. C.B.S., Inc.,* 666 F.2d 364, 371-72 (9th Cir. 1982); *In re NCAA Student-Athlete Name & Likeness Licensing Litig.,* 2012 WL 4846522 (N.D. Cal. 2012); *High Tech Medical Instrumentation, Inc. v. New Image Industries, Inc.,* 161 F.R.D. 86, 88 (N.D. Cal.1995) (awarding sanctions against party who failed to avoid burden to non-party).

The twenty-five separate requests would require AW to search for and review virtually every document in its possession that is even tangentially related to Chevron's Ecuador activities, amounting to tens if not hundreds of thousands of documents.[29] While Chevron promised to provide a proposal to limit the burden through agreed upon search terms, it never did. Production would take nearly 6 months of AW's time and *at least* 5,000 hours of document review. Dkt. 6 ¶ 44.[30] This would not only bring AW's work to a virtual standstill but also compromise AW's credibility and trustworthiness among its clients and donors. *See* Part III. B. 2. All of this is an overwhelming burden for a small non-profit with limited staff and budget. Chevron does not attempt to show otherwise. Dkt 13 at 4.

Chevron claims only that it is not required to show that it could not obtain the documents from other sources. Even if that were true, it does not address AW's showing that the burden is undue, but Chevron is wrong. As demonstrated above, Chevron must meet this requirement under the First Amendment, and the same is true under Rules 26 and 45. If the documents "can be obtained from some other source that is more convenient, less burdensome, or less expensive," Chevron must limit its subpoena. Fed. R. Civ. P. 26(b)(2)(C). In particular, Chevron must show that it attempted but could not obtain the documents from the defendants. *See Nidec Corp v. Victor Co. of Japan,* 249 F.R.D. 575, 577 (N.D.Cal. 2007); *Soto v. Castlerock Farming & Transp. Inc.,* 282 F.R.D. 492 (E.D. Cal. 2012).

Chevron's claim that this requirement would increase the burden on AW is also wrong; AW need not search for documents until Chevron has met its initial burden to show it does not have the requested information and cannot get it from a more appropriate source.

---

[29] Requests 5, 8, 18, and 21–23 would require AW to canvass all of its emails and documents related to expansive topics like shareholder advocacy and all social media postings, communications with "media," and communications with other NGOs that relate to the Chevron Litigations. *See* Dkt. 4, Ex. E. For at least six of AW's twelve staff members, this would likely require a document-by-document review of their entire hard drives and email archives. Dkt. 6 ¶45.
[30] Calculations were made assuming that half of the nearly 50,000 potentially responsive documents and/or files were documents and half were files.

13

**D. Chevron's proposed time period is unreasonable.**

Chevron has refused to limit the subpoena to a reasonable timeframe and has failed to justify the inordinate discovery period it seeks. During the meet-and-confer, Chevron proposed to "limit" the timeframe to 8-10 years.[31] Courts have considered similar unjustified discovery periods to be overbroad and particularly excessive when imposed upon a non-party. *Heidelberg Americas, Inc. v. Tokyo Kikai Seisakusho, Ltd.*, 333 F.3d 38, 41-42 (1st Cir. 2003); *see also Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 638 (C.D. Cal. 2005). Chevron has not, and cannot, demonstrate a need for information prior to the fall 2004 and subsequent to February 2011 (the filing date of the underlying litigation). And Chevron still has not told AW its position in the underlying litigation with respect to the proper time frame. *See* Dkt. 4, Ex. O; Herz. Decl. Ex. A.

**E. The parties have not finished conferring over the form of a privilege log.**

Chevron is incorrect to state that "AW claims that . . . it is not required to produce a privilege log" to assert the attorney-client privilege. Dkt. 13 at 4. AW made a good faith proposal under which it would log attorney-client privileged documents. To accomplish this, AW asked Chevron to tell AW the categories of documents Chevron was logging, and Chevron's position on logging, in the RICO litigation. Dkt. 4, Ex. I at 2; Ex. O at 1-2. AW still awaits that information.

**F. Chevron improperly seeks confidential commercial information.**

Courts may quash subpoenas that seek confidential research, development or commercial information. Fed. R. Civ. P. 45(c)(3)(B); *Moon*, 232 F.R.D. at 637. AW has shown that the proprietary information Chevron seek is "information that . . . nonpart[ies] ha[ve] historically sought to maintain confidential," *AFMS LLC v. UPS*, 2012 U.S. Dist. LEXIS 106925, *9 (S.D. Cal. July 27, 2012), and that the protections of Rule 45(c)(3)(B) also apply to nonprofit organizations, even if the information is not strictly commercial. *Klay v. All Defendants*, 425 F.3d 977 (11th Cir. 2005).

The disclosure of confidential campaign blueprints, strategies and work plans will inflict the same kinds of irreparable harms on AW as delineated in *Cohen v. City of New* York, 255 F.R.D. 110,

---

[31] Chevron proposed a February 14, 2011, cut-off for most requests (more than eight years), and July 10, 2012, for Requests 4, 11, 13, and 14 (nearly ten years). Dkt. 4, Ex. N ¶5. Chevron no longer appears willing to limit the subpoena to this timeframe, and instead defends its original time frame extending from January 2003 to the date of the subpoena. *See* Dkt. 13 at 4.

118-20 (S.D.N.Y. 2008). Revealing strategy and tactics would place AW at a "competitive disadvantage" in pursuing and maintaining public advocacy campaigns against violators of basic human and environmental rights. *Id.* at 118. Disclosing confidential campaign information would harm AW's "goodwill" in communities that rely on AW in confidence to advocate for them. *Id.* at 120.

Once the non-party shows that the requested information is confidential commercial information, the burden shifts to the requesting party to show a "substantial need . . . that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated." *Gonzales v. Google, Inc.,* 234 F.R.D. 674, 684 (N.D. Cal. 2006). Chevron has shown no such need here.

**G. Chevron should pay the reasonable costs of production.**

Chevron should cover the cost of complying with this burdensome subpoena. Since AW is a non-party, the general rule that a party should bear the burden of its discovery costs "is inapplicable." *C.B.S., Inc.,* 666 F.2d at 371; *Compaq Computer Corp. v. Packard Bell Elecs., Inc.,* 163 F.R.D. 329, 339 (N.D. Cal. 1995). AW is a non-profit, advocacy organization comprising twelve staff members, a shoestring budget, and no in-house counsel. Since the subpoena will run up significant expenses, straining AW's already limited financial resources, costs ought to be provided in the interim. Fed. R. Civ. P. 45; *see also C.B.S., Inc.,* 666 F.2d at 368.

**H. A robust protective order is warranted if any documents are to be revealed.**

Chevron only disputes the proposed protective order to the extent that the document request arguably excludes "commercial information." Chevron does not contest AW's concerns that the subpoena seeks confidential information protected by, among other things, the First Amendment from a non-party. AW respectfully requests an order from the Court that any documents AW may be commanded to produce be handled confidentially and not be distributed beyond Chevron's outside counsel, and to require Chevron to show that the documents are needed as exhibits in the litigation.

**IV. CONCLUSION**

For the foregoing reasons, Chevron's document subpoena should not be enforced.

DATED: March 11, 2013

Respectfully submitted,

EARTHRIGHTS INTERNATIONAL

/s/Richard Herz
Richard Herz [admitted *pro hac vice*]
rick@earthrights.org
Marco Simons
marco@earthrights.org
Michelle C. Harrison
michelle@earthrights.org
Marissa A. Vahlsing
marissa@earthrights.org
1612 K Street NW, Suite 401
Washington, DC 20006
Telephone: (202) 466-5188
Facsimile: (202) 466-5189

*Counsel For Non-Party Amazon Watch*

Case No. C 13-80038-MISC CRB       OPPOSITION TO CHEVRON'S MOTION TO ENFORCE

Marco Simons (SBN 237314)
marco@earthrights.org
Richard L. Herz
rick@earthrights.org
Michelle C. Harrison
michelle@earthrights.org
Marissa A. Vahlsing
marissa@earthrights.org
EARTHRIGHTS INTERNATIONAL
1612 K Street NW, Suite 401
Washington, DC 20006
Telephone: (202) 466-5188

Jose Luis Fuentes
jlf@siegelyee.com
Siegel & Yee
499 14th Street Ste 300
Oakland, CA 94612
Tele: (510) 839-1200
Facsimile: (510) 444-6698

Attorneys for Non-Party Amazon Watch

## UNITED STATES DISTRICT COURT

## FOR THE NOTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| CHEVRON CORP., | Case No. C 13-80038-MISC CRB |
| Plaintiff, | **DECLARATION OF RICHARD HERZ IN SUPPORT OF NON-PARTY AMAZON WATCH'S OPPOSITION TO CHEVRON'S MOTION TO ENFORCE** |
| v. | |
| STEVEN DONZIGER, *et al.* | |
| Defendants. | |

# DECLARATION OF RICHARD HERZ

I, Richard Herz, hereby declare as follows:

1.   I am over the age of 18 and am competent to make this declaration.

2.   I have personal knowledge of all matters set forth in this declaration. If called upon to do so, I could and would testify to all matters set forth herein.

3.   I am an attorney duly licensed to practice law in the State of New York. I serve as counsel for Amazon Watch with respect to the subpoena at issue in Chevron's motion to enforce, and am admitted *pro hac vice* in this Court.

4.   Attached as Exhibit A is a true and correct copy of my letter to Chevron's counsel dated March 8, 2013.

I declare under penalty of perjury and pursuant to the laws of California and the United States of America that the foregoing is true and correct.

Executed this 11th day of March, 2013 at West Hartford, CT.

Richard Herz

Case No. C 13-80038-MISC CRB     DECLARATION OF RICHARD HERZ

# EXHIBIT A

EARTHRIGHTS INTERNATIONAL

March 8, 2013

<u>VIA ELECTRONIC MAIL</u>

Ethan Dettmer
Gibson Dunn
555 Mission Street
San Francisco CA, 94105

Dear Ethan:

     I write with respect to the still unfinished meet and confer concerning Chevron's document subpoena. Once the subpoena was reinstated, AW sought to reopen the meet and confer process to resolve the outstanding issues. *See* Simons Feb 21 Letter. You refused. *See* Dettmer Email Feb. 21; Dettmer email Feb 22. I urge you to reconsider your refusal and meet and confer, as the Rules require. As a threshold matter, however, I must correct assertions you have recently made to the Court that are simply false.

     As you will recall, in our last substantive exchange prior to things being placed on hold by Judge Kaplan, I agreed to file our motion to quash regarding certain legal issues, and you and I "also agreed . . . to continue to meet and confer regarding burden and rolling production." Herz January 8 letter at 1. Thus, although I expressly noted that I thought the motion was premature, I nonetheless accommodated "your desire to tee up certain issues as soon as possible." *Id.* Your representations to the Court misstate those facts.

     First, you certified that you have conferred with Amazon Watch "for the purpose of attempting to resolve all disputed issues without court action." Motion to Enforce Amazon Watch Subpoena to Produce Documents (MTE) at 1 (emphasis added). But you failed to mention that you declared an end to the meet and confer process despite the fact that there are a number of issues outstanding. Indeed, this includes issues for which you can hardly claim there is an impasse, since we are waiting for a proposal from you. In fact, you referred to our effort to re-start the unfinished meet and confer process, as required by the Local Rules, as "confirmation" that we "intend[ed] only to delay the discovery process." Dettmer Email Feb 21. Your certification to the Court is incomplete and misleading.

     Second, you represented that "AW refuses to produce a single document in response to the subpoena." MTE at 1. As you know and our January 8 letter makes clear, we never did any such thing. The meet and confer was ongoing with respect to rolling production. Indeed, as I noted in my January 8 letter, as Marco reminded you in his email of February 22, before you filed

**U.S. Office**
1612 K Street NW, Suite 401
Washington, DC 20006
Tel: (202) 466-5188
Fax: (202) 466-5189
email: infousa@earthrights.org

**Southeast Asia Office**
P.O. Box 123
Chiang Mai University
Chiang Mai 50202 Thailand
Tel/Fax: 66 1 531 1256
email: infoasia@earthrights.org

w w w . e a r t h r i g h t s . o r g

your motion, and as is still the case today, we continue to await *your* proposals on rolling production and burden. Your claim to the Court is false.

Third, your representation that we have made "repeated (but never fulfilled) assertions that a rolling production of non-objectionable documents would be forthcoming" is also false. Motion to Shorten Time for Briefing (MTST) at 1. As I made clear in my January 8 letter, we did not agree to begin rolling production; we were and still are awaiting a proposal from you. Herz January 8 Letter to Dettmer.

Fourth, you represented that "AW claims that. . . it is not required to produce a privilege log" to assert the attorney-client privilege. MTE at 4. But on December 21, I made a good faith proposal under which we would log attorney-client privileged documents before our other differences are resolved. To accomplish this, we requested that you tell us the categories of documents Chevron was logging, and Chevron's position on logging in the underlying litigation. Herz December 21 Letter to Dettmer, at 2; Herz January 8 Letter to Dettmer, at 1-2. You, however, still have not provided that information. Your claim to the Court is demonstrably untrue.

The Court is entitled to more candor than you have shown. Under the circumstances, the proper course would be to correct these misrepresentations.

Regardless, I believe we should continue to seek agreement on all of the outstanding issues. *see* Simons Letter to Dettmer, February 21 at 4. Accordingly, please provide the information you have promised but not yet delivered. In particular:

•   you still have not provided your position on redaction of names in fundraising documents. *See* Herz January 8 Letter to Dettmer.

•   you still have not answered our question as to Chevron's position in the underlying litigation as to the procedure for logging attorney-client privileged documents. *See* Herz January 8 Letter to Dettmer.

•   you still have not answered our question as to Chevron's position in the underlying litigation with respect to the proper time period of discovery. *See* Herz January 8 Letter to Dettmer.

•   you still have not provided your promised proposal on ways to limit the burden on Amazon Watch. *See* Herz January 8 Letter to Dettmer.

2

- you still have not provided your promised proposal on rolling production. *See* Herz January 8 Letter to Dettmer.

I also note, as Marco did in his February 21 letter, that new issues have arisen that need to be discussed. In particular, we need to meet and confer concerning your position with respect to the crime-fraud exception now that Chevron is not contesting in this litigation that the underlying claims in Ecuador are true. Simons Letter to Dettmer, February 21 at 3-4.

Moreover, thus far, our discussions of a privilege log have related to attorney-client privileged documents. December 21, letter at 2; Dettmer January 7, letter at 2; Herz January 8 letter to Dettmer. Consistent with this, the relevant heading of your motion asserts only that AW must log attorney-client privileged documents. MTE at 4. But the argument itself is somewhat unclear as to whether you are also arguing that AW must log documents that are protected under the First Amendment or that include confidential business information. *Id.* Obviously, that would multiply the burden on AW, and we would oppose it. Please clarify your position.

Last, we continue to disagree about whether information from which a functional interpretation of the inter-organizational core group can be derived requires the names of members of the core group, or whether the categories are sufficient (the identities themselves being protected by the First Amendment).[1] Nonetheless, I think that dispute is essentially moot, because the identities of members of the core group are largely public knowledge, and I provide those identities and categories below. (I have previously informed you that all staff members of AW itself, except administrative staff, are within the core group. Herz Dec. 21 letter to Dettmer). I note however, that AW reserves the right to add others to this list if they have been inadvertently left off, and that in a handful of instances, the identity is not public knowledge, and AW continues to assert its First Amendment privilege with respect to the identity of and communications with those persons, all of whom fall within the categories identified below. The members of the core group and categories (in bold) are:

**Human Rights & Environmental Organizations**:

RAN: Michael Brune, Rebecca Tarbotten (deceased), Ginger Cassady, Mike Gaworecki, David Taylor, Kerul Dyer, Nell Greenberg

---

[1]Although you claim that a functional interpretation of the core group cannot be determined from the categories, I do not see how you can know that without the seeing the categories, which you have never asked for.

3

Global Exchange: Antonia Juhasz, Kirsten Moller

Justice in Nigeria Now: Laura Livoti, Sarah Dotlich

Amnesty International USA: Tony Cruz, Simon Billenness

Communities for a Better Environment: Jessica Tovar, Nile Malloy

Asian Pacific Environmental Network: Vivian Chang

EarthRights International: Paul Donowitz

**Individuals**
Thomas Cavanagh, Mitch Anderson, Steven Donziger, Karen Hinton, Daniel Herriges, Nick Magel, Richie Goldman, Han Shan, Simeon Tiegel, Maria Lya Ramos, Jennifer Delury, Andrew Woods

**Shareholder Advocates**
As you Sow: Larry Fahn, Amy Galland

Patrick Doherty

Fair Pension: Louise Rouse

Boston Common Asset Management: Steven Heim

**Community Organizations**
San Ramon Valley Cares: Steve Harms
Rabbi Dan Goldblatt

**Humanitarian Organizations**
Give Clearwater

**Public Relations and Media Consultants**
Dominic Houes, Rikshaw Films

**Shareholder Advocacy Consultants**
Trillium Asset Management, Shelly Alpern

4

**Celebrity Advocates**
Daryl Hannah, Bianca Jagger

**LAPs' Council**:
Aaron Marr Page, Graham Erion, Juan Pablo Saenz, Luis Yanza, Pablo Fajardo, Julio Prieto, Vanesa Barham

**LAPs' Press Team**
Nancy Elizabeth Rodrihuez, Maria Eugenia Garces, Maria Eugenia Yepez, Guadalupe de Heredia, Francisco Mazon

      Again, I urge you to reconsider your decision to cut off the meet and confer, and to do so with us on all outstanding issues, as the rules require.

Sincerely,

/s/ Richard Herz
Richard Herz

5

1   Marco Simons (SBN 237314)
    marco@earthrights.org
2   Richard L. Herz
    rick@earthrights.org
3   Michelle C. Harrison
    michelle@earthrights.org
4   Marissa A. Vahlsing
    marissa@earthrights.org
5   EARTHRIGHTS INTERNATIONAL
6   1612 K Street NW, Suite 401
    Washington, DC 20006
7   Telephone: (202) 466-5188

8   Jose Luis Fuentes
    jlf@siegelyee.com
9   Siegel & Yee
    499 14th Street Ste 300
10  Oakland, CA 94612
    Tele: (510) 839-1200
11  Facsimile: (510) 444-6698

12

13   Attorneys for Non-Party Amazon Watch

14                  **UNITED STATES DISTRICT COURT**

15            **FOR THE NOTHERN DISTRICT OF CALIFORNIA**

16

17   CHEVRON CORP.,                    )   Case No. C 13-80038-MISC CRB
                                       )
18   Plaintiff,                        )   **DECLARATION OF ATOSSA SOLTANI IN**
                                       )   **SUPPORT OF AMAZON WATCH'S**
19            v.                       )   **OPPOSITION TO CHEVRON'S MOTION**
                                       )   **TO ENFORCE AMAZON WATCH'S**
20   STEVEN DONZIGER, *et al.*         )   **SUBPOENA TO PRODUCE DOCUMENTS**
                                       )
21   Defendants.                       )
                                       )
22                                     )
                                       )
23                                     )
                                       )
24                                     )
                                       )
25                                     )
                                       )
26                                     )
                                       )
27                                     )
                                       )
28

DECLARATION OF ATOSSA SOLTANI

### DECLARATION OF ATOSSA SOLTANI

I, Atossa Soltani, hereby declare as follows:

1.      I am over the age of 18 and am competent to make this declaration.

2.      I have personal knowledge of all matters set forth in this declaration, except where such facts are stated based on information and belief, and those facts I believe to be true. If called upon to do so, I could and would testify to all matters set forth herein.

3.      I am currently, and have been since its founding 1996, the Executive Director of Amazon Watch (AW), a nonprofit organization.

4.      In Dkt. 13 at page 2, footnote 2, Chevron misrepresents a statement that I made in the past and I would like to correct the record. Chevron references "AW Executive Director Atossa Soltani's participation in a June 2007 meeting in which Donziger and Defendant Pablo Fajardo discussed the need for a 'private army,' and Soltani warned that "its illegal to conspire to break the law." *Id.*, *see also*, Dkt. 38-6. This is a mischaracterization of both my statements and the context in which the statement was made. At the moment in question, Steven Donziger was describing how, in order to ensure that Chevron didn't exert undue influence upon the court, it was necessary to have groups there to monitor the court and to have people protesting before the courthouse to object to the delays in the process. This conversation was being filmed by the documentary crew making the film *Crude*. At one point, Steven Donziger and Luis Yanza turned this conversation into a joke about targeting the court and getting arms from Iran (most likely because I am originally from Iran). I did not feel comfortable with the jokes that were referencing a takeover of the courthouse and feared that they could be used out of context against us. While I realized then that the comments were meant as a joke, I wanted to go on record as saying that I did not feel comfortable even joking about discussions on breaking the law.

5.      I also understand that Chevron references an email chain, Dkt. 13 at page 2, footnote 2, in which my colleagues and I express excitement about the appointment of  "global expert" in the Ecuador trial and a comment is made that our visit to the judge was "worth it." Again, this comment is wholly taken out of context. Amazon Watch never opined about *which* global expert should be appointed to the trial. Amazon Watch was only interested in the appointment of *a* global expert to the trial because we were concerned about the persistent delays in the case, and we felt concerned that

1

DECLARATION OF ATOSSA SOLTANI

because of these delays, an expert would not be appointed and the process would not move forward. For this reason, I participated in a public meeting and conference (with at least ten other people) in which the judge explained the process for the appointment of the global expert and we asked him questions about when this process would move forward. At no point did any AW staff or I urge the judge, or even suggest to the judge, that any particular expert be appointed. All of this of course, should be of no surprise to Chevron since Chevron itself submitted a video where all of this took place, Dkt. 356, ¶ 71, video CRS-347-00-CLIP-01, in the underlying action in New York, Case No. 11-cv-0691 (LAK) (S.D.N.Y.). On that video, it is clear, that I am merely asking the judge, in a public question and answer period, questions about the delay in the process and when the process would move forward so that an expert might be appointed. The judge then explains, in no uncertain terms, that the "process has been delayed" because the company "Texaco" has been objecting to, and holding up, the process of having the expert appointed. At no point did AW ever coordinate with the LAPs or RICO defendants as a part of an alleged scheme to "control the court, to pressure the court" to have Cabrera appointed. Dkt. 38 at 3. Again, AW never opined on who the expert should be; AW only wanted the process of appointing *an expert* to move forward, which was something that we felt the plaintiffs deserved as a matter of due process. Similarly, Chevron's accusations that we ever sought to "control the court, to pressure the court" to appoint Cabrera, Dkt. 38 at 3, are disingenuous and false.

////

////

////

////

6.     Chevron also seeks to characterize AW's Ecuador campaign as being "launched" with funds by the LAPs legal team. Again, this is simply not true. Amazon Watch was committed to the issue of supporting the communities affected by Chevron years before we ever received any monetary support from the LAPs or their lawyers. Although at various times AW received funds from donors to assist it in particular phases of campaigns, no single donation can be said to have "launched" a campaign. The same holds true for our work in support of the communities affected by Chevron. Although Chevron

2

1   makes much of a donation that we received from the financial supporters of the LAPs, Dkt. 38 at 5,

2   this donation accounted for less than 10% of the over all expenses that AW has spent on its campaign

3   in support of the communities in Ecuador.

4

5       I declare under penalty of perjury of the laws of the United States and the State of California that

6   the foregoing is true and correct. Executed on March 11, 2013.

7

8

9   _____

10   Atossa Soltani

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case  No.  C  13-80038-
MISC CRB                     DECLARATION OF ATOSSA SOLTANI

Marco Simons (SBN 237314)
marco@earthrights.org
Richard L. Herz
rick@earthrights.org
Michelle C. Harrison
michelle@earthrights.org
Marissa A. Vahlsing
marissa@earthrights.org
EARTHRIGHTS INTERNATIONAL
1612 K Street NW, Suite 401
Washington, DC 20006
Telephone: (202) 466-5188

Jose Luis Fuentes
jlf@siegelyee.com
Siegel & Yee
499 14ᵗʰ Street Ste 300
Oakland, CA 94612
Tele: (510) 839-1200
Facsimile: (510) 444-6698

Attorneys for Non-Party Amazon Watch

# UNITED STATES DISTRICT COURT

## FOR THE NOTHERN DISTRICT OF CALIFORNIA

CHEVRON CORP.,                                )   Case No. C 13-80038-MISC CRB
                                              )
Plaintiff,                                    )   **DECLARATION OF PAUL PAZ Y MIÑO**
                                              )   **IN SUPPORT OF AMAZON WATCH'S**
        v.                                    )   **OPPOSITION TO CHEVRON'S MOTION**
                                              )   **TO ENFORCE AMAZON WATCH'S**
STEVEN DONZIGER, *et al.*                     )   **SUBPOENA TO PRODUCE DOCUMENTS**
                                              )
Defendants.                                   )
                                              )
                                              )
                                              )
                                              )
                                              )
                                              )
                                              )
                                              )
                                              )
                                              )
_____)

**DECLARATION OF PAUL PAZ Y MIÑO**

I, Paul Paz y Miño, hereby declare as follows:

1.   I am over the age of 18 and am competent to make this declaration.

2.   I have personal knowledge of all matters set forth in this declaration, except where such facts are stated based on information and belief, and those facts I believe to be true. If called upon to do so, I could and would testify to all matters set forth herein.

3.   I am currently the Online and Operations Director at Amazon Watch and until January 2013 had been the Managing Director since September 2007.

4.   Amazon Watch has maintained The Clean Up Ecuador campaign for over 10 years and as a legally registered 501c3 non-profit, receives donations of varying amounts to do so. Over the course of that time Amazon Watch has received reimbursement for some campaign expenses and donations from the firm of Kohn, Swift and Graf. The costs of maintaining this extended campaign is well over a million dollars and the amounts received from Kohn, Swift and Graf are only a small portion of our costs. In fact, no single donor has ever been a majority contributor to this campaign.

5.   Amazon Watch receives many large donations from foundations, businesses and individual donors and yet remains an independent organization that determines its own goals and methods.

////

////

////

////

////

6.   With respect to the Amazon Watch use of the "30 times the Exxon Valdez" figure, as stated before, we made the decision not to promote that figure after the first quarter of 2006, even though we still agreed with it, after some objections were raised. It is absurd to then consider Amazon Watch part

1

of a "global conspiracy" because we did not then remove archived and searchable documents and news stories on the ChevronToxico.com website that reference the figure.

I declare under penalty of perjury of the laws of the United States and the State of California that the foregoing is true and correct. Executed on March 11, 2013.


_____

Paul Paz y Miño

Case No.  C  13-80038-
MISC CRB

DECLARATION OF PAUL PAZ Y MIÑO

1  Marco Simons (SBN 237314)
   marco@earthrights.org
2  Richard L. Herz
   rick@earthrights.org
3  Michelle C. Harrison
   michelle@earthrights.org
4  Marissa A. Vahlsing
   marissa@earthrights.org
5  EARTHRIGHTS INTERNATIONAL
   1612 K Street NW, Suite 401
6  Washington, DC 20006
   Telephone: (202) 466-5188
7
8  Jose Luis Fuentes
   jlf@siegelyee.com
9  Siegel & Yee
   499 14ᵗʰ Street Ste 300
10 Oakland, CA 94612
   Tele: (510) 839-1200
11 Facsimile: (510) 444-6698
12
   Attorneys for Non-Party Amazon Watch
13
                    UNITED STATES DISTRICT COURT
14
              FOR THE NOTHERN DISTRICT OF CALIFORNIA
15
16
17 CHEVRON CORP.,                    )  Case No. C 13-80038-MISC CRB
                                     )
18         Plaintiff,                )  **DECLARATION OF KEVIN MICHAEL**
                                     )  **KOENIG IN SUPPORT OF AMAZON**
19         v.                        )  **WATCH'S OPPOSITION TO CHEVRON'S**
                                     )  **MOTION TO ENFORCE AMAZON**
20 STEVEN DONZIGER, *et al.*         )  **WATCH'S SUBPOENA TO PRODUCE**
                                     )  **DOCUMENTS**
21         Defendants.               )
                                     )
22                                   )
                                     )
23                                   )
                                     )
24                                   )
                                     )
25                                   )
                                     )
26                                   )
                                     )
27                                   )
                                     )
28
   ─────────────────────────────────────────────────────────────
   Case No. C 13-80038-
   MISC CRB              DECLARATION OF KEVIN MICHAEL KOENIG

# DECLARATION OF KEVIN MICHAEL KOENIG

I, Kevin Michael Koenig, hereby declare as follows:

1.   I am over the age of 18 and am competent to make this declaration.

2.   I have personal knowledge of all matters set forth in this declaration. If called upon to do so, I could and would testify to all matters set forth herein.

3.   I am currently the Ecuador Program Coordinator at Amazon Watch.

4.   I have been working with Amazon Watch in support of communities in Ecuador affected by oil contamination since the year 2000. Before that time, I also worked and lived in Ecuador while working with other NGOs, including, Accion Ecologica (Ecological Action, an Ecuadorian environmental non-profit based in Quito) and the Center for Economic and Social Rights.

5.   In these capacities, and also in my capacity at Amazon Watch, I have been exposed to extensive reports, photos, videos, and analyses that informs my good faith belief that Chevron/Texaco is primarily responsible for the contamination in the Oriente region of Ecuador, as the court held Judgment of the Provincial Court of Justice of Sucumbíos, Nueva Loja, Ecuador, *Maria Aguinda v. Chevron Corp.*, No. 2003-0002 (Feb. 14, 2011).[1]

6.   At the time Amazon Watch received the request in 2000 of the Ecuadorian communities affected by Texaco (then in acquisition discussions with Chevron) to assist them in their campaign, there was an abundance of evidence that I believed pointed to Texaco's responsibility. This evidence served as the basis and justification for undertaking our campaign, and provided the sense of urgency for a campaign to pressure Texaco into cleaning up the damage. Texaco's original contract with the Ecuadorian government stipulated that the company was the operator of, and held a minority stake in, a consortium with the Ecuadorian state oil company Petroecuador (at the time, "CEPE") to drill for oil over 1 million hectares of rainforest in the country's Amazon region in what would be the country's first major oil development project. Texaco designed, built, operated, and maintained oil field operations of some 339 well sites from 1965 - 1990 that produced an estimated 1.5 billion barrels of crude. Texaco

---

[1] Available at: http://chevrontoxico.com/assets/docs/2011-02-14-Aguinda-v-ChevronTexaco-judgement-English.pdf, last accessed February 22, 2013.

Case No. C 13-80038-MISC CRB    DECLARATION OF KEVIN MICHAEL KOENIG

also built and operated the Trans-Ecuadorian Pipeline until 1989.[2]

7.    On information and belief, Texaco designed, built, operated, and maintained a substandard oil field operation in the Oriente region of Ecuador, on the cheap, that was designed to pollute. When Texaco left Ecuador, the company had spilled more than 16.8 million gallons of crude, and dumped some 4.3 billion gallons of toxic waste.[3] Within a year and a half, LAPs filed their case in New York courts. Chevron has since spent 18 years attempting to delay and derail the case against it (both in New York and in Ecuador), primarily by scapegoating Petroecuador who took over Texaco's operations in July 1992. The reality is that the northern Ecuadorian Amazon was a disaster area when Texaco left; and the LAPs filed their case almost immediately after Texaco's departure. Because Texaco was the operator, we at Amazon Watch feel that it is primarily responsible for the damage.

8.    When Texaco first arrived in Ecuador, Texaco was viewed as a leading international oil company that could bring state of the art drilling technology to Ecuador and transfer oil field know-how and training to Ecuador's upstart state oil company that had never before produced or transported crude oil. However, on information and belief Texaco designed a system using substandard technology out of step with standard industry practice.  According to the American Petroleum Institute (API) standards and training manuals, and relevant oil industry laws in places were Texaco was already operating such as Louisiana and Texas, Texaco's system for disposing of toxic produced water in Ecuador was antiquated. Thus, Texaco's system of oil field production, waste disposal, and transportation led to widespread contamination, and violated Ecuadorian law.  Indeed, Texaco filed for a patent in 1974 for a system of wastewater re-injection that, had it been employed in Ecuador, would have greatly reduced contamination[4]. But the company did not utilize this technique in Ecuador. Internal Texaco documents, now in the public record and viewed by Amazon Watch, show that Texaco micromanaged the operation from the United States, and on the ground, as the operator, was running the day-to-day operations and was charged with most major decision-making.  On information and

---

[2] Declaration of Denis York LeCorgne, President of Texaco Petroleum Company, Case No. 1:93-cv-07527 Aguinda, et al v. Texaco inc.
[3] Kimerling, Judith. Amazon Crude. Natural Resource Defense Council, 1991. Pg. 63.
[4] United States Patent Office, June 18,1974.  "Waste Water Treatment Method", filed by Jack F. Tate, assignor to Texaco Inc., New York, NY.

Case  No.  C  13-80038-MISC CRB                DECLARATION OF KEVIN MICHAEL KOENIG

belief, the company deliberately employed cost cutting measures that led to greater pollution and exposure of nearby residents to toxins.[5]  Texaco also ordered all field staff to destroy any record of past spills and underreport current or future ones.[6]

9.   Texaco handed over its operations to Petroecuador in 1991.  In October of 1992, Furgo-McClelland conducted a final environmental field audit for practices between 1964 and 1990 for Texaco. The audit found "hydrocarbon contamination requiring remediation at all production facilities and a majority of the drill sites."[7]  Shortly thereafter, in 1993, the *Aguinda v. Texaco* case was filed in the Southern District of New York on behalf of 30,000 residents of the Oriente region of the Ecuadorian Amazon who are live amongst Texaco's contamination.

10.   Also in 1993, HBT Agra prepared an environmental audit of the same fields.  It found abundant contamination and major violations of Ecuadorian hydrocarbon and environmental laws.[8] Between 1995 - 1998, Texaco conducted an environmental "remediation" of contaminated former sites. However, investigators such as Judith Kimerling, viewed the scope, standards, and execution of the "remediation" as greatly flawed.[9]  Photos and video of the "clean up," which I have seen, show bulldozers simply pushing dirt over waste pits; workers burning off refuse, and poorly equipped workers wading in sludge attempting to corral the crude with their bare hands.[10]

---

[5] Letter from D. W. Archer to Ing. Rene Bucharan, "Piscinas de Perforacion Reacondicionamiento y Produccion." June 25, 1980. http://chevrontoxico.com/assets/docs/1980-06-25-internal-texaco-letter-re-pits.pdf. Last accessed March 11, 2013.
[6] "Reporting of Environmental Incidents - New Instructions." Letter from R.C. Shields, Chairman of the Board, to Mr. M.E. Crawford, Acting Manager, Texaco Petroleum Company, Quito Ecuador. According to the memo, "a) Only major events as per Oil Spill Response Plan Instructions are to be reported.  These events are to reported immediately, b). A major event is further defined as one which attracts the attention of press and/or regulatory authorities or in your judgment merits reporting. c). No reports are to be kept on a routine basis and all previous reports are to be removed from Field and Division offices and destroyed." http://chevrontoxico.com/assets/docs/shields2008-10-15.pdf. Last accessed March 11, 2013.
[7] Furgo-McClelland, October 1992. Available at: http://chevrontoxico.com/assets/docs/Fugro-McLelland-Field-Audit-1964-1990.pdf. Last accessed March 11, 2013.
[8] HBT Agra, October, 1993. http://chevrontoxico.com/assets/docs/HBT-Agra-Vol-1-Draft-Oct-1993.pdf. Last accessed March 11, 2013.
[9] Kimerling, Judith. Texaco's Environmental Audit: Justice or Business as Usual?  Harvard Law Journal 1994.
[10] CBS News, 60 Minutes. "Amazon Crude," May 3, 2009.

Case No. C 13-80038-MISC CRB         DECLARATION OF KEVIN MICHAEL KOENIG

11.  I have repeatedly visited "remediated" sites only to find that beneath a thin layer of dirt is extensive oil contamination.

12.  Given Texaco's poor practices and crumbling infrastructure, it was no surprise that spills and contamination continued once Petroecuador took over operations in 1993 since, according to Texaco Petroleum's Declaration, "all former employees of TexPet, who had direct operational responsibility for any wells or the operation of the pipeline, are now employed by Petroecuador's companies in Ecuador."[11] Since that time, and in the nineteen years since, on information and belief, Petroecuador has improved its operating practices over the standards Texaco used. Petroecuador now re-injects all produced water--something Texaco never did. PetroEcuador has recorded many spills since 1993, but it may never be precisely known how many occurred on Texaco's watch because, on information and belief, Texaco deliberately destroyed documents and failed to report, or underreported, spills.[12]  A memo entitled "Reporting of Environmental Incidents - New Instructions," Texaco field employees were told, "No reports are to be kept on a routine basis and all previous reports are to be removed from Field and Division offices and destroyed."[13] According to the Ecuadorian government, the transnational pipeline that Texaco built and operated, spilled an admitted 16.8 million gallons of crude along its 318-mile route from the Amazon to the Pacific coast-- a number not disputed by Texaco nor Chevron today.[14]

13.  Based on this and other evidence, Amazon Watch felt that Texaco was responsible for the severe contamination in the Oriente region and therefore owed the people who resided in the company's former oil patch what their communities sought: (1) a full, true clean up, (2) potable water, and (3) funds for health care.

14.  Throughout its work on this campaign, Amazon Watch has shared the widely held view that, given the immense power and resources that Chevron holds, protests, public pressure and media were all needed to combat Chevron's influence on the Ecuadorian political system.  A strong message needed

---

[11] Declaration of Denis York LeCorgne, on behalf of Texaco Petroleum Company, 93 CIV 07527 (VLB).

[12] "Reporting of Environmental Incidents - New Instructions." Letter from R.C. Shields, Chairman of the Board, to Mr. M.E. Crawford, Acting Manager, Texaco Petroleum Company, Quito Ecuador. http://chevrontoxico.com/assets/docs/shields2008-10-15.pdf. Last accessed March 11, 2013.

[13] *Id.*

[14] Kimerling, Judith. Amazon Crude pg. 69.

4

DECLARATION OF KEVIN MICHAEL KOENIG

to be sent that the eyes of the world were on this case, and that neither the communities nor the world would tolerate the kind of corruption or quid-pro-quo "business as usual" style to which Chevron was accustomed.

15.   On information and belief, at the time of the trial, Chevron was still receiving privileges from the Ecuadorian government -- for example, at the start of the 2003 *Aguinda* litigation in Ecuador, the Ecuadorian government gave Chevron employees plush accommodations at the Rayo 64 military base in Lago Agrio for several years.  On information and belief, Chevron worked with the military in producing a false security threat during the trial that canceled a major judicial inspection that would have been detrimental to Chevron.[15]

16.   On information and belief, during the course of the Ecuador trial, Chevron repeatedly engaged in efforts to delay and derail the trial. For example, on information and belief, [16] Chevron successfully forced the removal of a presiding judge based on "independent" videos that allegedly show "corruption" but which turned out to be procured by a former Chevron employee and a convicted felon who coordinated efforts with Chevron officials in California. I have personally had a number of conversations with the whistleblower at the heart of this scandal, Santiago Escobar, and these conversations and the above cited news reports informed my belief that Chevron/Texaco was needlessly attempting to stall/thwart the trail process in bad faith.

17.   Amazon Watch was thus concerned that Chevron's tactics were inappropriately prolonging what was already more than a decade worth of litigation.  And given the historic influence of Chevron in Ecuador and recent antics before the court, we felt there was a need for the judge to know that the eyes of the world were upon him, and that any undue or illegal influence by Chevron was unacceptable.  We, like the LAPs, felt the appointment of an "expert" was an important step to the case proceeding.

---

[15] Report Submitted by Major I. Arturo Velasco, Sub Commander of Special Forces Group-IV "Rayo" to Lt. Em. Francisco Narvaez, Commander of Special Forces Group-IV "Rayo," regarding events provoked with the Texaco Company. Available at
http://chevrontoxico.com/assets/docs/military-report-english.pdf. Last accessed March 11, 2013.
[16] *See e.g.,* http://www.reuters.com/article/2010/04/06/chevron-ecuador-idUSN0614269920100406?type=marketsNews; http://www.chevroninecuador.com/2010/06/whistleblower-receives-death-threat-for.html. Last accessed March 11, 2013.

Case  No. C  13-80038-MISC CRB          DECLARATION OF KEVIN MICHAEL KOENIG

Amazon Watch had no expertise, nor influence over any selection process, nor preference in which "expert" was chosen--only that one be appointed and the case move forward.

18.   Amazon Watch and I believe that a major reason Chevron argued for the *Aguinda* litigation to be dismissed back to Ecuador was because Chevron thought it would be able to use its influence and connections to influence the case there.

19.   This is the background to the out of context statements Chevron cites in Dkt. 13 at 2, note 2 about raising a "private army." *See also,* Dkt. 38-6. I was in the room when those statements were made, and I know that what was being discussed was not a literal "army" or "brigade", but rather groups of "court observers" comprised of affected peoples that could be organized to monitor the courthouse day in and day out.  Chevron's counsel and representatives were inside and outside the court everyday, meeting with the Judge, flirting with the court's secretary, and hounding officers of the court.  Despite any off color remarks which are obviously made in jest, the true intent and function of the groups was to monitor the court, given the long history of Chevron's influence in Ecuador and the historic bias that Ecuadorian institutions have traditionally had against the exact groups of people who brought the *Aguinda* case. It is important to note, that what Chevron seeks to portray as a "private army" was, in reality, if anything, groups of unarmed, peaceful, campesinos and indigenous peoples standing outside of the courthouse. Because the courthouse is located inside a busy shopping center, these groups were mixing with the hustle and bustle of the shoppers. It is also important to note that Chevron's personnel almost always outnumbered these groups there.

I declare under penalty of perjury of the laws of the United States and the State of California that the foregoing is true and correct. Executed on March 11, 2013

Kevin Michael Koenig

6

DECLARATION OF KEVIN MICHAEL KOENIG