ETHAN D. DETTMER, SBN 196046
  edettmer@gibsondunn.com
ENRIQUE A. MONAGAS, SBN 239087
  emonagas@gibsondunn.com
AIMEE M. HALBERT, SBN 279144
  ahalbert@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, California 94105-0921
Telephone: 415.393.8200
Facsimile:  415.393.8306

*Attorneys for Plaintiff Chevron Corporation*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CHEVRON CORPORATION,<br><br>            Plaintiff,<br><br>    v.<br><br>STEVEN DONZIGER, *et al.*,<br><br>            Defendants. | Case No. 3:13-mc-80038-CRB<br><br>**CHEVRON CORPORATION'S OPPOSITION TO AMAZON WATCH'S MOTION TO QUASH AND/OR MODIFY SUBPOENA TO PRODUCE DOCUMENTS**<br><br>**Hearing**:[1]<br>Date:  April 3, 2013<br>Time: 1:00 p.m.<br>Place: Courtroom A, 15th Floor |

---

[1]  Amazon Watch prematurely noticed the hearing on its motion before Magistrate Judge Cousins. In light of this Court's unavailability during the week of April 1, 2013, Chevron respectfully requests the hearing date of March 29, 2013, at 10:00 a.m., in order for Chevron to meet its pending discovery deadlines in the underlying litigation.

**TABLE OF CONTENTS**

**Page**

I. SUMMARY OF ARGUMENT ................................................................................................ 1

II. BACKGROUND ..................................................................................................................... 2

    A. The Fraudulent And Extortionate Campaign Against Chevron. .................................... 3

    B. Chevron Filed A RICO Action In The Southern District Of New York Based On The LAPs' Fraudulent And Extortionate Conduct. .................................................. 4

    C. AW Was "Critical" To The LAPs' U.S.-Based Campaign To Pressure Chevron To Settle The Fraudulent Lago Agrio Litigation. ............................................ 5

    D. The LAPs And Their Allies Continue To Resist Discovery "To An Astonishing Degree." ....................................................................................................... 9

III. ARGUMENT ......................................................................................................................... 10

    A. Judge Kaplan Already Has Decided AW's Manufactured Service Dispute. ............... 10

    B. The First Amendment Does Not Protect AW's Fraudulent Conduct. ......................... 11

    C. AW Must Log Documents It Claims Are Privileged. .................................................. 13

    D. The Subpoena Does Not Unduly Burden AW. ............................................................ 14

    E. The Subpoena Does Not Seek AW's Protectable Commercial Information. .............. 14

    F. AW Should Bear The Costs of Production Given Its Participation In The Conspiracy. .................................................................................................................. 15

IV. CONCLUSION ...................................................................................................................... 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Branzburg v. Hayes*,
  408 U.S. 665 (1972) .................................................................................................................. 11

*Burlington N. & Santa Fe Ry. Co. v. District Court*,
  408 F.3d 1142 (9th Cir. 2005) ................................................................................................... 13

*Chevron Corp. v. Champ*,
  No. 10-mc-27, 2010 WL 3418394 (W.D.N.C. Aug. 30, 2010) ................................................ 14

*Chevron Corp. v. Donziger*,
  768 F. Supp. 2d 581 (S.D.N.Y. 2011) ................................................................................. 3, 14

*Chevron Corp. v. Donziger*,
  886 F. Supp. 2d 235 (S.D.N.Y. 2012) ................................................................................... 3, 4

*Chevron Corp. v. Page*,
  No. RWT-11-1942 (D. Md. Jan. 25, 2013) ............................................................................... 14

*Chevron Corp. v. Salazar*,
  275 F.R.D. 437 (S.D.N.Y. 2011) .............................................................................................. 14

*Choudhuri v. Wells Fargo Bank, N.A.*,
  No. 11-cv-518, 2011 U.S. Dist. LEXIS 78278 (N.D. Cal. July 19, 2011) .................................. 2

*Compaq Computer Corp. v. Packard Bell Elec., Inc.*,
  163 F.R.D. 329 (N.D. Cal. 1995) ......................................................................................... 2, 15

*Direct Mail Specialists, Inc. v. Eclat Computerized Techs., Inc.*,
  840 F.2d 685 (9th Cir. 1988) .................................................................................................... 11

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*,
  538 U.S. 600 (2003) .................................................................................................................... 1

*In re Appl. of Chevron Corp.*,
  633 F.3d 153 (3d Cir. 2011) ...................................................................................................... 14

*In re Appl. of Chevron Corp.*,
  No. 10-cv-2675, Dkt. 33 (D.N.J. June 11, 2010) ...................................................................... 14

*In re Applic. of Chevron Corp.*,
  749 F. Supp. 2d 141 (S.D.N.Y. 2010) ................................................................................. 7, 14

*In re Chevron Corp.*,
  No. 10-cv-1146-IEG, 2010 WL 3584520 (S.D. Cal. Sept. 10, 2010) ....................................... 14

*In re Chevron Corp.*,
  No. 11-cv-24599-MGC-WCT, 2012 WL 3636925 (S.D. Fla. June 12, 2012) ......................... 14

*In re Chevron Corp.*,
  Nos. 1:10-mc-21-22, Dkt. 173 (D.N.M Sept. 2, 2010) ............................................................. 14

*In re Grand Jury Proceedings*,
   87 F.3d 377 (9th Cir. 1996) .................................................................................................. 13

*In re Honeywell Int'l, Inc. Sec. Litig.*,
   230 F.R.D. 293 (S.D.N.Y. 2003) ........................................................................................... 15

*In re Jean-Baptiste*,
   No. M 11-188, 1985 WL 1863 (S.D.N.Y. July 5, 1985) ....................................................... 11

*Nat'l Org. for Marriage v. McKee*,
   723 F. Supp. 2d 236 (D. Me. 2010) ....................................................................................... 12

*Perry v. Schwarzenegger*,
   591 F.3d 1147 (9th Cir. 2010) ..................................................................................... 2, 11, 12, 13

*Perry v. Schwarzenegger*,
   602 F.3d 976 (9th Cir. 2010) ................................................................................................. 12

*Roche Palo Alto LLC v. Apotex, Inc.*,
   526 F. Supp. 2d 985 (N.D. Cal. 2007) ................................................................................... 11

*United States v. Hempfling*,
   431 F. Supp. 2d 1069 (E.D. Cal. 2006) ................................................................................. 11

*United States v. Rybicki*,
   354 F.3d 124 (2d Cir. 2003) .................................................................................................. 11

*United States v. Sattar*,
   395 F. Supp. 2d 79 (S.D.N.Y. 2005) ...................................................................................... 11

**Rules**

Fed. R. Civ. P. 26 ........................................................................................................................ 10

Fed. R. Civ. P. 45 ............................................................................................................... 2, 10, 13

# I. SUMMARY OF ARGUMENT

In June 2006, Atossa Soltani, the Executive Director of Amazon Watch ("AW"), had a videotaped meeting in Ecuador with Steven Donziger, the ringleader of a conspiracy to obtain a fraudulent $19 billion judgment in Ecuador on behalf of the Lago Agrio Plaintiffs and their agents (the "LAPs"), and extort billions of dollars from Chevron based on that fraudulent judgment. During that meeting, Donziger discussed raising a "private army" to "send a message to the court . . . , 'don't f[**]k with us anymore—not now, and not—not later, and never.'" Dkt. 38-5. Soltani asked, "[d]o you guys know if anybody can, uh, subpoena these videos?" Dkt. 38-6. Donziger said, "[w]e don't have the power of subpoena in Ecuador," and Soltani asked, "[w]hat about U.S.?" *Id.* She noted, "I just want you to know that it's—it's illegal to conspire to break the law." *Id*.

But Soltani and AW continued to do Donziger's bidding, playing what Donziger described as "an absolutely critical role" in the conspiracy, because "the pain AW can cause Chevron in many respects is greater than the pain [the LAPs' lawyers] can cause." Dkt. 38-14. And at the same time AW publicly disavowed connection with the LAPs' representatives (*e.g.*, Halbert Decl. Ex. 1 at 37), Donziger was paying AW to issue press releases and letters to government agencies that he had secretly ghostwritten. *See, e.g.*, Halbert Decl. Ex. 2 at 9; Dkt. 14 Exs. 11, 12, 13; Dkt. 14 Ex. 5 (Donziger writes: "I . . . know the press releases on the Ecuador campaign are not a terrible work burden to AW because I am writing most of them."); Dkt. 14 Ex. 6 (Donziger writes: "FYI, a check is being sent today for $1,000 for p.r. newswire propaganda.").

Now, having received the subpoena Soltani feared, AW obstructs and delays further revelation of its role in this fraudulent conspiracy. But its arguments are unsupported. **First**, AW argues that service was improper. Dkt. 3 at 8. But AW has already litigated and lost this issue before Judge Kaplan (Dkt. 14 Ex. 3), and thus this question is settled. **Second**, AW claims its documents are protected from disclosure by the First Amendment. Dkt. 3 at 9-17. But the First Amendment does not protect fraudulent activity or associations that further a conspiracy. *E.g.*, *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003). And even if AW's furtherance of this conspiracy were entitled to First Amendment protection, it seeks to cloak documents far outside the protected "*private, internal* campaign communications" among "the core group of *persons* engaged in

the formulation of campaign strategy and messages." *Perry v. Schwarzenegger*, 591 F.3d 1147, 1165 n.12 (9th Cir. 2010) (emphases in original). **Third**, to the extent AW claims its communications are privileged, it is obligated to log those communications so that Chevron may assess the asserted privilege. *See* Fed. R. Civ. P. 45(d)(2)(A). **Fourth**, AW's "undue burden" complaints should be rejected given its participation in a fraudulent conspiracy, and given Chevron's reasonable, rejected efforts to address those concerns. **Fifth**, the information sought is not the sort of "important proprietary information" that is protected from disclosure, and in any event, AW may use the protective order in the underlying case. Further, "[a] survey of the relevant case law reveals that discovery is virtually always ordered once the movant has established that the secret information is both relevant and necessary." *Compaq Computer Corp. v. Packard Bell Elec., Inc.*, 163 F.R.D. 329, 338 (N.D. Cal. 1995). **Finally**, AW's request to share costs should be rejected. AW's "critical" role in the fraudulent conspiracy, among other things, weighs heavily against any reallocation of costs here.[2] AW's motion to quash should be denied, and immediate production should be ordered.[3]

## II. BACKGROUND

AW's initial connection with the LAPs is unclear, but Donziger's former co-counsel Joseph Kohn, who funded the LAPs, claimed that his firm's payments to AW "launched" AW's involvement in the Lago Agrio litigation and the associated campaign against Chevron. Dkt. 38-13 at 1. By 2002, AW was donating funds to the Amazon Defense Front, a "coalition of Ecuadorians" under whose

---

[2] AW's claim that "Chevron is not contesting the validity of the LAPs' pollution claims" in the underlying litigation (Dkt. 3 at 1, 2) is false. Chevron has always disputed the LAPs' fraudulent claims. But in the underlying RICO case, Chevron will not "relitigate the environmental conditions existing in the Oriente," because the focus of the RICO litigation is "whether the judgment's findings have any support untainted by fraud in the record that existed before the Ecuadorian court at the time the judgment was issued." Halbert Decl. Ex. 4 at 3-4. The Court presiding over the underlying case has agreed that this is the scope of the RICO litigation. *Id.* Ex. 5.

[3] Counsel for Chevron and AW met and conferred by telephone for well over four hours on multiple days, and exchanged over forty pages of correspondence regarding the subpoena. The parties reached an impasse with respect to all legal issues. *See, e.g., Choudhuri v. Wells Fargo Bank, N.A.*, No. 11-cv-518, 2011 U.S. Dist. LEXIS 78278, at *2 (N.D. Cal. July 19, 2011) (judicial intervention is proper when "informal negotiations have reached an impasse on the substantive issues in dispute"). In a January 4 letter, counsel for AW acknowledged the parties' impasse with respect to the substantive issues AW has raised. *See* Dkt. 4 Ex. M; *see also* Halbert Decl. Exs. 37, 38. AW also continues to claim, falsely, that Chevron never offered a proposal for the production of non-objectionable documents on a rolling basis. *E.g.*, Dkt. 3 at 7. For example, Chevron presented a detailed proposal on January 7, 2013 (Halbert Decl. Ex. 39), which AW rejected, claiming that it could not search for or produce any documents without undue burden. *See* Dkt. 4 Ex. O.

name the RICO Defendants disseminate false and misleading propaganda. Halbert Decl. Ex. 21; *see also id.* Ex. 22. By 2006, Soltani was collaborating frequently with Donziger both in the United States and Ecuador. *E.g.*, Halbert Decl. Ex. 1 at 2-3 (Soltani discusses an *ex parte* lunch with the Lago Agrio judge, plaintiffs' experts, and counsel).

### A. The Fraudulent And Extortionate Campaign Against Chevron.

In the underlying RICO case, Chevron submitted unrefuted evidence of the LAPs' fraud and corruption throughout the course of the Ecuadorian lawsuit. *E.g.*, Dkt. 38-3. For example, the LAPs' counsel and consultants forged reports submitted to the Lago Agrio court under the name of their own expert, Dr. Charles Calmbacher, after he inspected certain oil production sites in Ecuador and found that the LAPs' contamination claims were unsupported. *See Chevron Corp. v. Donziger*, 886 F. Supp. 2d 235, 255 (S.D.N.Y. 2012). The LAPs pressured and colluded with the Ecuadorian court to halt the adversarial "judicial inspection" process and instead appoint a single, supposedly neutral expert, Richard Stalin Cabrera Vega. *See id.* at 256-58; *see also* Dkt. 38-7; Halbert Decl. Ex. 2 at 11-12, 18, 30; *id.* Ex. 3. But Cabrera was not independent. The LAPs not only met with Cabrera to discuss his report *before* he was appointed (*Donziger*, 886 F. Supp. 2d at 258-59; Halbert Decl. Ex. 1 at 26-30), but also paid him from a "secret" account (Halbert Decl. Exs. 6, 7, 8, 9, 10, 11; *id.* Ex. 23 at 4877:16-4878:12), and ghostwrote the report submitted to the Lago Agrio court under Cabrera's name (*Donziger*, 886 F. Supp. 2d at 259-60; Halbert Decl. Ex. 12). The ghostwritten Cabrera report initially found Chevron liable for $16 billion. *Donziger*, 886 F. Supp. 2d at 260; Halbert Decl. Ex. 13. After the LAPs "criticized" Cabrera's findings—which they and their representatives had themselves written—the LAPs then ghostwrote a supplemental Cabrera report, which increased damages to $27 billion. *Donziger*, 886 F. Supp. 2d at 260; Halbert Decl. Ex. 14. With AW's assistance, the LAPs touted Cabrera's report to the public, to the media, and to members of the U.S. Congress as an "independent" assessment of damages. Halbert Decl. Exs. 3, 15; *id.* Ex. 23 at 463:14-469:24.

As Chevron began to obtain evidence of the Cabrera fraud through discovery proceedings in the United States, an Ecuadorian lawyer for the LAPs worried that exposure of the Cabrera fraud would be "potentially devastating in Ecuador (apart from destroying the proceeding, all of us, your attorneys, might go to jail)." Halbert Decl. Ex. 16; *Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581,

610 (S.D.N.Y. 2011). Donziger and his co-conspirators then created what they called "cleansing" reports, in an attempt to launder Cabrera's fraudulent report through new experts. *Donziger*, 886 F. Supp. 2d at 260-62; Halbert Decl. Exs. 11, 17, 18, 19, 20.

The Ecuadorian court issued a judgment against Chevron for more than $18 billion in February 2011. Although AW dismisses the proof of fraudulent submissions to the Ecuadorian court, saying "that is a far cry from the notion that the *judgment* was the *result* of fraud, let alone a massive conspiracy" (Dkt. 3 at 4 (emphasis in original)), a participant in the conspiracy to allow the LAPs to ghostwrite the judgment itself has given sworn testimony and corroborating evidence of just that. In a declaration submitted in the RICO litigation, Judge Alberto Guerra Bastidas admitted that he assisted the judgment's purported author, Judge Nicholas Zambrano, in selling the right to draft the judgment to the LAPs' representatives for $500,000 from the LAPs' expected enforcement proceeds.[4] Halbert Decl. Ex. 24 at ¶ 23. The LAPs' agents then ghostwrote the judgment, *see id.* ¶¶ 25-28, as confirmed by the fact that text from unfiled, internal documents of LAPs' counsel appears verbatim in the judgment itself. *See, e.g.*, Halbert Decl. Exs. 25, 26, 27, 28; Dkt. 38-3 at 15. As another district court hearing a related discovery proceeding observed, "Chevron has shown to anyone with common sense that this is a blatant cut and paste exercise." Dkt. 38-4 at 57:22-24.

**B.   Chevron Filed A RICO Action In The Southern District Of New York Based On The LAPs' Fraudulent And Extortionate Conduct.**

Chevron filed a RICO action against Donziger, the LAPs, and other LAP agents. *Chevron Corp. v. Donziger*, No. 11 Civ. 0691 (LAK) (S.D.N.Y.). Chevron collected much of the evidence in support of its RICO and associated claims through U.S. discovery proceedings targeting Donziger's allies and consultants, including scientific consultants, lawyers, documentary filmmakers, and funders. In light of the LAPs' misconduct, multiple U.S. courts have permitted discovery from participants in the fraud (*e.g.*, Donziger) and those who claimed to be unwitting accomplices (*e.g.*, Joe Berlinger, a documentary filmmaker who made the movie *Crude*).

---

[4]   Guerra also provided documentary evidence corroborating his sworn statement, including bank deposit slips showing deposits by an LAP employee into his bank account. Halbert Decl. Ex. 24 at ¶ 14, Attachments K-N. And other witnesses corroborated other aspects of the Guerra's testimony. Dkt. 38-3 at 5 & n.13.

Chevron's RICO case is based on claims that the RICO Defendants' ultimate aim is to pressure Chevron to extort a settlement based on the fraudulent judgment. Dkt. 4 Ex. 1 at ¶¶ 1-5. That pressure campaign, as Chevron's complaint explains, subjected Chevron to public attacks in the United States and elsewhere based on false and misleading statements and induced U.S. public officials to investigate Chevron. *Id.* at ¶ 214. AW, the LAPs' mouthpiece, furthered both aspects of the campaign. Judge Kaplan set a trial date of October 15, 2013, with fact discovery set to close on May 31, 2013. Halbert Decl. Ex. 29; Dkt. 38-2 at 1.

C. **AW Was "Critical" To The LAPs' U.S.-Based Campaign To Pressure Chevron To Settle The Fraudulent Lago Agrio Litigation.**

Donziger has noted that AW "played an absolutely critical role" in the LAPs' pressure campaign. Dkt. 38-14; *see also* Halbert Decl. Ex. 1 at 10 (Donziger says that Chevron "fears far more the pressure that can be generated by Amazon Watch than they do our case").[5] AW embraced this role. In requesting $1 million from the LAPs to spearhead the pressure campaign, AW said it intended to put Chevron's management and board "in a position where, to survive intact in American society as a reputable company with a competitive edge, they will be *forced to settle the lawsuit*." Dkt. 14 Ex. 4 (emphasis added).[6] To accomplish this, AW cooperated closely with Donziger and often issued press releases, letters, and other documents that Donziger or his associates solicited, revised, or ghostwrote entirely. As Donziger put it, the conspirators initiated a "press and internet strategy, using Amazon Watch as the surrogate." Halbert Decl. Ex. 2 at 9 of 109. All the while, AW disavowed connection with the LAPs' representatives. *E.g.*, *id.* Ex. 1 at 37 (Soltani states that AW has "nothing to do with the plaintiffs").

1. **Donziger Dictated The Content And Tone Of AW Publications And Letters.**

Contrary to AW's claim, AW and Donziger did not merely "at times coordinate[] [their] mes-

---

[5] As one of the RICO Defendants acknowledged in an e-mail to AW about the progress of their plan to procure endorsements for the fraudulent Cabrera report, "a big part of this will be for media." Halbert Decl. Ex. 30.
[6] AW's plan echoed Donziger's intent: "I also think that if you run . . . the costs in terms of the hassle, the management time, reputational . . . [h]arm, dealing with the board, looking bad, having your kids . . . in school, have friends who say, hey, what'd your daddy do in Ecuador? . . . . I think all of that factors into it in an af—extremely significant way, much more than th—the hard-core costs, . . . out-of-pocket expenses and stuff, and I, you know, I think that's where they're most vulnerable." Halbert Decl. Ex. 1 at 23.

sage." Dkt. 3 at 1. Rather, in keeping with the LAPs' approach, Donziger frequently ghostwrote AW press releases.[7] In a November 2006 e-mail to AW personnel, Donziger wrote, "I . . . know the press releases on the Ecuador campaign are not a terrible work burden to AW because I am writing most of them." Dkt. 14 Ex. 5; *see also* Halbert Decl. Ex. 33 (Donziger tells AW that the LAPs' lawyers "are never going to outsource [their] editing responsibility" to AW or others and says "[w]e can be collaborators, but we are not equal partners"). The LAPs' lawyers or agents also paid AW directly for what they called "propaganda." *See* Dkt. 14 Ex. 6. ("FYI, a check is being sent today for $1,000 for p.r. newswire propaganda.").[8]

Donziger also dictated AW's effort to persuade the Securities and Exchange Commission ("SEC") and Department of Justice ("DOJ") to investigate Chevron. Donziger admitted that he and his associates drafted complaint letters, submitted over Soltani's signature, to the SEC. Halbert Decl. Ex. 23 at 3177-3178. At Donziger's behest, AW not only submitted the letters that Donziger and his associates drafted, but also publicized that the SEC was investigating Chevron even after AW questioned whether such an investigation was occurring. *See id.* Ex. 32. And AW collaborated with Donziger on other efforts to foment government investigations. *E.g.*, Dkt. 14 Exs. 11, 12, 13, 14.

AW was and is a key outlet for the LAPs' public statements. AW operates the LAP-funded chevrontoxico.com website, *see* Halbert Decl. Ex. 33, through which Donziger and his allies disseminate their messages. Using AW's website, its blog, and other affiliated sites, the LAPs' representatives created an echo chamber for their claims. For example, on April 3, 2008, the LAPs' lead Ecuadorian counsel, Pablo Fajardo, stated in a press release issued by the Amazon Defense Coalition on

---

[7] Donziger also dictated the timing of AW press releases. For example, in an e-mail exchange dated October 3, 2006, Donziger and Joseph Mutti, AW's then-Director of Communications, timed an AW press release to avoid the appearance of collusion with counsel for the Republic of Ecuador. Donziger instructed Mutti: "There are other considerations. If we get [the press release] out before I am sure Chevron is officially notified of this, Chevron will then try to portray us as acting in concert with Winston [& Strawn] to litigate thru [sic] the press, which could prejudice our position in the New York litigation, and it will piss off Winston. So the timing needs to be exactly right. I will make the call, just get ready and I will tell u [sic] when." Halbert Decl. Ex. 31.

[8] Such payments supplemented the thousands of dollars in donations AW received from individuals and entities associated with the LAPs and direct funding provided by Donziger's former co-counsel. Dkt. 38-13. Donziger noted on video that donors are more willing to donate to organizations like AW than legal cases, "[e]specially when lawyers like me stand to make money from the legal case." Halbert Decl. Ex. 1 at 21.

1 chevrontoxico.com, "Chevron's claim that Professor Cabrera is cooperating with the plaintiffs is completely false," and "Chevron is frightened by Cabrera precisely because he is an independent and credible expert." Halbert Decl. Ex. 34. Links to the same press release also appear on AW's website.

### 2. AW Conveyed False And Misleading Information To Pressure Chevron.

To "turn up the heat on Chevron through various means, shareholder resolutions, major media coverage and major investigations through, for example, the Securities and Exchange Commission," *id*. Ex. 1 at 13, AW publicized the results of fraudulent and corrupt acts by the LAPs' agents. AW propagated false or misleading information to win the public relations battle against Chevron.[9] For example, after receiving an e-mail from the LAPs' former expert, David Russell, that his $6 billion damages estimate was wildly exaggerated, Dkt. 14 Ex. 9, AW—at Donziger's direction—continued to use that figure. *Id*. Ex. 10. *Cf. In re Appl. of Chevron Corp.*, 749 F. Supp. 2d 141, 153 n.63 (S.D.N.Y. 2010).[10] Although AW relied on the $6 billion figure in a letter asking the SEC to investigate Chevron, AW failed to correct the falsehood in subsequent letters to the SEC, instead incorporating the prior letter by reference. *See* Dkt. 14 Exs. 11, 12, 13; *cf. id*. Ex. 14 (Donziger suggests that AW submit a follow-up letter to the SEC "without disavowing or mentioning Russell's report"); Halbert Decl. Ex. 35 ("MANY PRESS PEOPLE KNOW IT AS A 6 BILLION ESTIMATE SO CHANGING IT WILL CAUSE CONFUSION AND MAKE US LOOK BAD"). Soltani knew of Russell's repudiation of the damages estimate, yet AW never disavowed the figure, and Soltani admits that the figure is on AW's website today.[11] Dkt. 37, Soltani Decl. ¶¶ 23-24, 27.

---

[9] Indeed, an attorney unaffiliated with the LAPs stated in an April 5, 2011 speech: "I know personally I debated with [Soltani] over the wisdom and ethics of distorting the facts. And I said to her, because you know, there were a lot of things they wrote, and I would say, 'oh where did you get this,' and they would say, 'from your book,' and I would say, 'that's not what I wrote, this is what I wrote,' and they'd say the same thing, again. And so at one point I said, 'what are you guys doing, because you are really jeopardizing the credibility of the communities,' and basically what they said was, 'well we have to win a PR battle.'" Professor Judith Kimerling, CUNY School of Law, "Oil, Litigation and Conservation in the Amazon Rainforest in Ecuador" at 1:41:30 (Apr. 5, 2011), *available at* http://www.utexas.edu/law/depts/media/Reels/HumanRights/HH4-5-11.WMA.

[10] In a conversation with Soltani, Donziger acknowledged that the "[p]rice tag" for remediation "would only be a guess" and that Russell's $6 billion "very rough estimate" significantly overstated the true costs of remediation: "[The] six billion dollar thing is out there. The reality is, based on what this guy is telling me, [it] would cost less than that. Significantly less than that . . . ." Halbert Decl. Ex. 1 at 18-19.

[11] Nor did AW ever, to Chevron's knowledge, correct the statements it made regarding Cabrera in Soltani's March 18, 2008 letter to the SEC. In that letter, Soltani emphasized the forthcoming report,

*(Cont'd on next page)*

And even after Chevron publicized unrefuted evidence that the LAPs' representatives ghost-wrote the Cabrera reports, AW continues to refer to it as independent and authoritative. *E.g.*, Halbert Decl. Ex. 34. AW did so even though Donziger previewed the plan for the corrupt expert report in December 2006, telling Soltani: "[W]e have an expert. The judge is going to appoint a guy in Ecuador, um, to be the expert but really, you know, we'll be supporting him with the work—our people, E-Tech, whoever we choose to use. Once that ends, the case is over in terms of the evidence." Halbert Decl. Ex. 1 at 16.

Donziger also instructed AW to continue saying that Chevron was responsible for billions of dollars in environmental damage even after AW learned that the basis for that figure was baseless and discredited. In an internal May 2007 e-mail, Soltani acknowledged that AW's oft-repeated claim that Chevron spilled more than 30 times the waste that the Exxon Valdez spilled was "off by a factor of 10 it seems." Dkt. 14 Ex. 7. But Donziger told AW not to revise the figure because of the "HUGE implications for the legal case," *id*. Ex. 8, and AW obeyed. Notwithstanding Soltani's sworn statement that AW "'explicitly decided not to use [the figure] after the first quarter of 2006'" (Dkt. 37 at 4), the figure is cited on AW's websites *today*. Dkts. 38-8, 38-9, 38-10.

As one more example of how the LAPs used AW as their proxy to make extortionate threats to Chevron, in December 2009 Soltani wrote a letter "on behalf of Amazon Watch" to then-incoming Chevron CEO John Watson in which she cited the fraudulent $27 billion damages assessment from the Cabrera Report, and threatened, "[u]ntil Chevron takes meaningful steps to resolve this case, it will continue to play out in the courts of Ecuador, as well as in the global court of opinion." Halbert Decl. Ex. 36. She went on to state, "We don't make these suggestions lightly or symbolically." *Id.*

**3.     AW Representatives Participated In Improper Activities In Ecuador.**

As "critical" members of the LAPs' team, AW personnel attended key events in Ecuador. As discussed above, Donziger, Soltani, and Kevin Koenig, AW's Ecuador Program Coordinator, had a

---

*(Cont'd from previous page)*

and the independence of its purported author, "an independent special master" that had prepared his report "mak[ing] use of all evidence collected" with "a large team of technical experts under [his] supervision." Dkt. 14 Ex. 13.

June 2006 meeting in which they discussed the LAPs' intent to form a "private army" that would "send a message to the court . . . , 'don't f[**]k with us anymore—not now, and not—not later, and never.'" Dkts. 38-5, 38-6. In response to her co-conspirators' plans, Soltani asked whether "anybody can, uh, subpoena these videos?" and noted, "I just want you to know that it's—it's illegal to conspire to break the law." Dkt. 38-6.

AW also participated in improper *ex parte* meetings between the LAPs' representatives and the Lago Agrio judge. For example, Donziger e-mailed AW employees after the Lago Agrio court swore in Cabrera as the damages expert, stating, "The perito [Cabrera] got sworn in after all those visits to the court." Dkt. 14, Ex. 15. Congratulating AW, Donziger said "that visit to the judge last week was a huge help." *Id*. AW's former Associate Director replied: "YAY! Guess getting smooched by the smarmy judge was worth it." *Id.* Ex. 16. Donziger noted that these types of efforts worked because the judge "never would have [appointed Cabrera] had we not really pushed him." Dkt. 38-7. This was not an isolated meeting. The *Crude* outtakes reveal numerous other occasions when AW personnel pressured the Lago Agrio judge to side with the LAPs. *E.g.*, Halbert Decl. Ex. 1 at 2-3; *id.* at 6-7 (Donziger and Koenig discuss Koenig's recent and "effective" meeting with the Lago Agrio judge and his secretary, who Koenig described as "skittish," to which Donziger responded: "Good, good. So let her, let her be a little bit scared.").

AW's collusion with the LAPs' is ongoing. Chevron recently learned that AW improperly obtained Chevron's confidential, litigation work product from an "anonymous source," and rather than inform Chevron or return the materials, AW gave the videos to the LAPs' lead Ecuadorian counsel. Dkts. 38-15, 38-16.

**D.     The LAPs And Their Allies Continue To Resist Discovery "To An Astonishing Degree."**

The RICO Defendants and their allies have gone to great lengths to avoid discovery of their fraud. Judge Kaplan noted that "Defendants and/or their allies have resisted discovery to an astonishing degree by tactics including by refusing to produce responsive documents located in Ecuador, bringing a secret and collusive Ecuadorian lawsuit to obtain a court order barring their Ecuadorian agents from complying with document discovery requests, refusing to appear for depositions, and invoking frivolous privilege objections to block and delay discovery." Dkt. 14, Ex. 22. More recently,

1  Judge Kaplan determined that special masters were required to oversee discovery because "the
2  Donziger Defendants[] and their Ecuadorian allies have been remarkably obstructive" by "utterly re-
3  fus[ing] to comply with court orders," and "[t]he likelihood of further attempts to preclude or disrupt
4  discovery is palpable."  Dkt. 38-2.

### III. ARGUMENT

A party may serve a subpoena on a non-party requesting the production of documents that are "relevant to any party's claim or defense" or "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b), 45(a). "Relevancy, for the purposes of discovery, is defined broadly[.]" *Gonzales v. Google, Inc.*, 234 F.R.D. 674, 679-80 (N.D. Cal. 2006). "A district court whose only connection with a case is supervision of discovery ancillary to an action in another district should be especially hesitant to pass judgment on what constitutes relevant evidence thereunder. Where relevance is in doubt . . . the court should be permissive." *Id.* at 681.

### A. Judge Kaplan Already Has Decided AW's Manufactured Service Dispute.

AW argues that "[t]he subpoena is invalid because it was not properly served before [December 1, 2012], and in any case because the December 7, 2012, agreement as to service superseded any prior service attempts." Dkt. 3 at 8. But AW nowhere mentions that Judge Kaplan has already ruled that "[t]he undisputed evidence" demonstrates that the subpoena was timely served before December 1, 2012, and has rejected the argument that the alleged agreement by which AW would accept service as of December 7 "somehow rendered the November 28 service a nullity." Dkt. 14, Ex. 3 at 2.

Judge Kaplan granted the protective order with respect to the AW subpoena based on "a submission on behalf of AW" that falsely asserted that Chevron agreed service was effected on December 7. *Id.* at 1. Having considered Chevron's evidence that it served AW's Program Director on November 28, and AW's failure to submit evidence that she was not the Program Director or that she did not indicate to the process server that she could accept service, Judge Kaplan ruled that the subpoena was properly served.[12] *Id.* at 1-2. Issue preclusion bars AW from attempting to relitigate this

---

[12] Ms. Salazar-Lopez belatedly claims that when the process server asked whether she could accept service, she did not say "yes, I guess" but rather "I don't really want to accept and sign, but I guess I have to." Dkt. 7, Salazar-Lopez Decl. ¶¶ 6-9. Even if this account were true, it fails to show that she told the process server she was not authorized to accept service. In any event, service was valid be-
*(Cont'd on next page)*

issue, because the identical issue has already been decided on the merits in favor of Chevron. *See, e.g.*, *Roche Palo Alto LLC v. Apotex, Inc.*, 526 F. Supp. 2d 985, 994 (N.D. Cal. 2007).

**B.     The First Amendment Does Not Protect AW's Fraudulent Conduct.**

Although AW says its association with the RICO Defendants is based on political speech and advocacy, the record demonstrates that AW was "critical" to the RICO Defendants' fraudulent enterprise. *See* Part II, *supra*. The First Amendment does not protect fraudulent activity or associations that further a conspiracy.[13]

Even assuming, *arguendo*, that the First Amendment protects this fraudulent conspiracy, AW overstates the scope of potential protection afforded by *Perry v. Schwarzenegger*, 591 F.3d 1147 (9th Cir. 2010). There, the Ninth Circuit's holding was "limited to *private, internal* campaign communications" among "the core group of *persons* engaged in the formulation of campaign strategy and messages." *Id.* at 1165 n.12 (emphases in original). Less than one full business day before this Opposition was due, AW sent a letter to Chevron purportedly identifying the members of its "core group"—yet refused to identify members whose "identity is not public knowledge" and "reserve[d] the right to add others" to its list. Halbert Decl. Ex. 40. AW also identified numerous organizations as members of its "core group" (*id.*), ignoring that a core group can consist only of "persons," not entities.[14] *See*

---

*(Cont'd from previous page)*

cause Ms. Salazar-Lopez is sufficiently integrated with the organization, and the purpose of providing adequate notice was accomplished. *See Direct Mail Specialists, Inc. v. Eclat Computerized Techs., Inc.*, 840 F.2d 685, 688-89 (9th Cir. 1988).

[13] *See, e.g.*, *Madigan*, 538 U.S. at 612 ("[T]he First Amendment does not shield fraud."); *Branzburg v. Hayes*, 408 U.S. 665, 697 (1972) (the First Amendment does not protect "concealment of crime"); *United States v. Rybicki*, 354 F.3d 124, 150 (2d Cir. 2003) ("The conduct at issue – fraud – enjoys no constitutional protection[.]"); *United States v. Hempfling*, 431 F. Supp. 2d 1069, 1083 (E.D. Cal. 2006) ("The Supreme Court has repeatedly held that the First Amendment does not shield fraud."); *United States v. Sattar*, 395 F. Supp. 2d 79, 101 (S.D.N.Y. 2005) ("The First Amendment lends no protection to participation in a conspiracy, even if such participation is through speech."); *In re Jean-Baptiste*, No. M 11-188, 1985 WL 1863, at *1 (S.D.N.Y. July 5, 1985) ("[T]he law protects freedom of speech and association, it does not protect criminal conspiracies.").

[14] Included in AW's incomplete list of "core group" members are RICO Defendants, including Steven Donziger and Pablo Fajardo. Halbert Decl. Ex. 40. Yet Judge Kaplan already has found that the unrefuted evidence demonstrates that Donziger and Fajardo have engaged in fraudulent activities, including "coerc[ing] an Ecuadorian judge to (1) terminate the judicial inspections that previously had been ordered, (2) substitute a single global inspection to determine the extent of the alleged environmental damage, and (3) select a 'global expert' chosen by the LAPs, Richard Cabrera, to conduct it . . . by threatening the judge with the filing of a misconduct complaint." Dkt. 38-3 at 9. Thus, in the event the Court finds the First Amendment is applicable, Chevron requests the opportunity to

*(Cont'd on next page)*

*Perry*, 591 F.3d at 1165 n.12.  AW's continued refusal to identify the members of its core group makes it impossible to evaluate whether and to what extent *Perry* would apply (if the First Amendment applied at all).  *See Perry v. Schwarzenegger*, 602 F.3d 976, 981 (9th Cir. 2010).

Further, AW claims that "all communications with the media" are "subject to First Amendment protection."  Dkt. 9 at 1.  But such communications are "not a private, internal formulation of strategy or message and [are] thus far afield from the kinds of communications the First Amendment privilege protects."  *See* 591 F.3d at 1165 n.12.  AW also claims that requests for documents concerning their press releases, blog posts, and their efforts to recruit members and solicit donations implicate First Amendment protections.  Yet *Perry*'s holding "certainly does not apply to documents or messages conveyed to the electorate at large, discrete groups of voters or individual voters for purposes such as persuasion, recruitment or motivation," or to "communications soliciting active support from actual or potential . . . supporters."  *Id.*[15]

Unlike the Proponents of Proposition 8, who participated in an election campaign and were not alleged to have carried out a fraudulent conspiracy, AW is an active co-conspirator in the RICO Defendants' fraud.  *See* Part II, *supra*.  AW has made clear—*after* being served with the subpoena—that it will stop at nothing to bring Chevron "to its knees" and "will not back down," Halbert Decl. Ex. 41, belying its claims that disclosure could have a chilling effect on its activities.  Nor do its self-serving declarations make even a *prima facie* showing of a chilling effect on protected activities.  *See Nat'l Org. for Marriage v. McKee*, 723 F. Supp. 2d 236, 241 (D. Me. 2010) (holding that declarations

---

*(Cont'd from previous page)*

challenge AW's core group designations as beyond the scope of persons whose "associational interests the privilege is intended to protect."  *See Perry*, 591 F.3d at 1165 n.12.

[15]  AW argues that in *Perry*, the Ninth Circuit "reject[ed] a similar ploy to obtain a political opponent's strategy engineered by the same counsel who represent Chevron here."  Dkt. 3 at 1.  But the Ninth Circuit in *Perry* endorsed the vast majority of the discovery requests propounded by the challengers to Proposition 8, observing that its decision was narrow and chiding the Proposition 8 Proponents for seeking to shroud in First Amendment privilege documents that are "far afield from the kinds of communications the First Amendment privilege protects."  591 F.3d at 1165 n.12.  Indeed, when the discovery dispute was remanded to the district court, the Proposition 8 Proponents were required to produce—in their own words—"over 12,000 internal campaign or nonpublic documents revealing private political speech and association."  Br. of Resp'ts-Appellees, *Equality Cal. & No on Proposition 8, Campaign for Marriage Equality v. Hollingsworth*, No. 10-15649, at 5-6 (9th Cir. Mar. 26, 2010), Dkt. 8.

submitted by members of the subpoenaed organizations, "which convey[ed] their beliefs as to how donors to their organizations would respond," failed to demonstrate a chilling effect because they "differ[ed] in kind from the evidence at issue in *Perry* . . . , in which those whose information was proposed to be shared detailed the impact of the anticipated disclosure on them personally").

Even ignoring both that the First Amendment does not shield fraud, and AW's misreading of *Perry*, Chevron's requested discovery is highly relevant to its claims, and its interest in evidence of the extortion scheme against it outweighs any harm to AW's claimed First Amendment interests. *See* 591 F.3d at 1161. Chevron has not been able to obtain the requested discovery from other sources; as Judge Kaplan has observed, "Defendants and/or their allies have resisted discovery to an astonishing degree." Dkt. 14 Ex. 22 at 1. Indeed, Judge Kaplan recently appointed special masters to oversee discovery in the underlying litigation, because " the Donziger Defendants[] and their Ecuadorian allies have been remarkably obstructive" by "utterly refus[ing] to comply with court orders," and "[t]he likelihood of further attempts to preclude or disrupt discovery is palpable." Dkt. 38-2 at 1.[16]

### C. AW Must Log Documents It Claims Are Privileged.

AW must sufficiently describe the nature of any documents asserted to be protected by the attorney-client privilege, the First Amendment, confidential business information protections, or any other privilege or protection in order to "enable the parties to assess the claim." *See, e.g.*, Fed. R. Civ. P. 45(d)(2)(A); *Perry*, 591 F.3d at 1153 n.1. Failure to comply with this requirement risks a finding that the privilege has been waived. *See Burlington N. & Santa Fe Ry. Co. v. District Court*, 408 F.3d 1142, 1149 (9th Cir. 2005). Chevron must be able to assess AW's claims of privilege, particularly given that the crime-fraud exception defeats the privilege with respect to communications that furthered AW's or its co-conspirators' fraudulent activities. *See, e.g.*, *In re Grand Jury Proceedings*, 87 F.3d 377, 381 (9th Cir. 1996).

AW incorrectly claims that "U.S. courts have squarely rejected or questioned the same allegations that Chevron raises here for the purpose of overriding otherwise applicable privileges in order to obtain discovery." Dkt. 3 at 4. AW cites four cases from 2010, when Chevron was just beginning to

---

[16] In fact, Donziger's recently submitted privilege log includes over 100 entries of supposed "attorney-client privileged" communications with AW and other AW documents.

obtain evidence of the co-conspirators' fraud, and those isolated decisions turned on the specific facts concerning those witnesses—facts that are quite different from those here. Contrary to AW's incorrect assertion, numerous courts have found compelling the evidence that the fraud alleged in this case in fact occurred[17]—most recently in the District of Maryland, concerning one of the LAPs' lawyers who, like AW, was central to the scheme (and who AW identified as within its "core group"). Dkt. 38-4; Halbert Decl. Ex. 40. The evidence of the fraud perpetrated by the LAPs, their co-conspirators, and the Ecuadorian court, is unrefuted and has only grown stronger. *See* Section II, *supra*.

**D.  The Subpoena Does Not Unduly Burden AW.**

Where, as here, a party makes a sufficient showing of relevance and need for the subpoenaed information, a non-party's objections that compliance with a subpoena would be unduly burdensome are overcome. *See Gonzales*, 234 F.R.D. at 680. Further, any claimed burden on AW is not "undue," because AW is not an innocent third party; rather, AW is a co-conspirator in Defendants' extortion scheme. *See* Section II, *supra*. AW admits that the "target" of its activities is Chevron (Dkt. 3 at 10, 23), and can hardly be surprised that Chevron seeks discovery to expose the fraudulent conspiracy.

The time period of the requests, which Chevron offered to narrow even further during the course of the meet and confer process, is reasonable given the evidence that AW played a role in the RICO enterprise since at least 2002. Chevron made reasonable efforts to accommodate AW's claimed concerns regarding burden, yet AW's position throughout the meet and confer process was that it could not produce a single document in response to Chevron's subpoena without undue burden. *See* note 3, *supra*. AW's arguments are improper efforts to obstruct and delay discovery.

**E.  The Subpoena Does Not Seek AW's Protectable Commercial Information.**

AW asserts that Chevron is its "competitor" (Dkt. 3 at 23; Dkt. 1, Ex. B at 7), when Chevron

---

[17] *See, e.g.*, *In re Appl. of Chevron Corp.*, 633 F.3d 153, 166 (3d Cir. 2011); Tr. of Hrg. at 56:23-58:10, *Chevron Corp. v. Page*, No. RWT-11-1942 (D. Md. Jan. 25, 2013); *In re Chevron Corp.*, No. 11-cv-24599-MGC-WCT, 2012 WL 3636925 (S.D. Fla. June 12, 2012); *Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581, 636 (S.D.N.Y. 2011); *Chevron Corp. v. Salazar*, 275 F.R.D. 437, 442 (S.D.N.Y. 2011); *In re Appl. of Chevron Corp.*, 749 F. Supp. 2d 141, 167 (S.D.N.Y. 2010); *In re Chevron Corp.*, No. 10-cv-1146-IEG, 2010 WL 3584520, at *6 (S.D. Cal. Sept. 10, 2010); *In re Chevron Corp.*, Nos. 1:10-mc-21-22, Dkt. 173 at 11 (D.N.M Sept. 2, 2010); *Chevron Corp. v. Champ*, No. 10-mc-27, 2010 WL 3418394, at *6 (W.D.N.C. Aug. 30, 2010); Tr. of Hrg. at 43:13-44:16, *In re Appl. of Chevron Corp.*, No. 10-cv-2675, Dkt. 33 (D.N.J. June 11, 2010).

is in fact the admitted "target" (Dkt. 3 at 10, 23) of the extortionate scheme. AW's vague claim that the document requests "call for the disclosure of confidential campaign blueprints, strategies, tactics, work plans, and relationships with anonymous donors" (Dkt. 3 at 23) fails to make the requisite "strong showing" that the requested information is "important proprietary information." *See Compaq*, 163 F.R.D. at 338. Moreover, "[a] survey of the relevant case law reveals that discovery is virtually always ordered once the movant has established that the secret information is both relevant and necessary." *Id.* Thus, even assuming that AW could establish that the requested information is protectable commercial information, it is both relevant and necessary and should be produced.[18]

### F. AW Should Bear The Costs of Production Given Its Participation In The Conspiracy.

AW has profited from its fraudulent activities at Chevron's expense. *E.g.*, Dkt. 38-13 at 2 (reflecting donations from Kohn, Donziger's former co-counsel, totaling more than $184,000). Under Rule 45, "[a] non-party can be required to bear some or all of its expense where the equities of a particular case demand it." *In re Honeywell Int'l, Inc. Sec. Litig.*, 230 F.R.D. 293, 303 (S.D.N.Y. 2003). Relevant factors to consider are "whether the nonparty actually has an interest in the outcome of the case, whether the nonparty can more readily bear the costs than the requesting party and whether the litigation is of public importance." *Id.* Here, the equities demand that AW bear its own costs—which AW's own actions are responsible for increasing—because it is interested in the outcome of the case (financially and otherwise), and is a co-conspirator in fraudulent activity. Furthermore, the litigation is of public importance because it was brought in large part to protect the integrity of the judicial system against fraud and abuse.

### IV. CONCLUSION

For the foregoing reasons, Chevron respectfully requests that the Court deny AW's motion to quash the subpoena and require that AW produce responsive documents forthwith.

---

[18] It is ironic that AW seeks a "robust protective order" to protect its allegedly confidential information (Dkt. 3 at 25), given its complicity in funneling Chevron's confidential and protected work product to the LAPs' counsel. *See* Dkts. 38-15, 38-16. In any event, the protective order in the underlying litigation governs third-party discovery and addresses legitimate confidentiality concerns. *See* Dkt. 4, Ex. FF ¶¶ 2-3 (permitting a non-party to designate information—including "sensitive personal information" and "confidential business information"—as "Confidential Information" subject to restrictions on its use and disclosure).

| | |
|---|---|
| Dated: March 11, 2013 | Respectfully submitted, |
| | GIBSON, DUNN & CRUTCHER LLP |
| | By: _____/s/ Ethan D. Dettmer_____ |
| | Ethan D. Dettmer |
| | *Attorneys for Plaintiff Chevron Corporation* |