ETHAN D. DETTMER, SBN 196046
  edettmer@gibsondunn.com
ENRIQUE A. MONAGAS, SBN 239087
  emonagas@gibsondunn.com
AIMEE M. HALBERT, SBN 279144
  ahalbert@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, California 94105-0921
Telephone: 415.393.8200
Facsimile:  415.393.8306

*Attorneys for Plaintiff Chevron Corporation*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CHEVRON CORPORATION,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>STEVEN DONZIGER, *et al.*,<br><br>　　　　　Defendants. | Case No. 3:13-mc-80038-CRB (NMC)<br><br>**CHEVRON CORPORATION'S REPLY IN SUPPORT OF ITS MOTION TO ENFORCE AMAZON WATCH SUBPOENA TO PRODUCE DOCUMENTS**<br><br>**Hearing:**[1]<br>Date: April 1, 2013<br>Time: 10:00 a.m.<br>Place: Courtroom A, 15th Floor |

---

[1] On March 15, 2013, Chevron filed a Motion to Shorten Time for Hearing of Chevron's Motion to Enforce and Amazon Watch's Motion to Quash Subpoena to Produce Documents, requesting that both motions be heard on March 27, 2013, at 1:00 p.m. Dkt. 46; *see* Dkt. 47. On March 18, 2013, the parties agreed, subject to the Court's approval, that both motions should be heard on March 29, 2013, and expect to file a stipulated request to that effect on March 19, 2013.

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION ............................................................................................................... 1

II.  ARGUMENT ..................................................................................................................... 1

    A.   AW Admitted That The Lengthy Meet And Confer Process Ended In Impasse. .......... 1

    B.   The First Amendment Does Not Protect AW's Fraudulent Conduct. ......................... 2

        1.   AW Was A Knowing Participant In The Fraudulent Conspiracy. .................... 2

        2.   AW's "Core Group" Includes Core Members Of The Fraudulent Conspiracy. ............................................................................................... 4

        3.   Even If The First Amendment Applied, Its Protection Would Be Narrow. ........................................................................................................ 6

    C.   The Subpoena Does Not Unduly Burden AW. ............................................................ 8

    D.   AW Must Log Documents It Claims Are Privileged. .................................................. 8

    E.   The Subpoena Does Not Seek AW's Protectable Commercial Information. .............. 9

    F.   AW Should Bear The Costs Of Production Given Its Participation In The Conspiracy. .................................................................................................................. 10

    G.   An Additional Protective Order Is Unnecessary. ........................................................ 10

III. CONCLUSION ................................................................................................................. 10

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Branzburg v. Hayes*,
  408 U.S. 665 (1972) ................................................................................................................. 3

*Burlington N. & Santa Fe Ry. Co. v. District Court*,
  408 F.3d 1142 (9th Cir. 2005) .................................................................................................. 9

*Chevron Corp. v. Donziger*,
  No. 11-cv-0691-LAK (S.D.N.Y. Mar. 13, 2013), Dkt. 902 ...................................................... 3

*Chevron Corp. v. Donziger*,
  No. 11-cv-0691-LAK (S.D.N.Y. Mar. 15, 2013), Dkt. 905 ............................................. 8, 9, 10

*Choudhouri v. Wells Fargo Bank, N.A.*,
  No. 11-cv-518, 2011 U.S. Dist. LEXIS 78278 (N.D. Cal. July 19, 2011) ................................ 2

*Compaq Computer Corp. v. Packard Bell Elec., Inc.*,
  163 F.R.D. 329 (N.D. Cal. 1995) .............................................................................................. 9

*De Jonge v. Oregon*,
  299 U.S. 353 (1937) ................................................................................................................. 7

*Donaldson v. Read Magazine, Inc.*,
  333 U.S. 178 (1948) ................................................................................................................. 3

*Equality Cal. & No on Proposition 8, Campaign for Marriage Equality v. Hollingsworth*,
  No. 10-15649 (9th Cir. Mar. 26, 2010), Dkt. 8 ........................................................................ 6

*Gonzales v. Google, Inc.*,
  234 F.R.D. 674 (N.D. Cal. 2006) .............................................................................................. 8

*Illinois ex. rel. Madigan v. Telemarketing Assocs., Inc.*,
  538 U.S. 600 (2003) ................................................................................................................. 3

*In re Grand Jury Proceedings*,
  87 F.3d 377 (9th Cir. 1996) ...................................................................................................... 9

*In re Honeywell Int'l, Inc. Sec. Litig.*,
  230 F.R.D. 293 (S.D.N.Y. 2003) ............................................................................................ 10

*In re Jean-Baptiste*,
  No. M 11-188, 1985 WL 1863 (S.D.N.Y. July 5, 1985) .......................................................... 3

*NAACP v. Claiborne Hardware*,
  458 U.S. 886 (1982) ................................................................................................................. 7

*Nat'l Org. for Marriage v. McKee*,
  723 F. Supp. 2d 236 (D. Me. 2010) .......................................................................................... 6

*Perry v. Schwarzenegger*,
  591 F.3d 1147 (9th Cir. 2010) ........................................................................................ passim

*United States v. Hempfling,*
    431 F. Supp. 2d 1069 (E.D. Cal. 2006) .................................................................................. 3

*United States v. Rybicki,*
    354 F.3d 124 (2d Cir. 2003) .................................................................................................. 3

*United States v. Sattar,*
    395 F. Supp. 2d 79 (S.D.N.Y. 2005) ..................................................................................... 3

**Rules**

Fed. R. Civ. P. 45 ........................................................................................................................... 9

I.       INTRODUCTION

Amazon Watch ("AW") claims that it was not a participant in the extortionate RICO conspiracy that is the subject of the underlying case, at the same time it embraces that conspiracy's ringleader and key players as members of its "core group" involved "in the formulation of [its] campaign strategy and messages." *See Perry v. Schwarzenegger*, 591 F.3d 1147, 1165 n.12 (9th Cir. 2010). If, as AW claims, "Chevron's evidence shows nothing more than that AW at times coordinated its message with the defendants" (Dkt. 41 at 8)—despite evidence of far more—then those fraudulent conspirators would not be within AW's "core group" whose "*private, internal communications regarding formulation of strategy and messages*" are supposedly protected by the First Amendment. *See Perry*, 591 F.3d at 1165 n.12 (emphasis in original).[2]

Indeed, substantial and unrefuted evidence shows that several of AW's "core group" members planned and carried out fraudulent activities in furtherance of the extortionate conspiracy, and that AW was aware of it and participated nevertheless. These are not individuals whose "First Amendment associational interests the privilege is intended to protect," *see id.*, and AW admits that it partnered with them. Dkt. 42-41. Chevron respectfully requests that the Court grant its motion to enforce the subpoena and order AW to produce responsive documents immediately.

II.       ARGUMENT

**A.    AW Admitted That The Lengthy Meet And Confer Process Ended In Impasse.**

Chevron and AW met and conferred by telephone for well over four hours on multiple days, and exchanged over forty pages of correspondence regarding the subpoena. While AW now claims that the meet and confer process has not concluded, its counsel have repeatedly admitted that the parties had reached an impasse on substantive issues.[3] Indeed, when counsel for AW and Chevron

---

[2] AW claims that "Chevron refused repeated requests during the meet and confer to present AW with *any* evidence that implicated AW in Chevron's global conspiracy theory" and that "Chevron has consistently sandbagged AW with new exhibits with each new brief it files." Dkt. 41 at 5 n.10. But the bulk of the evidence Chevron has cited is publicly available in this very public case. And in any event, much of it is AW's own words and documents.

[3] *E.g.*, Dkt. 4 Ex. M (AW's counsel: "We agreed that we are at an impasse as to whether AW is entitled to any First Amendment protections at all." "I believe both parties recognize we are at an impasse [with respect to confidential business information protections]." "We remain in disagreement about the proper time period." "We have reached an impasse as to whether you are required to [show that potentially responsive documents are not available elsewhere or are not

*(Cont'd on next page)*

1  first met and conferred regarding the deposition subpoena issued to AW, counsel for AW agreed that
2  the parties had reached an impasse on all of the substantive issues. Dkt. 27-1 ¶ 28; Dkt. 44 at 4.
3        Nevertheless, AW claims that "Chevron had promised to provide a proposal [for rolling
4  production], and AW continues to await that proposal." Dkt. 41 at 1; *see also id.* at 4-5. But on
5  January 7, 2013, Chevron proposed "a rolling production . . . of all non-objectionable categories of
6  documents" that "would include responsive and non-privileged documents that include recipients or
7  senders who are not in [AW's] claimed 'core group.'" Dkt. 42-40.[4] AW rejected this proposal,
8  claiming that "this issue [of rolling production] is inextricably entwined with privilege and burden,"
9  and Chevron had not shown that each potentially responsive document was otherwise unavailable.
10 Dkt. 4 Ex. O. Yet AW previously agreed that the parties had reached an impasse as to whether such a
11 showing was required. Dkt. 4 Ex. M; *see* note 3, *supra*. And given AW's incorrect belief that "all
12 communications with the media" are "subject to First Amendment protection," Dkt. 9 at 1, AW
13 would not have agreed to the proposal. Judicial intervention is proper where, as here, "informal
14 negotiations have reached an impasse on the substantive issues in dispute." *Choudhouri v. Wells*
15 *Fargo Bank, N.A.*, No. 11-cv-518, 2011 U.S. Dist. LEXIS 78278, at *2 (N.D. Cal. July 19, 2011).
16       Chevron submits that the real reason for AW's continued insistence on never ending but never
17 fruitful negotiations is, in fact, the May 31, 2013 close of discovery in the underlying case. Given
18 this upcoming deadline, Chevron respectfully requests that the Court order immediate production.

**B.    The First Amendment Does Not Protect AW's Fraudulent Conduct.**

    **1.    AW Was A Knowing Participant In The Fraudulent Conspiracy.**

21       AW claims its association with the RICO Defendants is political speech and advocacy, and
22 protected by the First Amendment. Dkt. 41 at 5. But knowingly broadcasting falsehoods and

---

*(Cont'd from previous page)*

already in Chevron's possession]."); Dkt. 42-38 (Chevron's counsel: "On substantive questions, we are at an impasse."); Dkt. 42-39 (AW's counsel: "[Y]ou indicated that you believed that the parties were at impasse on all legal issues.").

[4] The "rolling production would include" all non-privileged communications "with media professionals or organizations, including drafts," "intended for public distribution (e.g. press releases, blog posts, news articles, and fundraising appeals), including drafts," "with the Lago Agrio court, U.S. courts, and government agencies, including drafts," and "with the defendants and co-conspirators" unless those individuals were within the "core group." Dkt. 42-40.

misrepresentations furthering extortion is not protected by the First Amendment.[5] Even just the evidence discovered to date refutes AW's claims that "Chevron cannot show that AW acted in furtherance of anything other than an advocacy campaign that drew attention to the contamination and sought justice and remediation for those affected." *Id.* at 6; *see also id.* at 2.[6]

AW played an "absolutely critical role" in the conspiracy to obtain a fraudulent $19 billion judgment in Ecuador on behalf of the Lago Agrio Plaintiffs and their agents (the "LAPs"), and extort billions of dollars from Chevron based on that fraudulent judgment. *See* Dkt. 42 at 1-10; *see also* Dkt. 13 at 1-2; Dkt. 18 at 1-2; Dkt. 38 at 1-5. *Id.* AW's so-called "advocacy campaign" was the mouthpiece for the fraudulent pressure campaign that was engineered, directed, and frequently ghostwritten by Donziger and his cohorts.

Chevron's evidence belies AW's argument that "the defendants did not direct AW's campaign." Dkt. 41 at 7-8; *see, e.g.*, Dkt. 42 at 5-7; Dkt. 14 Ex. 5 (Donziger writes to AW: "I . . . know the press releases on the Ecuador campaign are not a terrible work burden to AW because I am writing most of them."); Dkt. 42-3 (Donziger writes that the conspirators initiated a "press and internet strategy, using Amazon Watch as the surrogate"); Dkt. 42-32 (Donziger writes to AW that "the timing" of AW's press release "needs to be exactly right" and says "I will make the

---

[5] *See, e.g.*, *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003) ("[T]he First Amendment does not shield fraud."); *Branzburg v. Hayes*, 408 U.S. 665, 697 (1972) (the First Amendment does not protect "concealment of crime"); *United States v. Rybicki*, 354 F.3d 124, 150 (2d Cir. 2003) ("The conduct at issue – fraud – enjoys no constitutional protection[.]"); *United States v. Hempfling*, 431 F. Supp. 2d 1069, 1083 (E.D. Cal. 2006) ("The Supreme Court has repeatedly held that the First Amendment does not shield fraud."); *United States v. Sattar*, 395 F. Supp. 2d 79, 101 (S.D.N.Y. 2005) ("The First Amendment lends no protection to participation in a conspiracy, even if such participation is through speech."); *In re Jean-Baptiste*, No. M 11-188, 1985 WL 1863, at *1 (S.D.N.Y. July 5, 1985) ("[T]he law protects freedom of speech and association, it does not protect criminal conspiracies."). *Cf. Donaldson v. Read Magazine, Inc.*, 333 U.S. 178, 191-92 (1948) ("A contention cannot seriously be considered which assumes that freedom of the press includes a right to raise money to promote circulation by deception of the public.").

[6] AW continues to assert that "Chevron is *not* contesting the validity of the LAPs' pollution claims" in the underlying litigation. Dkt. 41 at 1 (emphasis in original); *see also id.* at 3. Chevron has always disputed the LAPs' fraudulent claims. But in the underlying RICO case, Chevron will not "relitigate the environmental conditions existing in the Oriente," because the focus of the RICO litigation is "whether the judgment's findings have any support untainted by fraud in the record that existed before the Ecuadorian court at the time the judgment was issued." *See* Dkt. 42-5 at 3-4. The Court presiding over the underlying case just last week reaffirmed that "[t]his Court repeatedly has ruled that this case will not retry the claims made in the Lago Agrio case." *See Chevron Corp. v. Donziger*, No. 11-cv-0691-LAK (S.D.N.Y. Mar. 13, 2013), Dkt. 902 at 2.

call, just get ready and I will tell u [sic] when"); Dkt. 42-34 (Donziger writes to AW: "We can be collaborators, but we are not equal partners. This is an important distinction.").

Chevron's evidence also belies AW's argument that it did "little more than . . . fail[] to redact old news stories on its website." Dkt. 41 at 7. AW admits that articles citing damages figures that AW knew to be false "remain[] archived and searchable on [its] website." *Id.* at 7 n.17. Thus, if an unsuspecting potential donor were to view, for example, AW's "Key Questions and Answers" regarding the Lago Agrio litigation available on AW's website and dated Spring 2009, he or she would read that Chevron spilled "30 times more crude oil than was spilled in the Exxon Valdez disaster." Dkt. 38-8. Yet Soltani previously acknowledged in a 2007 e-mail that this figure was "off by a factor of 10 it seems." Dkt. 14 Ex. 7. When Donziger told AW not to revise the figure because of the "HUGE implications for the legal case," *id.* Ex. 8, AW obeyed.[7]

Indeed, Professor Judith Kimerling—an attorney unaffiliated with the LAPs, who seeks a share in the fraudulent $19 billion judgment on behalf of a group of Ecuadorians known as the Huaorani—stated that she "personally [] debated" with Atossa Soltani "over the wisdom and ethics of distorting the facts" and that AW misrepresented information from her book even after she corrected them. Dkt. 42 at 7 n.9. In Professor Kimerling's view, AW was "really jeopardizing the credibility of the communities" by their distortion of the facts, and AW's response was, "'well, we have to win a PR battle.'" *Id.*

**2.     AW's "Core Group" Includes Core Members Of The Fraudulent Conspiracy.**

On March 8, 2013, AW confirmed its place in Donziger's fraudulent conspiracy when it wrote a letter to Chevron identifying the members of its "core group" who were "engaged in the formulation of campaign strategy and messages" and whose "*private, internal* campaign communications" are allegedly protected by the First Amendment. Dkt. 42-41; *see Perry*, 591 F.3d

---

[7] AW also claims that AW stopped using David Russell's $6 billion damages estimate in February 2006 after Russell sent a cease and desist letter stating that the figure was "no longer valid" and the actual damages were "substantially less than originally estimated." Dkt. 41 at 7 n.17. Yet its March 20, 2007 press release, titled "Ecuador Court Speeds Up Chevron's $6 Billion Amazon Trial Over Rainforest Contamination," stated that "[t]he only independent damage assessment, by the U.S. firm Global Environmental Operations [owned by Russell], puts clean-up costs at $6.14 billion." Dkt. 14 Ex. 10. And in letters to the SEC dated February 28, 2006 and March 18, 2008, *id.* Exs. 12-13, AW attached and incorporated its January 30, 2006 letter, which cited the $6 billion figure, *id.* Ex. 11.

at 1165 n.12 (emphases in original). This list included Donziger and Ecuadorian members of the conspiracy (including the LAPs' lead Ecuadorian counsel, Pablo Fajardo) who have "utterly refused" to comply with Court orders requiring them to provide discovery to Chevron.[8] Dkt. 38-2 at 1. AW also identified entire organizations as members of its core group (though the members must be "*persons*," not entities, *Perry*, 591 F.3d at 1165 n.12), refused to identify members whose "identity is not public knowledge," and "reserve[d] the right to add others" to its list. Dkt. 42-41 at 3-5.

Thus, AW's incomplete list of "core group" members further supports the fact that AW, far from exercising First Amendment rights, was and is an active participant in the extortionate RICO conspiracy. Judge Kaplan already found, for example, that the unrefuted evidence demonstrates that Donziger and Fajardo engaged in fraudulent activities, including "coerc[ing] an Ecuadorian judge to (1) terminate the judicial inspections that previously had been ordered, (2) substitute a single global inspection to determine the extent of the alleged environmental damages, and (3) select a 'global expert' chosen by the LAPs, Richard Cabrera, to conduct it . . . by threatening the judge with the filing of a misconduct complaint." Dkt. 38-3 at 9; *see also id.* at 15 ("[T]here is substantial evidence that at least Fajardo and Yanza bribed the trial judge in order to obtain a judgment favorable to the LAPs.").[9] While Soltani tries to explain as "joking" her 2006 conversation with Donziger and Yanza about "raising a private army" to intimidate the Ecuadorian court (Dkt. 41, Soltani Decl. ¶ 4), she cannot explain her recorded concerns that the videotape might be subpoenaed and that "it's illegal to conspire to break the law." Dkt. 38-6; *see* http://www.youtube.com/watch?v=_aQnqVDvDw0.

AW thus embraces the ringleader and key players in the RICO conspiracy as members of its core group "engaged in the formulation of [its] campaign strategy and messages," *Perry*, 591 F.3d at 1165 n.12, at the same time it argues that it was not a participant in that conspiracy and that, at most, it "at times coordinated its message" with those individuals. Dkt. 41 at 8. If that were true, those individuals would not be within AW's "core group" involved "in the formulation of campaign

---

[8] The co-conspirators identified as members of AW's "core group" include Donziger, Fajardo, Luis Yanza, members of Rainforest Action Network, Juan Pablo Saenz, Julio Prieto, and Karen Hinton. Dkt. 42-41 at 3-5; Dkt. 14 Ex. 1 at ¶¶ 8, 11, 12, 18(h),(l),(m),(n).
[9] Aaron Marr Page is also in the "core group" (Dkt. 42-41 at 5); the District of Maryland ordered his privileged documents produced based on the crime-fraud exception. Dkt. 38-4.

strategy and messages." *See Perry*, 591 F.3d at 1165 n.12.

### 3. Even If The First Amendment Applied, Its Protection Would Be Narrow.

AW is wrong about the scope of First Amendment protection, even if the First Amendment were to apply here. AW claims, for instance, that "all communications with the media" are "subject to First Amendment protection." Dkt. 9 at 1. But such communications are "not a private, internal formulation of strategy or message and [are] thus far afield from the kinds of communications the First Amendment privilege protects." *See* 591 F.3d at 1165 n.12. AW also claims that requests for documents concerning their press releases, blog posts, and their efforts to recruit members and solicit donations implicate First Amendment protections. Yet *Perry*'s holding "certainly does not apply to documents or messages conveyed to the electorate at large, discrete groups of voters or individual voters for purposes such as persuasion, recruitment or motivation," or to "communications soliciting active support from actual or potential . . . supporters." *Id.* The Ninth Circuit made clear that "the contents of such communications are not privileged." *Id.* Further, it "d[id] not foreclose the possibility that some of Proponents' internal campaign communications may be discoverable."[10] *Id.*

Unlike the Proponents of Proposition 8, who were not alleged to have carried out a fraudulent conspiracy, abundant evidence shows that AW is an active co-conspirator in the RICO Defendants' fraud. *See* Dkt. 42 at 1-10. AW has made clear—*after* being served with the subpoena—that it will stop at nothing to bring Chevron "to its knees" and "will not back down," Dkt. 42-42, belying its claims that disclosure could have a chilling effect on its activities. Nor do its self-serving declarations make even a *prima facie* showing of a chilling effect on protected activities. *See Nat'l Org. for Marriage v. McKee*, 723 F. Supp. 2d 236, 241 (D. Me. 2010) (holding that declarations

---

[10] AW continues to claim that in *Perry*, the Ninth Circuit "reject[ed] a similar ploy to obtain a political opponent's strategy engineered by the same counsel who represent Chevron here." Dkt. 41 at 1; *see also* Dkt. 3 at 1. But as Chevron has noted (Dkt. 42 at 12 n.15), the Ninth Circuit in *Perry* endorsed the vast majority of the discovery requests propounded by the challengers to Proposition 8, observing that its decision was narrow and chiding the Proposition 8 Proponents for seeking to hide documents that are "far afield from the kinds of communications the First Amendment privilege protects." 591 F.3d at 1165 n.12. And when the discovery dispute was remanded to the district court, the Proposition 8 Proponents were required to produce—in their own words—"over 12,000 internal campaign or nonpublic documents revealing private political speech and association." Br. of Resp'ts-Appellees, *Equality Cal. & No on Proposition 8, Campaign for Marriage Equality v. Hollingsworth*, No. 10-15649 (9th Cir. Mar. 26, 2010), Dkt. 8 at 5-6.

1  submitted by members of the subpoenaed organizations, "which convey[ed] their beliefs as to how
2  donors to their organizations would respond," failed to demonstrate a chilling effect because they
3  "differ[ed] in kind from the evidence at issue in *Perry* . . . , in which those whose information was
4  proposed to be shared detailed the impact of the anticipated disclosure on them personally").

5       AW relies on *NAACP v. Claiborne Hardware*, 458 U.S. 886 (1982), for the proposition that
6  "where a campaign involves both protected expression and illegal activity, courts must carefully
7  distinguish between the two, and cannot infringe upon the former, which remains protected." Dkt. 41
8  at 6. But *Claiborne Hardware* is distinguishable on many grounds. Most notably, the Supreme
9  Court there held that organizers of a civil rights boycott in favor of civil rights in Mississippi in the
10 1960s could not be *enjoined* or held liable in *damages* to the businesses affected by the boycott, even
11 if there were violent elements to the boycott. *Claiborne Hardware*, 458 U.S. at 933. The precedents
12 the *Claiborne Hardware* Court relied on were cases holding, for example, that "'peaceable assembly
13 for lawful purposes *cannot be made a crime*.'" *Id*. at 907 (quoting *De Jonge v. Oregon*, 299 U.S.
14 353, 365 (1937) (emphasis added)). What is before the Court here is a discovery dispute—not a
15 criminal case, request for prior restraint, or an action for damages. And AW's argument that "threats
16 of vilification or social ostracism" are "constitutionally protected" (Dkt. 41 at 13 (citing *Claiborne
17 Hardware*, 458 U.S. at 926)) is neither here nor there. AW's role in the conspiracy was and is to
18 parrot Donziger's and other co-conspirators' *falsehoods* in order to pressure an unjust settlement
19 based on a fraudulent judgment. *See* Dkt. 42 at 1-10; note 5, *supra*.

20      Even ignoring both that the First Amendment does not shield fraud, and AW's misreading of
21 *Perry* and *Claiborne Hardware*, Chevron's requested discovery is highly relevant to its claims, and
22 its interest in evidence of the extortion scheme against it outweighs any harm to AW's claimed First
23 Amendment interests. *See Perry*, 591 F.3d at 1161. As Judge Kaplan has observed, "Defendants
24 and/or their allies have resisted discovery to an astonishing degree." Dkt. 14 Ex. 22 at 1. Just last
25 week, in compelling discovery from another non-party co-conspirator, Patton Boggs LLP (one of the
26 LAPs' law firms), Judge Kaplan noted the RICO Defendants' "refus[al] to produce any documents in
27 the possession, custody, or control of their attorneys and agents in Ecuador [including AW's "core
28 group" members Fajardo, Yanza, Saenz, and Prieto] despite orders by this Court compelling them to

do so." *Chevron Corp. v. Donziger*, No. 11-cv-0691-LAK (S.D.N.Y. Mar. 15, 2013), Dkt. 905 at 46-52 (attached, as modified by Dkt. 907, for the Court's convenience as Exhibit A). Judge Kaplan stated that "defendants' obstinance with respect to discovery of evidence from Ecuador has reached a new level" and described, among other things, "core group" member Fajardo's collusive lawsuit to prevent this discovery. *Id*. at 47-49, 68 ("Especially in light of defendants' obstinate refusal to provide Chevron with discovery from Ecuador, Chevron has shown that it needs discovery from [Patton Boggs]."); Dkt. 38-2 at 1 ("core group" members "collusively . . . obtained an injunction from an Ecuadorian court that purports to restrain the Ecuadorian counsel and others from providing any information in discovery in this action"). Because Chevron cannot get discovery from Ecuadorian "core group" members, Chevron has a significant need for this discovery in this $19 billion case.

### C.  The Subpoena Does Not Unduly Burden AW.

A sufficient showing of relevance and need for the subpoenaed information overcomes a non-party's objections that compliance with a subpoena would be unduly burdensome. *See Gonzales v. Google, Inc.*, 234 F.R.D. 674, 680-81 (N.D. Cal. 2006) (noting that a court "whose only connection with a case is supervision of discovery ancillary to an action in another district should be especially hesitant to pass judgment on what constitutes relevant evidence thereunder"). Any claimed burden on AW is not "undue," because AW is not an innocent third party but rather is a co-conspirator in the RICO Defendants' extortion scheme. *See* Dkt. 42 at 1-10; Ex. A at 69 ("[Patton Boggs] is no ordinary, unrelated non-party witness. It is an alleged co-conspirator and some of its actions are at issue in this case regardless of whether the Subpoena as narrowed is enforced.").

The time period of the requests, which Chevron offered to narrow, is reasonable given the evidence that AW played a role in the RICO enterprise since at least 2002. *See* Dkt. 42 at 2-3. And Chevron cannot obtain the requested discovery from other sources, given that those potential sources "have resisted discovery to an astonishing degree" and "have been remarkably obstructive." Dkt. 14 Ex. 22 at 1; Dkt. 38-2 at 1; Ex. A at 47-49, 68.

### D.  AW Must Log Documents It Claims Are Privileged.

AW claims that it did not dispute whether it is required to produce a privilege log for documents it withholds on the basis of the attorney-client privilege. Yet AW stated that its proposal

for logging documents was contingent on its "agree[ing] that a log is warranted." Dkt. 4 Ex. I at 2; *id*. Ex. K at 2. Contrary to AW's claim that it "still awaits" information regarding what categories of documents Chevron was logging in the underlying litigation, Chevron informed AW that it was "logging all privileged documents on a document by document basis." *Id.* Ex. N at 2.[11]

AW must describe the nature of documents asserted to be protected by the attorney-client privilege, the First Amendment, or any other privilege or protection in order to "enable the parties to assess the claim." *See, e.g.*, Fed. R. Civ. P. 45(d)(2)(A); *Perry*, 591 F.3d at 1153 n.1. Failure to comply with this requirement risks a finding that the privilege has been waived. *See Burlington N. & Santa Fe Ry. Co. v. District Court*, 408 F.3d 1142, 1149 (9th Cir. 2005). Chevron must be able to assess AW's claims of privilege, particularly given that the crime-fraud exception defeats the privilege with respect to communications that furthered AW's or its co-conspirators' fraudulent activities.[12] *See, e.g.*, *In re Grand Jury Proceedings*, 87 F.3d 377, 381 (9th Cir. 1996).

**E.      The Subpoena Does Not Seek AW's Protectable Commercial Information.**

Even assuming AW made the requisite "strong showing" that the subpoena requests "important proprietary information," which its vague claims fail to do, "[a] survey of the relevant case law reveals that discovery is virtually always ordered once the movant has established that the secret information is both relevant and necessary." *Compaq Computer Corp. v. Packard Bell Elec., Inc.*, 163 F.R.D. 329, 338 (N.D. Cal. 1995). The requested discovery is highly relevant to Chevron's claims. Not only does Chevron's complaint identify AW as a non-party co-conspirator, but its evidence also supports its allegations that AW was an active participant in the fraudulent and extortionate scheme. And the requested discovery is necessary because Chevron cannot obtain it from other sources, given the conspirators' efforts to obstruct and delay discovery. Indeed, Donziger's recently submitted privilege log includes over 100 entries of supposed "attorney-client

---

[11] Since then, Chevron has served its privilege logs, including categorical privilege logs for a few particular categories of documents (*e.g.*, draft expert reports), but has served document-by-document logs for the vast majority of its withheld, privileged documents. Chevron has consistently stated that it is open to reasonable proposals for privilege logging. *E.g.*, Dkt. 4 Ex. N at 2.

[12] Judge Kaplan wrote: "sight cannot be lost of the fact that [Patton Boggs] is an alleged co-conspirator in this case," and "Chevron has established that 'a prudent person has[s] a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud.'" Ex. A at 61-62.

privileged" communications with AW, along with other AW documents.

**F.    AW Should Bear The Costs Of Production Given Its Participation In The Conspiracy.**

As with Patton Boggs, AW "is no ordinary, unrelated non-party witness. It is an alleged co-conspirator and some of its actions are at issue in this case regardless of whether the Subpoena as narrowed is enforced." Ex. 1 at 69; *see In re Honeywell Int'l, Inc. Sec. Litig.*, 230 F.R.D. 293, 303 (S.D.N.Y. 2003) ("A non-party can be required to bear some or all of its expense where the equities of a particular case demand it."). Here, the equities demand that AW bear its own costs—which AW's own actions are responsible for increasing—because it is interested in the outcome of the case (financially and otherwise), and is a co-conspirator in fraudulent activity. Furthermore, the litigation is of public importance because it was brought in large part to protect the integrity of the judicial system against fraud and abuse. And AW has profited from its fraudulent activities targeted at Chevron. *E.g.*, Dkt. 38-13 at 2 (reflecting donations from Kohn, Donziger's former co-counsel, totaling more than $184,000). Finally, as with Patton Boggs, "'[w]here a nonparty was substantially involved in the underlying transaction and could have anticipated that [it] would reasonably spawn some litigation, expenses should not be awarded.'" Ex. A at 71 (quoting *In re First Am. Corp.*, 184 F.R.D. 234, 242 (S.D.N.Y. 1998)). Here, not only *should* AW have anticipated a subpoena, AW *did* anticipate it. Dkt. 38-6 (Soltani: "Do you guys know if anybody can, uh, subpoena these videos?").

**G.    An Additional Protective Order Is Unnecessary.**

AW seeks a "robust protective order" to protect its allegedly confidential information (Dkt. 41 at 15) even though it has funneled Chevron's confidential and protected work product to the LAPs' counsel in Ecuador. *See* Dkts. 38-15, 38-16. In any event, the protective order in the underlying litigation governs third-party discovery and addresses legitimate confidentiality concerns. *See* Dkt. 4 Ex. FF ¶¶ 2-3 (permitting a non-party to designate information as "Confidential Information" subject to restrictions on its use and disclosure).

### III.    CONCLUSION

For the foregoing reasons, as well as those stated in Chevron's Motion to Enforce and in its Opposition to AW's Motion to Quash, Chevron respectfully requests that the Court require AW to produce responsive documents as soon as possible, and certainly no later than April 19, 2013.

Dated: March 18, 2013

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By:    */s/ Ethan D. Dettmer*
       Ethan D. Dettmer

*Attorneys for Plaintiff Chevron Corporation*