MARCO SIMONS [S.B. #237314]
marco@earthrights.org
RICHARD HERZ [admitted *pro hac vice*]
rick@earthrights.org
MICHELLE HARRISON
michelle@earthrights.org
MARISSA VAHLSING
marissa@earthrights.org
EARTHRIGHTS INTERNATIONAL
1612 K Street, Suite 401
Washington, DC 20006
Telephone: (202) 466-5188
Facsimile: (202) 466-5189

JOSE LUIS FUENTES
jlf@siegelyee.com
SIEGEL & YEE
499 14th Street Ste 300
Oakland, CA 94612
Tele: (510) 839-1200
Facsimile: (510) 444-6698
*Attorneys for Non-Party Amazon Watch*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CHEVRON CORP., | Case No. C 13-80038-MISC CRB (NMC) |
| Plaintiff, | **REPLY IN SUPPORT OF MOTION OF NON-PARTY AMAZON WATCH TO QUASH AND/OR MODIFY SUBPOENA DUCES TECUM** |
| v. | |
| STEVEN DONZIGER, *et al.*, | Date: April 3, 2013 |
| Defendants | Time: 1:00 pm |
| | Courtroom A - 15th Floor |

# TABLE OF CONTENTS

Table of Authorities ................................................................................................................ ii

I. INTRODUCTION AND SUMMARY OF THE ARGUMENT ................................. 1

II. ARGUMENT .............................................................................................................. 2

    A. The meet and confer process has not concluded ............................................... 2

    B. The subpoena is invalid due to improper service .............................................. 2

    C. AW was not a participant in any conspiracy ..................................................... 3

        1. Chevron ignores the law ............................................................................. 3

        2. Chevron's "evidence" does not suggest AW was part of a conspiracy ........... 6

            a. *AW had no involvement in the behavior at the heart of Chevron's case* ................ 6

            b. *Donziger never dictated or controlled AW's activity* ............................................ 7

            c. *AW did not intentionally convey false or misleading information* ......................... 8

            d. *AW did not participate in any improper activities* ............................................... 10

    D. The subpoena violates Amazon Watch's First Amendment rights ................. 11

    E. Chevron has not taken reasonable steps to avoid undue burden on Amazon Watch ........... 13

    F. Chevron improperly seeks confidential commercial information .................. 14

    G. The parties have not finished conferring over the form of a privilege log ........... 14

    H. Chevron should cover the reasonable costs of any production ...................... 14

    I. If documents must be revealed, a robust protective order is warranted ................. 15

III. CONCLUSION ........................................................................................................ 15

## TABLE OF AUTHORITIES

### FEDERAL CASES

*AFMS LLC v. UPS*,
 No. 12cv1503 JLS, 2012 U.S. Dist. LEXIS 106925 (S.D. Cal. July 27, 2012) ........................ 14

*Boy Scouts of Am. v. Dale*,
 530 U.S. 640 (2000) ........................................................................................................ 12

*Burlington N. & Santa Fe Ry. Co. v. Dist. Court*,
 408 F.3d 1142 (9th Cir. 2005) .................................................................................. 14 n.22

*Conte v. Newsday, Inc.*,
 703 F. Supp. 2d 126 (E.D.N.Y. 2010) ................................................................................ 5

*Gonzales v. Google, Inc.*,
 234 F.R.D. 674 (N.D. Cal. 2006) ...................................................................................... 13

*Havoco of Am., Ltd. v. Hollowbow*,
 702 F.2d 643 (7th Cir. 1983) ........................................................................................ 8 n.9

*In re Helm*,
 48 B.R. 215 (W.D. Ky. 1985) ............................................................................................. 3

*In re Honeywell Int'l, Inc. Sec. Litig.*,
 230 F.R.D. 293 (S.D.N.Y. 2003) ................................................................................. 14, 15

*Kendall v. Visa U.S.A., Inc.*,
 518 F.3d 1042 (9th Cir. 2008) ........................................................................................ 2, 3

*NAACP v. Claiborne Hardware Co.*,
 458 U.S. 886 (1982) ................................................................................................. passim

*Nat'l Org. For Marriage v. McKee*,
 723 F. Supp. 2d 236 (D. Me. 2010) ........................................................................... 12 n.20

*Nat'l Org. For Women, Inc. v. Scheidler*,
 510 U.S. 249 (1994) ........................................................................................................... 5

*Org. For a Better Austin v. Keefe*,
 402 U.S. 415 (1971) ........................................................................................................... 5

*Perry v. Schwarzenegger*,
 591 F.3d 1147 (9th Cir. 2010) *cert. dismissed,* 130 S. Ct. 2432, (U.S. 2010) ............ 2, 11, 12

*United States v. Pendergraft*,
 297 F.3d 1198 (11th Cir. 2002) ................................................................................. 10 n.16

**FEDERAL STATUTES**

18 U.S.C. § 1951 ........................................................................................................................... 5

**OTHER AUTHORTITIES**

Restatement (Second) of Torts § 531 (1977) .................................................................................. 5

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION AND SUMMARY OF THE ARGUMENT

Chevron devotes most of its brief to a failed attempt to show that AW was part of the conspiracy Chevron alleges in the underlying case. It neglects to even mention, let alone distinguish, *NAACP v. Claiborne Hardware Co.*, 458 U. S. 886 (1982), which forecloses Chevron's argument.

Chevron alleges that *the LAPs and RICO defendants* obtained a fraudulent judgment in Ecuador. But it cannot show that AW took part in obtaining any fraudulent judgment. Chevron mostly alleges that *AW* participated in the alleged conspiracy by communicating with the media, blogging, issuing press releases, and petitioning the government—fundamentally protected speech. The central holding of *Claiborne Hardware*, however, is that, where a campaign involves both protected expression and illegal activity, courts must carefully distinguish between the two, and cannot infringe upon the former. 458 U.S. at 915-18, 926-27. The Supreme Court rejected the idea that liability could be based solely on participation in an advocacy campaign that involved illegal acts by other participants. Thus, while AW at times coordinated its messaging with the defendants, this limited, lawful association is not, as Chevron argues, a crime; it is protected by the First Amendment.

In attempting to tar AW with the same brush as defendants, Chevron consistently distorts the evidence. For example, Chevron pretends that Donziger controlled AW's press releases. But the very evidence it cites shows precisely the opposite. Most importantly, Chevron cannot show that AW acted in furtherance of anything other than an advocacy campaign to call attention to Chevron's pollution and promote justice for those harmed by it. Thus, while *Claiborne Hardware* holds that absent evidence of specific intent to further a crime, a political campaign is protected speech, Chevron utterly fails to show AW had such intent. Nor could it, because AW publicly advocates against Chevron based on information it has a firm basis to genuinely believe to be (and which in fact is) true. This precludes any suggestion that Chevron can meet its high constitutional burden.

Chevron's opposition also fails for other reasons. It cannot overcome AW's showing that the meet and confer is incomplete, since AW is still awaiting, among other things, Chevron's promised proposal on means to lessen the burden on AW. And its argument that the issue of whether service is invalid is barred by collateral estoppel ignores the requirements of that doctrine.

Moreover, there is no question that Chevron's subpoena seeks the internal campaign communications and strategies of a campaign directed against it. But that information is clearly protected by the First Amendment. *See Perry v. Schwarzenegger*, 591 F.3d 1147 (9th Cir. 2010). And Chevron cannot meet its burden to show that the information it seeks is otherwise unavailable. Indeed, it does not even attempt to describe what kinds of documents it believes AW might have that it cannot obtain, or has not already obtained, from the defendants.

Likewise, Chevron makes no effort to refute AW's showing that the burden this subpoena would place on AW is extreme. For all of these reasons, AW's motion should be granted.

## II. ARGUMENT

### A. The meet and confer process has not concluded.

AW has demonstrated that Chevron ended the meet and confer before an impasse had been reached on all issues. Dkt. 3 at 6-8; Dkt. 41 at 4-5. Most notably, the parties had agreed to continue to meet and confer regarding burden and rolling production, and Chevron had agreed to provide a proposal on both issues, including proposing electronic search terms to limit the production burden on AW. Dkt. 41 at 5; Dkt. 4, Ex. O at 2. But Chevron never did. Dkt. 41 at 5.

To argue otherwise, Chevron points to its January 7 email, in which it described the categories of documents it would want first in a rolling production, and then falsely claims that AW rejected its proposal in a letter the next day. Dkt. 42 at 2, n.3 (citing Halbert Decl. Ex. 39; Dkt. 4, Ex. O). But AW's January 8 letter, reflecting a conversation with Chevron *after* receiving Chevron's email, specifically noted that rolling production and burden are inextricably intertwined, that counsel "agreed . . . to continue to meet and confer regarding burden and rolling production," and that AW was awaiting Chevron's proposal, including proposed search terms. Dkt. 4, Ex. O. AW did not "reject" a proposal it had not received. Indeed, after Judge Kaplan reinstated the subpoena, AW reiterated that it still had not received Chevron's proposal. Dkt. 4 Ex. Z at 4; Halbert Decl. Ex. 40. The meet and confer process has not yet ended.

### B. The subpoena is invalid due to improper service.

The issue of whether service is invalid is not barred by collateral estoppel. Dkt 42 at 10. AW neither had a "full . . . opportunity to litigate" nor "actually litigated" the validity of service. *See Kendall*

2

*v. Visa USA, Inc.*, 518 F.3d 1042, 1050 (9th Cir. 2008). AW's first letter stated that "the issue of when service was effected" was one that "the issuing court" would decide, but requested "the opportunity to brief these questions" if Judge Kaplan chose to decide them. Dkt. 14, Monagas Decl. Ex. 17 at 2.[1] AW's second letter stated that the "validity of Chevron's November 28 service attempt . . . should be determined by the issuing court." *Id.* Ex. 21 at 3. The only issue that was litigated—the effect of the December 7th agreement—is not precluded because AW was not a party before Judge Kaplan, *see Kendall*, 518 F.3d at 1050, and a denial of a protective order is not a "final judgment." *Id.*; *In re Helm*, 48 B.R. 215, 220 n.14 (W.D. Ky. 1985).

### C. AW was not a participant in any conspiracy.

Chevron seeks to strip AW of its First Amendment rights by alleging AW participated in a conspiracy. But the conduct Chevron asserts is illegal is political advocacy at the core of the First Amendment. Thus, Chevron's arguments are based on guilt by association, a notion the Supreme Court squarely rejected in holding that "[t]he right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct . . . that itself is not protected." *Claiborne Hardware*, 458 U.S. at 908. Without evidence of specific criminal intent, the exercise of First Amendment rights of expression and association are not criminal, and remain protected. *Id.* at 919-920. Despite Chevron's repeated efforts to distort the facts, it presents nothing suggesting that AW specifically intended to support any illegal activity. Thus, Chevron cannot show precisely what the Supreme Court requires.

### 1. Chevron ignores the law.

In *Claiborne Hardware,* the Court addressed a political advocacy campaign that "included elements of criminality and elements of majesty": a boycott designed to promote racial equality that was enforced in part through violence, but that also included speeches, peaceful protests and the voluntary choice of many local residents not to use certain stores. *Id* at 888-89, 903-4. The Court held

---

[1] Inexplicably, Chevron repeats its false statement that Judge Kaplan issued the January 23, 2013, protective order based on a "submission" by AW, *see* Dkt. 42 at 10, even after AW pointed out that this was impossible. *See* Dkt. 37 at 11 n.13. AW's first letter to Judge Kaplan was stamped "RECEIVED JAN 24 2013." *See* Dkt. 14, Monagas Decl. Ex. 17. Chevron's false statement relies on an error by Judge Kaplan, but that error is obvious, has been noted, and should not be repeated by counsel to deceive the Court.

that the non-violent elements of the campaign were protected by the First Amendment; that individuals' First Amendment rights are not limited—and they could not be held liable—simply because their partners in expressive activity violated the law in furtherance of their joint campaign. *Id.* at 908, 915, 919-20, 934.

Like the campaign in *Claiborne Hardware*, AW's "ultimate objectives"—justice for the thousands of victims of Chevron's pollution—"were unquestionably legitimate." *Id.* at 933. There, as here, "[t]he charge of illegality—like the claim of constitutional protection—derives from the means employed." *Id.* Chevron's argument fails under *Claiborne Hardware* in numerous respects.

First, where allegedly illegal acts occur "in the context of constitutionally protected activity," courts must look at the *specific* acts of each individual to determine whether those acts are illegal or protected. *Id.* at 916-17, 924-26, 933-34. The First Amendment demands "precision of regulation" and limits the grounds upon which liability may be imposed. *Id.* at 916-17. Speech itself cannot be evidence of illegality. *See Id.* at 932-34 ("The use of speeches, marches, and threats of social ostracism cannot provide the basis for a damages award.") Chevron, however, claims that AW is a member of a conspiracy based on its public advocacy campaign activities, which are undeniably protected.

Second, to show that the First Amendment does not protect peaceful political advocacy, a party must prove that the speaker had "a specific intent to further an unlawful aim." *Id.* at 925-26; *accord id.* at 920; *id.* at 933 (party must have "agreed to use unlawful means."). And such intent "must be judged according to the strictest law." *Id.* at 919 (internal quotation omitted). It is not enough that an individual "belonged to a group, some members of which committed [illegal acts]." *Id.* at 920. Thus, it is not sufficient that AW and certain Defendants at times worked together in pursuit of a shared *legitimate* end: justice for those Chevron harmed. AW did not participate in any fraud, let alone did it specifically intend to help procure a fraudulent judgment. Dkt. 37 at 2-5. AW engaged in its protected speech based upon its good faith (and correct) belief in Chevron's responsibility. *Id.* at 2-3. Irrespective of whether Defendants committed fraud, AW's campaigns are protected expression under *Claiborne Hardware*.[2]

---

[2] Chevron cites cases holding that fraud or conspiracy are not protected, Dkt.42 at 11, n.13, but those cases are unavailing because, absent evidence that AW had specific intent, its expression and association are protected. *Claiborne Hardware,* 458 U.S. at 919-20.

4

Third, because a public advocacy campaign is nothing if not protected speech, Chevron seeks to challenge AW's alleged goal: according to Chevron, AW's campaign sought to pressure Chevron into settling the lawsuit in Ecuador. Dkt 42 at 5. But "[s]peech does not lose its protected character . . . simply because it may . . . coerce [others] into action." *Claiborne Hardware*, 458 U.S. at 910; *accord Org. For a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) (holding that petitioners' purpose in distributing literature to "'force' respondent to sign a no-solicitation agreement. . . does not remove [the expression] from the reach of the First Amendment."). Likewise, "'threats' of vilification or social ostracism," even if resulting in business losses, are "constitutionally protected." *Claiborne Hardware*, 458 U.S. at 926; *accord id.* at 921, 933.

Chevron cannot avoid these principles simply by asserting AW's speech was part of a RICO conspiracy. "Conduct alleged to amount to Hobbs Act extortion, for example, or one of the other, somewhat elastic RICO predicate acts may turn out to be fully protected First Amendment activity, entitling the defendant to dismissal on that basis." *Nat'l Org. For Women, Inc., v. Scheidler*, 510 U.S. 249, 264 (1994) (Souter, J. concurring) (citing *Claiborne Hardware*, 458 U.S. at 917). The fact that Chevron calls AW's speech "extort[ion]" or "fraud" changes nothing.

Indeed, wholly part from the First Amendment, even if it were true, which is it is not, that AW's advocacy campaign was based on false statements, it would not meet the definition of "extort[ion]." The Hobbs Act requires "wrongful use of actual or threatened force, violence, or fear." 18 U.S.C. § 1951(b)(2). A threat to defame is not extortion. *Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 137-38 (E.D.N.Y. 2010).[3] Likewise, fraud requires that the victim relied to his detriment on the perpetrator's misrepresentations. *See* Restatement (Second) of Torts § 531 (1977). Chevron does not claim that *it* was misled by AW or anyone else.

In sum, Chevron accuses AW of a crime, even though AW's ultimate objectives are legitimate, its means constitutionally protected and evidence of criminal intent is wholly absent.

**2. Chevron's "evidence" does not suggest AW was part of a conspiracy.**[4]

---

[3] And if public statements made in the hopes that it would encourage a party to settle were extortion, attorneys in almost every high profile case would be guilty.

[4] Chevron sandbagged AW by presenting its purported evidence after refusing to do so during the meet and confer process. Dkt. 3 at 15 & n.18; Dkt. 4, Simons Decl. ¶¶ 46-47; Dkt. 41 at 5 n. 10.

Chevron mischaracterizes AW's public advocacy campaign as part of a conspiracy. Because there is no question that, absent Chevron's allegations of improper purpose, the conduct at issue is protected speech, Chevron's burden is "heavy." *Claiborne Hardware*, 458 U.S. at 934. The Court must be "wary", *id.* at 934; indeed, it is under "a special obligation" to examine Chevron's allegations "critically" and with "extreme care", *id.* at 915-16, 926-27, given "the importance of avoiding the imposition of punishment for constitutionally protected activity." *Id.* at 934. Chevron's innuendo of illegal purpose is not enough. Although Chevron has all of Donziger's communications, it comes nowhere close to showing that AW engaged in public advocacy with the specific intent of promoting fraud or extortion.

> a. **AW had no involvement in the behavior at the heart of Chevron's case.**

Chevron attempts to smear AW by association with a laundry list of charges about the *Defendants'* alleged actions in obtaining a fraudulent Ecuadorian judgment. Dkt. 42 at 3-5. Tellingly, that section describes the heart of Chevron's case, but Chevron utterly fails to show that AW participated in, let alone conspired in, these acts.

According to Chevron, *Defendants* forged reports submitted to the Ecuadorian court; pressured the Ecuadorian court to appoint a neutral expert, Cabrera, and then paid him and ghostwrote his reports; and ultimately paid the judge and ghostwrote the judgment. Dkt. 42 at 3-4. But AW did not take part in the legal case in Ecuador. AW never "submitted any evidence or findings to the court" and it has never "assist[ed] the court appointed expert in preparing his submissions to the court." Dkt. 37 at 43 ¶15; *see also Id.* at 51 ¶ 6, 59 ¶19. AW did not participate in obtaining any "fraudulent judgment."

Chevron raises only a single allegation against AW that even relates to its claim that the judgment was fraudulent—that AW participated in "improper" *ex parte* meetings with the Lago Agrio Judge and was involved in the appointment of a court expert. Dkt. 42 at 9. But the meetings to which Chevron refers are permitted under Ecuadorian law and the judge also met with Chevron. Dkt. 37 at 44 ¶17.[5] As for the appointment of an expert, AW never advocated for any particular expert to be

---

[5] Chevron cites what it calls an "*ex parte* lunch," Dkt 42 at 2, 9 at which AW allegedly "pressured the judge." *Id.* at 9. But the transcript merely shows that, at one of the inspections, all the women in the community cooked for the attendees; the only reason Texaco did not attend was that they leave with the military as soon as possible, and there is no indication that anyone from AW even spoke to the judge. Halbert Decl. Ex. 1 at 2-3. Equally unavailing is Chevron's citation to a conversation between Koenig and the judge and his secretary. Chevron asserts that this was an effort to improperly influence

appointed; it advocated for *an expert* to be appointed to move the case along because Chevron/Texaco had been holding up the process to cause delays.[6] Dkt 41 at 32-33 ¶5; *see also id.* at 43 ¶17; *id.* at 6 n.12.[7] Given the utter dearth of evidence that AW conspired in any effort to procure a fraudulent judgment, Chevron is forced to attack AW for its advocacy campaign.

### b. Donziger never dictated or controlled AW's activity

At no point has AW undertaken any campaign or organizing activities because it was "directed" to do so by Donziger or any of the other RICO defendants. *See* Dkt. 37 at 4; *Id.* at 43, ¶¶12-13, *Id.* at 45-46 ¶22; Dkt. 41 at 6-7 & n. 14.[8]

Chevron cherry-picks quotes from an email from Donziger, Dkt. 42-34, Ex. 33, to give the illusion that Donziger directed AW's press releases. Dkt. 42 at 6. But the full email exchange shows precisely the opposite: Donziger was angry because AW *refused* to do what he wanted. The recipient of the email, Simeon, refused to publish a press release sent by Donziger without "carefully fact-check[ing]" it. Dkt. 42-34 at 3. Simeon told Donziger that "as with all AW press releases, the final arbiters of the text will be AW rather than you[,]" and "AW is not here to simply rubber-stamp press releases that you send us[.]" *Id.*

Nor did Donziger dictate AW's exercise of its First Amendment right to petition the government to investigate Chevron. Chevron mischaracterizes the evidence; Donziger states that "at times" he drafted letters to the SEC, Dkt. 42-24 at 19, but when AW and Donziger disagreed on a point, AW went its own way. *See e.g.* Dkt. 37 at 47 ¶28 (AW excluded information in the SEC letter

---

the judge, but the transcript shows that Koenig simply asked why Chevron seemed to be getting three times as much time as the plaintiffs at trial.

[6] Chevron's *own* video submitted in the underlying litigation, No. 11-cv-0691 (LAK) (S.D.N.Y.), at Dkt. 356, ¶ 71, video CRS-347-00-CLIP-01 shows this. In that video, Ms. Soltani, along with about ten others, attend a question and answer session in which they merely ask the judge why the appointment of "an" expert is taking so long, and the judge replies that "Texaco" is delaying the process.

[7] Chevron's sexual innuendo about Ms. Soltani is offensive and entirely false. Dkt. 42 at 9. Ms. Soltani never "smooched" the judge. Dkt. 37 at 43-44 ¶ 16. The comment Chevron cites was a joke referencing a method of greeting, common in South America. Dkt. 37 at 5.

[8] Chevron's arguments about AW's press releases are false, and the comment about "propaganda" was made in jest and taken out of context. Dkt. 42 at 6. *See* Dkt. 37 at 5 n.7 (addressing Chevron's "propaganda" argument); Dkt 37 at 45 ¶21 (addressing the "press release" arguments); *Id.* at 47 ¶30 (addressing the "propaganda" argument); *Id.* at 51-52 ¶¶9-12 (addressing Chevron's "patently false" argument about "press releases" and "wholly misleading" "propaganda" argument).

7

REPLY IN SUPPORT OF MOTION TO QUASH

that Donziger wanted AW to include).[9]

Thus, all that Chevron can show is that AW at times coordinated its message with the defendants; exactly *Claiborne Hardware* held was insufficient.[10]

### c. AW did not intentionally convey false or misleading information.

Chevron has provided no evidence to suggest AW knowingly and intentionally publicized false information. Nor could it. AW has always had every reason to believe in the truth of its claim that Chevron has caused catastrophic damage in the Ecuadorian Amazon. Dkt. 37 at 41-43 ¶¶5-11; *Id.* at 50-51 ¶¶4-5; *Id.* at 55-57 ¶¶5-12. Indeed, an Ecuadorian appellate court has so found, *see* Dkt 3 at 3-4, and Chevron does not dispute the harm in the underlying litigation. Dkt. 3 at 15-16.

Contrary to Chevron's claim, Dkt. 42 at 7, once David Russell asked AW not to use his $6 billion figure, AW stopped using it. Dkt. 37 at 46 ¶25.[11] Similarly, when doubt arose as to Bill Powers's "Exxon Valdez" figure, AW stopped using that figure too. Dkt. 37 at 4.[12] Chevron "supports" its claim that AW continues to use this figure with only an old posting by Karen Hinton on the chevrontoxico website, Dkt 38-8, over which posting AW had no authority, Dkt 37 at 45 ¶21, and a 2010 web story posted by AW in which Powers, *affirms, under oath in a deposition by Chevron*, that "the amount of toxic liquids that should not have been in the environment in Ecuador was *at least 30 times* the quantity or

---

[9] In any event, AW's petitions to the SEC are protected First Amendment activity. *See e.g. Havoco of Am., Ltd. v. Hollobow*, 702 F.2d 643, 650 (7th Cir. 1983) (Registering complaints with the SEC "is privileged as petitioning activity[,]" and that such activity may have "an adverse effect on [the company's] business, even that [petitioner] knew this and intended such a result, has no effect on the First Amendment's protection, as long as the activity represents a genuine attempt to influence governmental action.").

[10] That AW at times received donations from law firms that also supported the LAPs in no way means that those individuals, or the LAPs, ever "directed", nor did they "launch," AW's Ecuador campaign. Dkt 42 at 2. Such donations accounted for less than 10% of AW's total expenditure on the campaign. Dkt. 41 at 33-34 ¶ 6; *id.*, at 36 ¶¶ 4-5.

[11] Chevron's own exhibits show Donziger criticized AW for *acting too quickly* to stop using the Russell $6 billion figure. Dkt. 14, Ex. 8; *see also* Dkt 37 at 47 ¶28. Chevron disingenuously relies on exhibits where AW used the figure *before* Russell asked AW not to, *Id.* Ex 11; Dkt 37 at 46 ¶25, and later letters submitted by AW which *lack any direct citation* to the Russell estimate, Dkt 14, Ex 12, 14, and any reference to the past letter was not for the purpose of citing that figure. Thus, Chevron can cite only a single instance in which AW "continued to use" the figure, which was "a mistake on our part since we had previously decided not to reference Mr. Russell's report." Dkt 37 at 47 ¶27. Chevron's claim that the figure continues to appear on AW's website refers to old, archived documents, Dkt. 37 at 46-47, ¶¶ 23-24, 27. Regardless, AW had reason to belief the figure was, if anything, too low. Dkt 37 at 46 ¶26.

[12] Chevron's only support for the allegation that Donziger told AW to continue using the figure and that "AW obeyed" is an email from Donziger in which Donziger begs AW to continue using the "30 times Exxon Valdez" multiplier and criticizes AW for discontinuing use of the Russell Report's estimate so quickly once it came under questioning. Dkt. 14, Ex. 8.

the volume of crude that was spilled in the Exxon-Valdez disaster." Dkt. 38-10, Ex. 9 (emphasis added); *see also* Dkt 37 at 52-53 ¶14.[13]

Chevron asserts that "[w]ith AW's assistance, the LAPs touted Cabrera's report to the public, to the media, and to members of the U.S. Congress as an 'independent' assessment of damages." Dkt. 42 at 3. But none of the exhibits cited even mention the Cabrera Report.[14] Chevron also claims that AW failed to "correct" statements in the March 18, 2008 letter to the SEC, which was written before the independence of the Cabrera report had been questioned. Similarly, Chevron's assertion that AW continued to refer to it after Chevron "publicized unrefuted evidence" that it was "ghostwritten" cites only a press release issued by the Amazon Defense Coalition—not AW—and in any event, is an archived article from 2008, again before Cabrera's integrity was questioned. *See* Dkt. 42 at 8.[15]

In sum, Chevron's claim that AW "conveyed false and misleading information" boils down to little more than an argument that AW should have gone back and removed old postings on its website, or otherwise corrected statements that, according to Chevron, later turned out to be false. But to prove participation in a conspiracy, and to overcome *Claiborne Hardware*, Chevron is required to prove far more: that AW intentionally made false statements with the specific intent to promote fraud or extortion. Chevron comes no where close to meeting its burden.

Finally, Chevron cites a letter from Ms. Soltani to Chevron's CEO to claim the LAPs used AW "as their proxy to make extortionate threats." Dt 42 at 8. Nonsense. Far from a "threat," the letter is a respectful plea by Amazon Watch for Chevron to do the right thing by the people it has harmed. Indeed, as Chevron concedes, it was presented by Ms. Soltani "on behalf of Amazon Watch." Thus, Ms. Soltani's observation that the case will continue to play out in Ecuador until Chevron takes meaningful steps to resolve it was a statement of fact, not a threat to do anything, because Ms. Soltani

---

[13] Chevron's need to resort to a vague quote from a law professor, Dkt. 42 at 7 n.9, which is double, if not triple hearsay, further demonstrates Chevron's lack of evidence.

[14] Halbert Decl. Ex. 3; Halbert Decl. Ex. 15; Halbert Decl. Ex. 23 at 463:14-469:24. Indeed, Ex. 15 and the cited part of Ex. 23 do not mention AW at all. In Ex. 3, a letter from the LAPs to the US government calling attention to an alleged FCPA violation by Chevron, the only "assistance" from AW was some light editing ("All I did was make some corrections and suggestions.")

[15] Chevron claims that Donziger "previewed the plan for the corrupt expert report" to Ms. Soltani, by telling her that the LAPs would be supporting the expert with work, Dkt 42 at 8, but Ms Soltani always understood that both sides supported experts with technical assistance.

is not a lawyer for the LAPs and thus had no power to affect whether the litigation went forward or not.[16] That this is the best "evidence" Chevron could come up with of "extortionate threats" speaks volumes about the poverty of their allegations. And to accept Chevron's theory that this kind of statement is "extortion" would do untold damage to activists and lawyers' First Amendment rights.

### d. AW did not participate in any improper activities.

Chevron's claim of "improper activities" by AW also fails. First, the reference to forming a "private army" is taken entirely out of context.[17] Regardless, mere presence at a meeting where *other* individuals make comments that might have unlawful ends, is insufficient to support liability. *Claiborne Hardware*, 458 U.S. at 926 n.68 & 69 ("a legal duty to 'repudiate'—to disassociate oneself from the acts of another—cannot arise unless, absent the repudiation, an individual could be found liable for those acts"). And, as Chevron demonstrates by quoting Ms. Soltani, Dkt. 42 at 9, she did not adopt, but rather *repudiated* the statements of the RICO defendant. Dkt. 41 at 32 ¶4.

Finally, Chevron claims that AW "improperly obtained" Chevron's confidential work product. Dkt 42 at 9. But, as Chevron itself notes, the documents were sent anonymously to AW. *Id.* And while Chevron now insinuates that it was improper for AW to provide them to the LAP's counsel, it cites no law imputing any duty to non-attorneys and non-parties to return such documents. Indeed, after the LAPs produced them, Chevron did not bother to ask for them back for three months. Dkt. 38-15.[18]

\* \* \*

Chevron seeks to impute guilt by association on AW by alleging wrongdoing by the *LAPs and*

---

[16] Moreover, Chevron's suggestion that this letter was not, as it purports to be, a statement from AW, but was rather a threat from the LAPs, makes no sense. Even accepting Chevron's false claim that the LAPs controlled AW, it argues that the LAPs and AW kept that control *secret*. Thus, if this was a threat from the LAPs, it was remarkably inept, since Chevron would not have had any basis to understand it as such. Regardless, a threat of litigation, even based on fabricated evidence, is not extortion. *U.S. v. Pendergraft*, 297 F.3d 1198, 1207-08 (11th Cir. 2002).

[17] The meeting Chevron references was about finding citizens groups to monitor the court to ensure Chevron did not corrupt the judicial process. Dkt. 41 at 8 n.18, 32 ¶4. The RICO defendants joked about the need to raise a "private army", *id.*, but Donziger said that these groups would be "unarmed." Dkt. 38-6. Regardless, no "private army" was ever raised. Unarmed groups of campesinos and indigenous people stood outside the court in peaceful vigils, but were outnumbered by people affiliated with Chevron. Dkt. 41 at 42-44 ¶¶ 14-19.

[18] If assisting the LAPs in litigating *Chevron's* suit is part of the conspiracy, then Chevron's ever-growing conspiracy necessarily includes all of the defense counsel in the underlying action.

*the RICO defendants*. But even assuming Chevron's allegations about the defendants are correct, AW does not lose its right to speak out—even in conjunction with the defendants—as a result of defendants' conduct. *Claiborne Hardware*, 458 U.S. at 908.

### D. The subpoena violates Amazon Watch's First Amendment rights

Chevron's assertion that the First Amendment does not protect fraudulent activity or associations that further a conspiracy fails for all of the reasons noted above. But even if the Court were to agree with Chevron that AW was part of a conspiracy with the defendants, its suggestion that *none* of AW's documents are entitled to protection is a *non-sequitur*. Any claim that *all* of AW's campaign communications and activities are somehow illegal cannot be squared with *Claiborne Hardware*'s holding that courts must carefully distinguish between protected expression and illegal activity. 458 U.S. at 915-18; *id.* at 926-27 (considering each of an individual's acts separately). Indeed, AW partnered in its campaign with a number of other organizations that even Chevron does not claim are co-conspirators. *See* Dkt 42-41 Halbert Decl. Ex. 40 (listing partners).

Chevron's attempt to limit *Perry v. Schwarzenegger*, 591 F.3d 1147 (9th Cir. 2010) also fails. Dkt. 42 at 10-11. AW has provided the names of members of the "core group." Dkt 42-41, Halbert Decl. Ex. 40. Chevron does not challenge those individual designations here. Instead, it reserves the right to challenge them later. Dkt 42 at 11, n.14. At least until Chevron does so, internal communications with these individuals are protected.

Chevron's objections to AW's list are irrelevant to the persons whose names AW has provided, and lack merit. First, the fact that AW "reserve[d] the right to add [any] others . . . inadvertently left off," Dkt 42-41, Halbert Decl. Ex. 40 at 3, cannot prejudice Chevron, since Chevron does not seek to challenge particular individuals now. Second, Chevron's objection to AW's statement "that in a handful of instances, the identity is not public knowledge, and AW continues to assert its First Amendment privilege with respect to the identity of and communications with those persons" is premature for the same reason. More importantly, these identities are themselves protected by the First Amendment right to associational privacy. Dkt. 3 at 12, n.16.[19]

---

[19] AW did not "identif[y]. . . organizations as members of its 'core group.'" Dkt. 42 at 11. It identified individuals under their organization's name (giving Chevron *more* information). AW inadvertently listed Give Clearwater without noting the group member, but he (Mitch Anderson), was listed separately.

11

Chevron cites *Perry* for the proposition that communications with the media or the public are not protected. Dkt 42 at 12 (citing 591 F.3d at 1165 n.12). But Chevron seeks far more than just those communications: it is after any documents "concerning" those communications. Dkt 42 at 12. "[P]rivate, internal campaign communications" about communications with the press and public can, and usually will, involve "the formulation of campaign strategy and messages" and are therefore protected. *Perry*, 591 F.3d at 1165 n.12.

Chevron's effort to refute AW's showing that "disclosure *could* have a chilling effect on protected activities" also fails. *Perry*, 591 F.3d at 1164 (emphasis added); Dkt 42 at 12-13. Chevron cites a blog post from an AW employee stating: "Although we view Chevron's subpoena as a calculated effort to silence us, we will not back down." Dkt 42 at 12; Dkt 42-42, Halbert Decl. Ex. 41. According to Chevron, then, only those willing to give up their First Amendment rights are entitled to protection under *Perry*. That meritless claim does not overcome AW's showing that disclosure could chill participation in AW's advocacy campaigns, Dkt. 3 at 11-12, restrict open, free communication among staff and partners, *id.* at 12, and chill funding and other support for AW's work, *id.* at 13-14, and that disclosure could be used to harass AW, its allies and the communities with which it works. *Id.* at 14-15.

Equally unavailing is Chevron's claim that AW is not entitled to rely on declarations from its own employees, Dkt 42 at 12-13—even though they are the best, perhaps only, persons who could fully describe the effects of Chevron's subpoena. The Supreme Court has held that "we must . . .give deference to an association's view of what would impair its expression." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000). And in *Perry*, the Ninth Circuit relied on declarations from those whose communications would be revealed. 591 F.3d at 1163. Here, that is AW's employees. Dkt. 3 at 11-13.[20]

Nor can Chevron establish that the information sought is highly relevant. Dkt. 3 at 15-16. Chevron simply declares that it is, Dkt. 42 at 13, but that does not meet its burden. Chevron does not even attempt to refute AW's showing that this discovery is irrelevant in light of Chevron's position in the underlying litigation. Dkt. 3 at 15-16. By its own admission, "Chevron will not relitigate the

---

[20] Chevron's reliance on *Nat'l Org. for Marriage v. McKee*, 723 F. Supp. 2d 236, 241 (D. Me. 2010) is misplaced. There, the declarants conveyed their beliefs as to how donors to their organizations would respond. But that could apply only to a fraction of AW's citations, *see* Dkt. 3 at 14, even assuming *McKee* can be squared with *Dale*, which it cannot.

environmental conditions existing in the Oriente, because the focus of the RICO litigation is whether the [Ecuadorian] judgment's findings have any support untainted by fraud." Dkt 42 at 2, n.2 (internal quotations omitted). AW's advocacy campaign has nothing to do with "the focus of the litigation." And Chevron can hardly claim that AW's campaign is relevant (let alone that it shows AW was a "co-conspirator"), when AW sought to inform the public of pollution Chevron does not deny in this case. Moreover, since AW's advocacy is protected speech, it cannot be considered evidence of a conspiracy. *See Claiborne Hardware*, 458 U.S. at 908, 920. Further, much of the evidence Chevron seeks pertains to the public campaign generally, and is not limited to those aspects Chevron claims are tainted by fraud. Likewise, Chevron seeks communications between AW and its campaign partners, *many of whom are not even alleged to be co-conspirators*. This is far afield from the allegations against defendants, who purportedly directed the conspiracy.

Last, Chevron has not met its burden to show that the information sought is otherwise unavailable. *See* Dkt. 3 at 16-17. It cites Judge Kaplan's finding that the Defendants and their Ecuadorian allies have resisted discovery. Dkt 42 at 13. But that is self-defeating, because that finding was support for orders designed to fix the problem. Dkt. 14 Ex. 22 at 1; Dkt. 38-2 at 1. Chevron does not even attempt to describe what types of documents it thinks AW would have that it claims it could not get from the Defendants. Dkt 42 at 13. Chevron's argument is far too vague to meet its burden.[21]

### E. Chevron has not taken reasonable steps to avoid undue burden on Amazon Watch.

Chevron does not dispute that the burden on AW to comply with its subpoena would be overwhelming. Dkt. 3 at 21-22; Dkt 42 at 14. Instead, it suggests a sufficient showing of relevance necessarily overcomes any burden objection, no matter how large the burden. Dkt 42 at 14. But even assuming relevance, courts balance the relevance of and need for the information with the potential hardship to the non-party. *Gonzales v. Google, Inc.*, 234 F.R.D. 674, 680 (N.D. Cal. 2006). Thus, burden is not some secondary consideration. Chevron's further claim that any burden is not undue because AW is a co-conspirator fails along with its conspiracy theory. Chevrons' final claim, that AW has taken

---

[21] According to Chevron, Donziger has submitted a privilege log that lists communications with AW. Dkt. 42 at 13, n.16. But if such documents are privileged, Chevron is not entitled to them here. And if they are not privileged, Chevron can get them by challenging Donziger's designation.

the position that "it could not produce a single document . . . without undue burden", Dkt. 42 at 14, is demonstrably false. Section II.A. *supra.* AW still awaits Chevrons' promised proposal for reducing the burden on AW, including its proposal for electronic search terms.

**F. Chevron improperly seeks confidential commercial information.**

Chevron's claim that AW's confidential campaign strategies, plans, and relationships with anonymous donors is not "important proprietary information," *i.e.* information that it "has historically sought to maintain confidential," is not a serious argument. *See AFMS LLC v. UPS*, 2012 U.S. Dist. LEXIS 106925, *9 (S.D. Cal. July 27, 2012). As described above, Chevron can show neither that such information is relevant, nor that it cannot get the documents it claims it needs from other sources.

**G. The parties have not finished conferring over the form of a privilege log.**

Chevron's argument that AW must produce a privilege log is odd, since AW has already made a good faith proposal under which it would log privileged documents. Dkt. 4, Ex. I at 2; Ex. O at 1-2. Chevron has stated that "we do not object, in principle, to a categorical privilege log." Dkt. 4, Ex. N at 2. The missing piece is that AW asked Chevron to tell AW the categories of documents Chevron was logging, and its position on logging, in the underlying litigation, because AW should not bear more of a burden than Chevron. Dkt. 4, Ex. I at 2; Ex. O at 1-2. AW still awaits that information.[22]

**H. Chevron should cover the reasonable costs of any production.**

Should the court order AW to produce documents, Chevron should bear the reasonable costs. Rule 45 requires the Court to protect a non-party from "significant expense resulting from the inspection and copying commanded." Fed. R. Civ. P. 45(c)(2)(B). The factors Chevron cites in fact favor AW. Dkt. 42 at 15 (citing *In re Honeywell Int'l, Inc. Sec. Litig.,* 230 F.R.D. 293, 303 (S.D.N.Y. 2003)). AW does not stand to gain from this case financially, and Chevron's claim that AW is a co-conspirator is false. In any event, Chevron does not address the third factor: "whether the nonparty

---

[22] Chevron references the crime-fraud exception to the attorney-client privilege, but is not presently asserting that exception applies. Dkt 42 at 13. Nonetheless, Chevron cites decisions in which courts in the underlying litigation have found fraud for purposes of the exception, *id.*, although as AW noted, courts have also found otherwise. Dkt. 3 at 4. Of course, none of Chevron's cases involve AW, and AW did not commit any crime or fraud. Chevron also references waiver, but does not argue here that AW has waived any privilege. Dkt 42 at 13 (citing *Burlington N. & Santa Fe Ry. Co. v. Dist. Court*, 408 F.3d 1142, 1149 (9th Cir. 2005) (rejecting "*per se* waiver rule that deems a privilege waived if a privilege log is not produced.")).

can more readily bear the costs than the requesting party." *Honeywell Int'l Inc.,* 230 F.R.D. at 303; Dkt. 42 at 15. There is no argument that AW, a small non-profit, can more readily bear the costs of production than Chevron, one of the world's largest corporations. Chevron should not be permitted to impose the costs of *its* discovery on a political opponent.

**I. If documents must be revealed, a robust protective order is warranted.**

Any documents produced should be subject to a protective order that prevents Chevron from learning AW's internal strategy and tactics. Dkt. 3 at 25. With respect to other third-parties in this case, Chevron has agreed to "a protective order limiting access to confidential documents to outside counsel until such time as those documents are introduced at trial or as exhibits in court filings." Herz Decl. Ex. A. That Chevron is unwilling to do so here confirms that it seeks AW's documents at least in part for improper purposes, and highlights AW's need for protection.

## III. CONCLUSION

For the foregoing reasons, the subpoena should be quashed in its entirety.

DATED: March 18, 2013

Respectfully submitted,

EARTHRIGHTS INTERNATIONAL

/s/Richard Herz
Richard Herz [admitted *pro hac vice*]
rick@earthrights.org
Marco Simons
marco@earthrights.org
Michelle C. Harrison
michelle@earthrights.org
Marissa A. Vahlsing
marissa@earthrights.org
1612 K Street NW, Suite 401
Washington, DC 20006
Telephone: (202) 466-5188
Facsimile: (202) 466-5189

Jose Luis Fuentes
jlf@siegelyee.com
Siegel & Yee
499 14th Street Ste 300
Oakland, CA 94612
Tele: (510) 839-1200
Facsimile: (510) 444-6698

*Counsel For Non-Party Amazon Watch*

15
REPLY IN SUPPORT OF MOTION TO QUASH