1  ETHAN D. DETTMER, SBN 196046
     edettmer@gibsondunn.com
2  ENRIQUE A. MONAGAS, SBN 239087
     emonagas@gibsondunn.com
3  AIMEE M. HALBERT, SBN 279144
     ahalbert@gibsondunn.com
4  GIBSON, DUNN & CRUTCHER LLP
   555 Mission Street, Suite 3000
5  San Francisco, California 94105-0921
   Telephone: 415.393.8200
6  Facsimile:  415.393.8306

7  *Attorneys for Plaintiff Chevron Corporation*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CHEVRON CORPORATION,<br><br>        Plaintiff,<br><br>   v.<br><br>STEVEN DONZIGER, *et al.*,<br><br>        Defendants. | Case No. 3:13-mc-80038-CRB (NC)<br><br>**CHEVRON CORPORATION'S OPPOSITION TO AMAZON WATCH'S MOTION TO QUASH AND/OR MODIFY DEPOSITION SUBPOENAS**<br><br>**Hearing:**<br>Date:    April 3, 2013<br>Time:   1:00 p.m.<br>Place:   Courtroom A, 15th Floor |

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ........................................................................................................... 1

II. ARGUMENT .................................................................................................................. 2

    A. AW's Motion Is Untimely, And Therefore AW Has Waived Its Opportunity To Contest The Deposition Subpoena. .......................................................... 2

    B. The Deposition Subpoena Does Not Unduly Burden AW. ........................................ 5

        1. The Testimony Chevron Seeks Is Highly Relevant And Unavailable Elsewhere. ............................................................................................. 6

        2. AW Should Bear The Costs Of Complying With The Subpoena. .................... 8

        3. The Subpoena Describes The Relevant Topics With Reasonable Particularity. ........................................................................................... 9

    C. The First Amendment Does Not Protect AW's Fraudulent Conduct. ....................... 10

        1. AW Is A Partner In The Fraudulent Pressure Campaign Against Chevron. ................................................................................................ 10

        2. AW Overstates The Scope Of Applicable First Amendment Protections. ........................................................................................... 13

    D. AW's Privilege Argument Is Premature. .................................................................. 14

    E. The Subpoena Does Not Seek Any Protectable Business Information ..................... 14

    F. An Additional Protective Order Is Unnecessary. ..................................................... 15

III. CONCLUSION ............................................................................................................... 15

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson v. Abercrombie & Fitch Stores, Inc.*,
   No. 06-cv-991, 2007 WL 1994059 (S.D. Cal. July 2, 2007) ............................................. 2, 3

*Behrend v. Comcast Corp.*,
   248 F.R.D. 84 (D. Mass. 2008) ................................................................................................ 8

*Branzburg v. Hayes*,
   408 U.S. 665 (1972) ................................................................................................................ 10

*Brooke Credit Corp. v. Lobell Ins. Servs., LLC*,
   No. 06-2577, 2007 WL 4125791 (D. Kan. Nov. 15, 2007) .................................................... 9

*Compaq Computer Corp. v. Packard Bell Elec., Inc.*,
   163 F.R.D. 329 (N.D. Cal. 1995) ........................................................................................... 15

*De Jonge v. Oregon*,
   299 U.S. 353 (1937) ................................................................................................................ 14

*Dibel v. Jenny Craig, Inc.*,
   No. 06-cv-2533, 2007 WL 2220987 (S.D. Cal. Aug. 1, 2007) ............................................... 7

*Donaldson v. Read Magazine, Inc.*,
   333 U.S. 178 (1948) ................................................................................................................ 10

*Gonzales v. Google, Inc.*,
   234 F.R.D. 674 (N.D. Cal. 2006) ............................................................................................. 5

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*,
   538 U.S. 600 (2003) ................................................................................................................ 10

*In re First Am. Corp.*,
   184 F.R.D. 234 (S.D.N.Y. 1998) ............................................................................................. 8

*In re Jean-Baptiste*,
   No. M 11-188, 1985 WL 1863 (S.D.N.Y. July 5, 1985) ...................................................... 10

*Innomed Labs, LLC v. Aha Corp.*,
   211 F.R.D. 237 (S.D.N.Y. 2002) ............................................................................................. 2

*Molex v. San Francisco*,
   No. C-4:11-1282, 2012 WL 1965607 (N.D. Cal. May 31, 2012) .......................................... 9

*NAACP v. Claiborne Hardware*,
   458 U.S. 886 (1982) ......................................................................................................... 13, 14

*Perry v. Schwarzenegger*,
   591 F.3d 1147 (9th Cir. 2010) ................................................................................................ 10

*Pioche Mines Consol., Inc. v. Dolman*,
   333 F.2d 257 (9th Cir. 1964) .................................................................................................... 2

# TABLE OF AUTHORITIES
**(**continued**)**

Page(s)

*Soto v. Castlerock Farming & Transp., Inc.*,
   282 F.R.D. 492 (E.D. Cal. 2012) .................................................................................................. 7

*United States ex rel. Pogue v. Diabetes Treatment Ctr. of Am., Inc.*,
   238 F. Supp. 2d 270 (D.D.C. 2002) ............................................................................................. 2

*United States v. Columbia Broad. Sys., Inc.*,
   666 F.2d 364 (9th Cir. 1982) ....................................................................................................... 8

*United States v. Hempfling*,
   431 F. Supp. 2d 1069 (E.D. Cal. 2006) ..................................................................................... 10

*United States v. Rybicki*,
   354 F.3d 124 (2d Cir. 2003) ...................................................................................................... 10

*United States v. Sattar*,
   395 F. Supp. 2d 79 (S.D.N.Y. 2005) ......................................................................................... 10

*Williams v. City of Weed*,
   No. 07-cv-1787, 2008 WL 1733026 (E.D. Cal. Apr. 10, 2008) .................................................. 7

**Rules**

Civ. L.R. 1-5(n) ................................................................................................................................ 4

Fed. R. Civ. P. 26 ....................................................................................................................... 6, 15

Fed. R. Civ. P. 30 ............................................................................................................................. 2

Fed. R. Civ. P. 45 .................................................................................................................... 1, 5, 8

# I. INTRODUCTION

Although not a party, Amazon Watch ("AW") is a long-time collaborator with and supporter of the defendants in the underlying racketeering action. Its delaying tactics here continue to serve the interest of those defendants by obstructing Chevron's access to discovery in the underlying litigation. Two weeks after its failure to produce a representative for a properly noticed deposition, AW now moves to quash or modify that subpoena and a second subpoena served on AW's Executive Director, Atossa Soltani. But AW has waived Rule 45(c)'s protections because it filed its motion two weeks too late. *See* Fed. R. Civ. P. 45(c)(3)(A) ("On *timely* motion, the issuing court must quash or modify . . . ." (emphasis added)). To confer those protections at this late date would reward AW for dragging out the meet and confer process and disregarding a valid subpoena issued under this Court's authority. Chevron faces a May 31, 2013 discovery deadline, and AW's conduct in this proceeding threatens to run out that clock on Chevron.

In any event, each of the arguments in AW's motion is unavailing, and they are largely retreads of the same arguments that AW has been asserting since December 2012. *See* Dkt. 27-1 Ex. 1. ***First***, despite its decade-long partnership with defendant Steven Donziger and his co-conspirators, AW puts great weight on its assertion that it is a non-party "afforded special protection" from the alleged burden of complying with the subpoena. Dkt. 44 at 6. But AW—and Soltani in particular, *see* Dkt. 38-6—has long foreseen the day when it would be subpoenaed for evidence about AW's role in the extortionate campaign against Chevron. *Cf.* Dkt. 48-1 at 69-71 (compelling discovery from Patton Boggs, another non-party co-conspirator, and rejecting its undue burden argument because it "is no ordinary, unrelated non-party witness" and should have anticipated the litigation). The Rule 30(b)(6) subpoena reflects AW's long-standing and "absolutely critical role" in the conspiracy against Chevron, Dkt. 38-14, and does not impose any *undue* burden on AW.[1] ***Second***, AW seeks to cloak itself in the First Amendment. *See* Dkt. 44 at 11-14. But as Chevron explained in opposing

---

[1] After lengthy negotiations in the RICO matter and at least one hearing, Judge Kaplan limited the parties to twenty-one fact depositions. Monagas Decl. Ex. 1 at 1. As a result of that limit, Chevron has opted not to proceed with the planned deposition of Soltani in her personal capacity at this time. *Cf. id.* Ex. 2 at 2-3. Although Soltani remains under subpoena, Chevron's decision vitiates many of AW's burden arguments.

AW's motion to quash the document subpoena, *see* Dkt. 42, the First Amendment shields neither fraud nor associations that advance a conspiracy. **Third**, although AW raises the concern that Chevron may seek testimony regarding privileged communications, AW's proper recourse is to assert the relevant privilege or protection during the deposition. *Cf.* Fed. R. Civ. P. 30(c)(2). **Fourth**, AW claims that Chevron "seeks confidential business information," Dkt 44 at 14, but fails to identify any important proprietary information that merits protection. **Finally**, AW asserts the need for a protective order, but the Southern District of New York has issued a protective order in the underlying litigation that appropriately addresses AW's concerns. *See* Dkt. 4 Ex. FF.

AW's rehashed burden, First Amendment, privilege, and confidentiality arguments are by now familiar to the Court. *See* Dkt. 1; Dkt. 3; Dkt. 41; Dkt. 49. But they are no more convincing now than when they first were made. This Court should deny AW's motion and require AW to produce its representative forthwith to give testimony.

## II.  ARGUMENT

### A. AW's Motion Is Untimely, And Therefore AW Has Waived Its Opportunity To Contest The Deposition Subpoena.

One month after Chevron served the deposition subpoena on AW, *see* Dkt. 27-1 Ex. 3, and two weeks after the deposition subpoena's return date, *see* Dkt. 1 Ex. A, AW asked this Court to quash or modify the deposition subpoena. Yet Rule 45(c)(3)(A) requires that a motion to quash or modify a subpoena be "timely"—and, at the very least, the motion must predate the subpoena's return date. *See, e.g.*, *Pioche Mines Consol., Inc. v. Dolman*, 333 F.2d 257, 269 (9th Cir. 1964) ("[U]nless [the proposed deponent] has obtained a court order that postpones or dispenses with his duty to appear, that duty remains."); *Anderson v. Abercrombie & Fitch Stores, Inc.*, No. 06-cv-991, 2007 WL 1994059, at *8 (S.D. Cal. July 2, 2007) ("To excuse compliance, a motion to quash must be made before the . . . deposition date identified in the subpoena."); *United States ex rel. Pogue v. Diabetes Treatment Ctr. of Am., Inc.*, 238 F. Supp. 2d 270, 278 (D.D.C. 2002) ("In general, courts have read 'timely' to mean within the time set in the subpoena for compliance."); *Innomed Labs, LLC v. Aha Corp.*, 211 F.R.D. 237, 240 (S.D.N.Y. 2002) (holding that a motion to quash filed after the noticed deposition date was untimely). Here, as in *Anderson*, the return date "came and went without a

1  timely motion," and accordingly, AW "cannot now attack the subpoena's validity through a motion
2  to quash." 2007 WL 1994059, at *8.

3       AW had more than two weeks to file a motion to quash or modify the deposition subpoena
4  before the return date. *See* Dkt. 27-1 ¶¶ 7-9. Notably, AW filed a motion to quash the *document*
5  *subpoena* on February 25, 2013, **before** the *deposition subpoena*'s return date, *see* Dkt. 3—and AW
6  now relies heavily on the legal arguments made in that motion to contest this deposition subpoena.
7  *See* Dkt. 44 at 11 n.15 ("AW's First Amendment arguments . . . is [sic] provided in Dkt. 3 at 9-17.");
8  *see also id.* at 9 n.9 (relying on Dkt. 3); *id.* at 14-15 (same). *Compare* Dkt. 3 at i-ii (table of
9  contents), *with* Dkt. 44 at i (table of contents). Thus, AW's current arguments were available to them
10 well before the return date of the deposition subpoena. Given that AW's arguments have not changed
11 materially—and that Chevron repeatedly reminded AW of its obligation to file any motions before
12 the noticed deposition date, *see* Dkt. 27-1 Ex. 2 at 2-4—the Court should conclude that AW waived
13 its right to file a motion to quash or modify the deposition subpoena.

14      Nor should AW be allowed to salvage its position by mischaracterizing the meet and confer
15 process, which AW itself prolonged. Chevron's opposition to AW's last-minute administrative
16 motion to enlarge time details the meet and confer process up to March 1, 2013, the date on which
17 AW's counsel made himself available to confer by telephone as Local Rule 1-5(n) requires. *See* Dkt.
18 27 at 1-3; Dkt. 27-1 ¶¶ 3-28. The key facts regarding the meet and confer process are these:

- Chevron delivered the Rule 30(b)(6) subpoena to AW's counsel on February 8, 2013, *see* Dkt. 27-1 ¶ 7;
- Chevron served the subpoena on AW on February 12, 2013, *id.* ¶ 9;
- After conferring by e-mail with AW's counsel between February 12, 2013, and February 20, 2013, Chevron sought to schedule a meet and confer teleconference for February 21 or February 22, 2013, *id.* ¶ 17;
- AW sent Chevron a "letter stating Amazon Watch's position regarding the subpoena" on February 20, 2013, *id.* ¶¶ 18-19, even though that statement mirrors AW's December 13, 2012 letter regarding the document subpoena Chevron served on AW;
- AW's counsel—who to that point had handled the meet and confer process and signed the position statement—informed Chevron on February 20, 2013, that his colleague, who would be on vacation through the Rule 30(b)(6) deposition's return date, would handle the meet and confer process moving forward, *id.* ¶ 19;
- After receiving the statement, Chevron again sought to schedule a meet and confer

teleconference for February 21 or February 22, 2013, but AW's counsel refused, *id.* ¶¶ 20-21; and

- AW's counsel wrote Chevron's counsel on February 22, 2013, stating "there is not sufficient time for a telephonic conference to discuss the issues" until February 26, 2013, the subpoena's return date, *id.* ¶ 23.

This record does not support AW's refusal to schedule a teleconference before the return date.[2] Indeed, despite AW's claimed commitment to completing the meet and confer process, AW's counsel would not spare forty-five minutes—the duration of the March 1, 2013 teleconference—between February 12, 2013 (the date of service), and February 26, 2013 (the return date), to confer with Chevron's counsel. Worse, AW's objections and legal arguments are the same that AW first set forth in December 2012, reiterated (at times verbatim) in its February 20, 2013 letter, and argued in its February 25, 2013 motion to quash the document subpoena. *See* Dkt. 27-1 Ex. 2 at 7-8 (Feb. 18, 2013 e-mail from E. Monagas to M. Simons). AW's counsel's claim that "there is not sufficient time for a telephonic conference to discuss the issues," *id.* at 16 (Feb. 22, 2013 e-mail from M. Simons to E. Monagas), suggests an effort simply to run out the discovery clock, which concludes on May 31, 2013, by order of the Southern District of New York.[3]

Further, AW's discussion of the remainder of the meet and confer process offers no adequate excuse for AW's failure to file a timely motion to quash. AW's motion takes umbrage at the fact that Chevron "refused" to forego its opportunity to depose AW's representative in accordance with the federal rules. Far from ignoring its "Rule 45 responsibility," Dkt. 44 at 3, Chevron served a deposition subpoena of a scope commensurate with AW's decade-long participation in an illegal campaign to "force[] [Chevron] to settle the lawsuit." *See* Dkt. 14 Ex. 4. AW offers no support for

---

[2] AW claims that Chevron insisted on a telephonic meet and confer, thereby forcing AW to engage in "motion practice that should have been unnecessary." Dkt. 44 at 4. But Local Rule 1-5(n) states that the meet and confer requirement "can be satisfied only through direct dialogue and discussion – either in a face to face meeting or in a telephone conversation." Civ. L.R. 1-5(n). "The mere sending of a written, electronic, or voice-mail communication"—what AW insisted upon before finally agreeing to the March 1, 2013 teleconference—"does not satisfy a requirement to 'meet and confer' or to 'confer.'" *See id.* AW thus refused to meet and confer as required until after the return date.
[3] In light of these facts, it would be prudent to appoint a special master to oversee the deposition. Such a measure—well-warranted by the course of this litigation—would be consistent with the approach of the Court in the underlying litigation. *See* Dkt. 38-2 at 1 (granting Chevron's motion to appoint special masters to oversee depositions because "[t]here is no reason to expect that depositions of many or all of the important witnesses in this case will proceed properly without supervision").

its request that Chevron direct AW's Rule 30(b)(6) representative to the AW documents relevant to Chevron's deposition topics. *See* Dkt. 44 at 5. Like any other Rule 30(b)(6) deponent, Soltani should, as Chevron stated in its response to AW's proposals, adequately prepare herself to testify regarding the topics listed in the subpoena notice.[4]

Further, the Court's silence on AW's motion to enlarge time should not amount to tacit consent to the extension AW sought in that motion. *See* Dkt. 1 at 4. Indeed, as Chevron explained in its opposition to that administrative motion, AW should not be rewarded for its unjustified delay and its unexcused failure to produce a witness in contravention of a subpoena issued under this Court's authority. *See* Dkt. 27. *Cf.* Fed. R. Civ. P. 45(e) ("The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena.").

**B.     The Deposition Subpoena Does Not Unduly Burden AW.**

Where, as here, a party makes a sufficient showing of relevance and need for the subpoenaed information, a non-party's objections that compliance with a subpoena would be unduly burdensome are overcome. *See Gonzales v. Google, Inc.*, 234 F.R.D. 674, 680 (N.D. Cal. 2006). And here, AW is not a neutral bystander entitled to the protections of Rule 45 against undue burden. Rather, AW is an active co-conspirator in a fraudulent and extortionate scheme. *Cf.* Dkt. 48-1 at 69-71 (compelling discovery from another non-party co-conspirator and rejecting its undue burden argument because it "is no ordinary, unrelated non-party witness" and should have anticipated the litigation).

---

[4] Although Chevron will not address each of AW's assertions regarding the meet and confer process, AW's claim that "Chevron's new position in the underlying litigation [is] that it no longer contests the fact of oil pollution," Dkt. 44 at 5 n.5, is false. As Chevron has previously explained, Chevron has always disputed the LAPs' fraudulent claims. *See* Dkt. 42 at 2 n.2; Dkt. 48 at 3 n.6. But Chevron will not, in the underlying RICO case, "relitigate the environmental conditions" because the focus of that case is "whether the judgment's findings have any support untainted by fraud in the record that existed before the Ecuadorian court at the time the judgment was issued." *See* Dkt. 42-5 at 3-4. AW also asserts that "Chevron refused" to negotiate regarding a protective order. Dkt. 44 at 6. But in response to AW's concerns, Chevron suggested during the March 1, 2013 teleconference that Soltani testify under seal as an interim solution until the Court could hear AW's confidentiality claims, and AW responded that it would rather litigate the question first. *See* Monagas Decl. ¶ 11. AW also claims that during the call, Chevron "refused" to limit examination of Soltani to one day. Dkt. 44 at 5. Although it is a moot point for now, AW's representation is not accurate. During the call, Chevron's counsel acknowledged that one day might be sufficient, but noted that Chevron could not make that determination beforehand, particularly given that AW had not yet complied with the document subpoena. *See* Monagas Decl. ¶ 7.

**1.     The Testimony Chevron Seeks Is Highly Relevant And Unavailable Elsewhere.**

A party is entitled to discover information "that is relevant to [its] claim[s]" and "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). AW played what Donziger described as "an absolutely critical role" in the underlying RICO conspiracy. *See* Dkt. 38-14. Donziger and his co-conspirators corrupted the Ecuadorian proceedings. *See* Dkt. 48-1 at 3-4 ("Chevron has established at least probable cause to believe there was fraud or other criminal activity in the procurement of the Judgment and in other respects relating to the Lago Agrio litigation in which that Judgment was rendered and in certain litigations in the United States relating to the Ecuadorian litigation."). But they relied on AW to bring the news of those corrupt efforts to Chevron's doorstep in the United States. *Cf.* Dkt 38-14 ("[T]he pain AW can cause Chevron in many respects is greater than the pain [the LAPs' lawyers] can cause[.]"). The LAPs' public relations campaign was the spear's tip of the effort to compel Chevron to settle (so as "to survive intact in American society as a reputable company"). Dkt. 14 Ex. 4. Chevron therefore seeks discovery regarding how Donziger and his co-conspirators used AW's name and public relations pulpit—with AW's knowledge and participation—to advance the RICO defendants' extortionate scheme. And as an inside participant in Donziger's scheme, AW witnessed other illegal acts taken by Donziger and his co-conspirators. *E.g.*, Dkt. 38-6. Discovery into AW's knowledge of these activities is well within the bounds of information to which Chevron is entitled in the RICO action.

As a result of the RICO defendants' efforts to preclude discovery of their activities, the only way for Chevron to obtain this evidence is through discovery from AW. Judge Kaplan has noted that "Defendants and/or their allies have resisted discovery to an astonishing degree by tactics including by refusing to produce responsive documents located in Ecuador, . . . refusing to appear for depositions, and invoking frivolous privilege objections to block and delay discovery." Dkt. 14 Ex. 22 at 1-2; *see also* Dkt. 38-2 at 1 (noting that defendants and their allies "have been remarkably obstructive" by "utterly refus[ing] to comply with court orders" such that "[t]he likelihood of further attempts to preclude or disrupt discovery is palpable"). For example, in response to Chevron's discovery requests, Donziger asserted privilege over communications with AW, *see* Monagas Decl. Ex. 7, but he previously instructed another member of the LAPs' legal team that although an AW

representative was "a collaborator" "he is not subject to privilege," *see* Monagas Decl. Ex. 8. And Donziger has testified that he does not remember (or know) other key facts relating to AW's role in the conspiracy. *See* Monagas Decl. Ex. 3 at 2481:19-2482:15 ("Q. Did you provide Amazon Watch with an English version of the executive summary of the Cabrera report [that was posted on the Amazon Watch web site]? A. I don't know. [ . . . ] Q. Did you ever provide Amazon Watch with a certified translation of the Cabrera executive summary? A. I don't remember. I don't believe so."); *id.* at 3178:22-3179:14 ("Q. It is your testimony . . . that you think Amazon Watch may have taken steps to inform the SEC that th[e] $6 billion remediation estimate was no longer valid? A. I don't know.").

In truth, the evidence already collected by Chevron shows that AW representatives personally participated in activities both in the United States and Ecuador in coordination with the RICO defendants that furthered the fraudulent conspiracy at issue in the RICO suit. *See* discussion *infra* Part C.1. AW personnel worked in the same Ecuadorian offices as members of the LAPs' legal team. *See* Monagas Decl. Ex. 8. A legal intern for the LAPs' legal team worked closely with AW and even traveled "to the jungle" alongside AW personnel. *See id.* AW and the RICO defendants were so involved that Donziger has attempted to shield his communications with AW under privilege, *see id.* Ex. 7, even though he has previously admitted to his legal team that AW is not subject to privilege, *see id.* Ex. 8. AW's Rule 30(b)(6) witness can therefore provide unique factual testimony that parties to the RICO litigation cannot provide, unlike the non-parties in the cases cited by AW. *See, e.g.*, *Dibel v. Jenny Craig, Inc.*, No. 06-cv-2533, 2007 WL 2220987, at *2 (S.D. Cal. Aug. 1, 2007) (quashing subpoenas because "these witnesses are not fact witnesses"); *Williams v. City of Weed*, No. 07-cv-1787, 2008 WL 1733026, at *2-3 (E.D. Cal. Apr. 10, 2008) (quashing subpoena served on District Attorney who had no role in the underlying facts giving rise to the lawsuit).[5] Thus, Chevron cannot obtain the evidence it seeks here through other means.

---

[5] In the other case cited by AW, *Soto v. Castlerock Farming & Transport, Inc.*, the court enforced the non-party subpoena because the plaintiff established a need to obtain discovery that the defendant refused to produce. 282 F.R.D. 492, 505 (E.D. Cal. 2012).

**2.     AW Should Bear The Costs Of Complying With The Subpoena.**

When an *independent* non-party is compelled to comply with discovery requests, courts will act to shield it from the "significant expense" associated with compliance. *See* Fed. R. Civ. P. 45(c)(2)(B)(ii). But, where, as here, "a nonparty was substantially involved in the underlying transaction and could have anticipated that [it] would reasonably spawn some litigation, expenses should not be awarded." Dkt. 48-1 at 71 (quoting *In re First Am. Corp.*, 184 F.R.D. 234, 242 (S.D.N.Y. 1998)).

As AW itself admits, the campaign against Chevron has been AW's "largest campaign for the last 10 years" and "AW has at times coordinated its public message with [the RICO defendants]." Dkt. 44 at 1. And the record shows that the latter claim is a substantial understatement. *See* discussion *infra* Part C.1; *see also* Dkt. 42 at 1-10. The *Crude* outtakes confirm that AW personnel were heavily involved in many of the meetings, conferences, and events that underlie Chevron's RICO claims. AW's claim that it was not involved in aspects of the conspiracy rings hollow given that its preliminary search for materials responsive to the related document subpoena uncovered more than 78,000 records potentially relevant to the underlying litigation. *See* Dkt. 44 at 3. And unlike the non-party producers in *United States v. Columbia Broadcasting System, Inc.*, 666 F.2d 364, 371 (9th Cir. 1982), AW personnel participated in many of the events underlying Chevron's RICO complaint.

Moreover, where a non-party can anticipate that its actions could give rise to litigation, its claim for costs is considerably weakened. *See In re First Am. Corp.*, 184 F.R.D. at 242; *Behrend v. Comcast Corp.*, 248 F.R.D. 84, 87 (D. Mass. 2008). AW not only could have anticipated further litigation, but in fact did anticipate that its involvement with the RICO defendants might lead to discovery requests or litigation. In a scene captured in the *Crude* outtakes, after Donziger discussed raising a "private army" to "send a message to the court," Soltani inquired whether "anybody can, uh, subpoena these videos?" Dkt. 38-5; Dkt. 38-6. After being told that the subpoena power did not exist in Ecuador, Soltani asked whether the videos could be subpoenaed in the United States and noted "it's illegal to conspire to break the law." Dkt. 38-6. Because AW foresaw this discovery, it does not warrant protection under Rule 45 from the costs related to the discovery. *See In re First Am. Corp.*, 184 F.R.D. at 242; *Behrend v. Comcast Corp.*, 248 F.R.D. at 87. Chevron should not be

required to remit discovery costs to a co-conspirator. *See* Dkt. 48-1 at 71 (requiring non-party co-conspirator to bear the costs of compliance with the subpoena, even assuming they were "in the range of $1,060,000 and $1,290,000," because "[m]any of the events in which it was involved underlie Chevron's main allegations" and "there is no persuasive evidence that the compliance costs are out of line with what would be typical for [a] nonparty witness in complex commercial litigation").

Lastly, the Court should also reject AW's unsupported request to limit Soltani's preparation time for the Rule 30(b)(6) deposition to eight hours. *See* Dkt. 44 at 10. AW offers no basis in the federal rules or case law for this request. And it is unclear why AW believes that Soltani merits a special exemption from the requirement that a Rule 30(b)(6) witness take reasonable measures to prepare herself to testify on the specified topics. *See Molex v. San Francisco*, No. C-4:11-1282, 2012 WL 1965607, at *2 (N.D. Cal. May 31, 2012) (requiring responding party to produce a "prepared witness on designated topics . . . not only within the personal knowledge of the witness but on matters reasonably known by the responding party"); *Cf. Brooke Credit Corp. v. Lobell Ins. Servs., LLC*, No. 06-2577, 2007 WL 4125791, at *2 (D. Kan. Nov. 15, 2007) ("Discovery often involves effort and expenditure . . . . The rules of discovery do not guarantee or provide some easy procedure."). AW's claims about the number of documents to review or the necessity of trips to Ecuador should not obscure the fact that there is no *undue* burden here in light of AW's past activities.

### 3. The Subpoena Describes The Relevant Topics With Reasonable Particularity.

AW fails to demonstrate why the designated deposition topics are broad or irrelevant. By AW's own admission, its work regarding Chevron constitutes "AW's largest campaign for the last 10 years." Dkt. 44 at 1. The evidence collected thus far only reinforces that AW was heavily involved in the LAPs' pressure campaign against Chevron. *See, e.g.*, Dkt. 14 Ex. 4; Dkt 42 at 1-10; Dkt. 38-14. Discovery into AW's communications with the media about the Lago Agrio litigation and the underlying RICO litigations—two areas that AW now claims are irrelevant and overbroad—are not only relevant to Chevron's claims but also "reasonably calculated to lead to the discovery of admissible evidence." *See Molex*, 2012 WL 1965607, at *3. AW's broad and vague claims that the subpoena topics are improper cannot suffice to deprive Chevron of highly relevant testimony.

C. **The First Amendment Does Not Protect AW's Fraudulent Conduct.**

As a knowing participant in the fraudulent conspiracy, AW cannot invoke the First Amendment as protection against disclosure. The First Amendment does not protect fraudulent activity or associations that further a conspiracy.[6] Here, AW actively collaborated with the RICO defendants in the conspiracy to extort billions of dollars from Chevron.

1. **AW Is A Partner In The Fraudulent Pressure Campaign Against Chevron.**

In an attempt to shield its activities under the protections of the First Amendment, AW sent Chevron a letter on March 8, 2013, identifying the members of its "core group . . . engaged in the formulation of campaign strategy and messages" and whose "*private, internal* campaign communications" are allegedly protected by the First Amendment. Dkt. 42-41; *see Perry v. Schwarzenegger*, 591 F.3d 1147, 1165 n.12 (9th Cir. 2010) (emphases in original); Dkt. 48 at 4-6. AW's list included Donziger and Ecuadorian members of the conspiracy (including the LAPs' lead Ecuadorian counsel, Pablo Fajardo), the very individuals that AW has attempted to distance itself from in its previous statements. *See, e.g.*, Dkt. 41 at 6-8 (claiming that the RICO defendants "did not direct AW's campaign" and that "Chevron's evidence shows nothing more than AW at times coordinated its message with the defendants"). As Judge Kaplan has already found, the unrefuted evidence demonstrates that Donziger, Fajardo, and their colleagues engaged in fraudulent activities, including coercion and bribery of the Ecuadorian judiciary overseeing the Lago Agrio litigation. *See, e.g.*, Dkt. 38-3 at 9, 15; *see also* Dkt. 48 at 5. The evidence demonstrates that AW collaborated with these "core group" members to carry out the RICO conspiracy against Chevron.

As Donziger himself has noted, AW played an "absolutely critical role" in the LAPs' pressure

---

[6] *See, e.g.*, *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003) ("[T]he First Amendment does not shield fraud."); *Branzburg v. Hayes*, 408 U.S. 665, 697 (1972) (stating that the First Amendment does not protect "concealment of crime"); *United States v. Rybicki*, 354 F.3d 124, 150 (2d Cir. 2003) ("The conduct at issue – fraud – enjoys no constitutional protection[.]"); *United States v. Hempfling*, 431 F. Supp. 2d 1069, 1083 (E.D. Cal. 2006) ("The Supreme Court has repeatedly held that the First Amendment does not shield fraud."); *United States v. Sattar*, 395 F. Supp. 2d 79, 101 (S.D.N.Y. 2005) ("The First Amendment lends no protection to participation in a conspiracy, even if such participation is through speech."); *In re Jean-Baptiste*, No. M 11-188, 1985 WL 1863, at *1 (S.D.N.Y. July 5, 1985) ("[T]he law protects freedom of speech and association, it does not protect criminal conspiracies."); *Cf. Donaldson v. Read Magazine, Inc.*, 333 U.S. 178, 191-92 (1948) ("A contention cannot seriously be considered which assumes that freedom of the press includes a right to raise money to promote circulation by deception of the public.").

campaign against Chevron. Dkt. 38-14; *see also* Dkt. 42 at 1-10; Dkt 13 at 1-2; Dkt. 18 at 1-2; Dkt. 48 at 2-4. AW requested $1 million from the LAPs to implement a multi-faceted campaign against Chevron designed to "leverag[e] multiple pressure points on Chevron and its decision makers that will force the company to . . . settle the lawsuit." Dkt. 14 Ex. 4. To accomplish these goals, AW acted as the LAPs' mouthpiece, issuing press releases, letters, appeals to federal and state government officials, and other documents designed to exert pressure on Chevron. In return, AW received funding directly from the LAPs' representatives. *See, e.g.*, Dkt. 14 Ex. 6 (discussing a payment of $1,000 made by Donziger to AW "for p.r. newswire propaganda"). And for years, the centerpiece evidence in this campaign was the so-called Cabrera Report, a purported expert report ghostwritten by the RICO defendants, which, as the Southern District of New York already has found, was "tainted by fraud" from its inception through its promotion by, among others, AW. *See* Dkt. 38-3 at 9-10. Yet even now AW's website touts the Cabrera Report as the work of an "independent expert" and hosts documents claiming that the "Cabrera report is an independent review and assessment." Monagas Decl. Ex. 4; *id.* Ex. 5. *Cf. id.* Ex. 6 at 2 (Spring 2012 AW briefing falsely implying that the LAPs merely followed "court orders to assist" Cabrera).[7]

AW acknowledges that it has "coordinated its public message with" the RICO defendants.[8] Dkt. 44 at 6. But, in fact, Donziger and his associates solicited, revised, and ghostwrote documents that AW subsequently published under its own banner. *See, e.g.*, Dkt. 42 at 5-7; Dkt. 14 Ex. 5 (Donziger writes to AW: "I . . . know the press releases on the Ecuador campaign are not a terrible work burden to AW because I am writing most of them."); Dkt. 42-3 (Donziger writes that the conspirators initiated a "press and internet strategy, using Amazon Watch as the surrogate"); Dkt. 42-

---

[7] And there is reason to believe Ms. Soltani knew long before the *Crude* outtakes revealed the Cabrera fraud that the RICO Defendants planned to ghostwrote the global damages report. *See* Dkt. 42-2 at 16 (Donziger tells Soltani in 2006: "The judge is going to appoint a guy in Ecuador, um, to be the expert but really, you know, we'll be supporting him with the work.").

[8] Professor Judith Kimerling, an attorney unaffiliated with the LAPs who is seeking a share of the fraudulent $19 billion judgment on behalf of a group of Ecuadorians known as the Huaorani, recalled conversations in which she "personally [] debated with [Soltani] over the wisdom and ethics of distorting the facts." Dkt. 42 at 7 n.9. Kimerling said she informed Soltani that AW had misrepresented many facts drawn from Kimerling's book and that AW was "really jeopardizing the credibility of the communities." *Id.* Kimerling recalled that Soltani's response was, "well we have to win a PR battle." *Id.*

32 (Donziger writes to AW that "the timing" of AW's press release "needs to be exactly right" and says, "I will make the call, just get ready and I will tell u [sic] when"); Dkt. 42-34 (Donziger writes to AW: "We can be collaborators, but we are not equal partners.  This is an important distinction."). Furthermore, Donziger directed AW's efforts to persuade the Securities and Exchange Commission ("SEC") to investigate Chevron.  *See* Dkt. 42-24 at 3177-78.  Donziger's level of involvement casts significant doubt on AW's claim that the RICO defendants "did not direct AW's campaign." Dkt. 41 at 6-7.

AW also published and continues to maintain falsehoods regarding the Lago Agrio litigation. In May 2007, Soltani learned from Donziger that AW had published false oil contamination statistics on its website relating to AW's claim that Chevron had spilled thirty times more crude oil than was spilled in the Exxon Valdez disaster.  *See* Dkt. 14 Ex. 7.  Although Soltani noted that the statistics were exaggerated "by a factor of 10 it seems," Soltani's primary concern was not to remove or revise these statistics, but on how to "save face moving forward" with the pressure campaign "and what to do with all the documents where we site [sic] this figure on our website." *See id.*  When Donziger instructed AW not to revise the figures because of the "HUGE implications for the legal case," Dkt. 14 Ex. 8, AW obeyed.  To date, AW continues to maintain materials on its website dated after May 2007 and citing the Exxon Valdez claim. *See, e.g.*, Dkt. 38-8.

Similarly, AW continues to rely on David Russell's $6 billion damages assessment even after receiving a February 2006 e-mail from Russell "demand[ing]" that AW "cease and desist" citing the figure because "[i]t [wa]s no longer valid" and the actual cleanup costs were "substantially less than originally estimated."  *See* Dkt. 14 Ex. 9.  AW had relied on Russell's damages estimate in its press releases and in its January 30, 2006 letter to the SEC requesting an investigation of Chevron.  *See, e.g.*, Dkt. 14 Ex. 11.  Despite receiving Russell's instructions to cease using his figures, AW failed to correct the falsehood in its subsequent letters to the SEC and, at Donziger's behest, instead incorporated the January 30, 2006 letter by reference.  *See* Dkt. 14 Exs. 12, 13, 14 (Donziger suggests that AW submit a follow-up letter to the SEC "without disavowing or mentioning Russell's report").[9]

---

[9] In a conversation with Soltani captured by the *Crude* filmmakers, Donziger acknowledged that Russell's $6 billion "very rough estimate" significantly overstated the true costs of remediation:

*(Cont'd on next page)*

AW even continued to cite the Russell estimate in its press releases; for example, in its March 20, 2007 press release titled "Ecuador Court Speeds Up Chevron's $6 Billion Amazon Trial Over Rainforest Contamination," AW stated that "[t]he only independent damage assessment, by the U.S. firm Global Environmental Operations [owned by Russell], puts clean-up costs at $6.14 billion." Dkt. 14. Ex. 10.  To date, AW has not disavowed its use of the Russell damages estimate; indeed, Soltani acknowledges that the figure is on AW's website today.  Dkt. 37, Soltani Decl. ¶ 27.

AW also assisted the RICO Defendants in exerting pressure on the Ecuadorian judiciary to rule against Chevron in the Lago Agrio litigation.  In addition to discussing plans with Donziger to create a "private army" to exert pressure on the Lago Agrio court (Dkt. 38-5; Dkt. 38-6), AW personnel including Soltani met with members of the Ecuadorian judiciary outside the courtroom, including at community events and judicial inspections.  *See, e.g.*, Dkt. 42-2 at 2-3; Monagas Decl. Ex. 9.  These interactions demonstrate that AW did not merely "coordinate[] its public message with" Donziger and his colleagues, *see* Dkt. 44 at 1, but also served as the RICO defendants' agents in the pressure campaign against Chevron.

**2.      AW Overstates The Scope Of Applicable First Amendment Protections.**

AW relies on *NAACP v. Claiborne Hardware*, 458 U.S. 886 (1982), for the proposition that "'[f]or liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims.'"  Dkt. 44 at 13 n.19 (quoting *Claiborne Hardware*, 458 U.S. at 920).  Yet the evidence Chevron has presented thus far demonstrates that AW collaborated with the RICO defendants to pressure Chevron into settlement based on the specter of a fraudulent judgment or the impact of serial false attacks in the press and public relations sphere.  *See, e.g.*, Dkt. 42 at 1-10.  And the Court in *Claiborne Hardware* held that organizers of a civil rights boycott in favor of civil rights in Mississippi in the 1960s could not be *enjoined* or held liable in *damages* to the businesses affected by the boycott, even if there were violent elements to the boycott.  458 U.S. at 933.  The precedents the

---

*(Cont'd from previous page)*

"[The] six billion dollar thing is out there.  The reality is, based on what this guy is telling me, [it] would cost less than that.  Significantly less than that . . . ."  Dkt. 42-2 at 18-19.

1   Court relied on were cases holding, for example, that "'peaceable assembly for lawful purposes
2   *cannot be made a crime*." *Id*. at 907 (quoting *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937)
3   (emphasis added)).  Here, the issue relates to discovery, not a civil judgment or criminal punishment.
4       Even if AW had First Amendment rights to assert in this proceeding, the information
5   responsive to the subpoena is highly relevant—including to the RICO predicates that Chevron
6   alleges—and the subpoena topics arte narrowly tailored to address AW's long-standing partnership
7   with the RICO defendants.  Further, as described *supra*, Part B.1, Chevron cannot obtain the
8   information from other sources, especially where those sources are even less cooperative than AW.
9   Indeed, Judge Kaplan recently noted the RICO defendants' "refus[al] to produce any documents in
10  the possession, custody, or control of their attorneys and agents in Ecuador [including AW's "core
11  group" members Fajardo, Yanza, Saenz, and Prieto] despite orders by this Court compelling them to
12  do so." Dkt. 48-1 at 46-47.  Judge Kaplan went on to state that "defendants' obstinance with respect
13  to discovery of evidence from Ecuador has reached a new level" and described, among other things,
14  "core group" member Fajardo's collusive lawsuit to prevent this discovery.  *Id*. at 47-50; *see also id.*
15  at 68 ("Especially in light of defendants' obstinate refusal to provide Chevron with discovery from
16  Ecuador, Chevron has shown that it needs discovery from [non-party co-conspirator Patton Boggs]").

17  **D.    AW's Privilege Argument Is Premature.**

18      AW speculates that some of Chevron's noticed topics "would include privileged attorney-
19  client communications and attorney work product." Dkt. 44 at 14.  But AW fails to specify what
20  relief it seeks from the Court at this time.  The Court should decline to follow AW's lead in
21  speculating about how the subpoena could be modified to avoid hypothetical questions that Chevron
22  has not even asked yet.  The fact that a Rule 30(b)(6) deposition topic *might* encompass
23  communications with the subpoena recipient's counsel simply cannot serve as a reason to quash the
24  entire subpoena, and AW offers no suggestions regarding how to narrow the subpoena.  The proper
25  remedy for AW is to assert any necessary privilege or protection claims as they arise during the
26  course of the deposition.  *See* Fed. R. Civ. P. 30(c)(2).

27  **E.    The Subpoena Does Not Seek Any Protectable Business Information.**

28      AW's vague claim that the subpoena "seeks confidential business information," Dkt. 44 at 15,

1 fails to make the requisite "strong showing" that the requested information is "important proprietary information." *Compaq Computer Corp. v. Packard Bell Elec., Inc.*, 163 F.R.D. 329, 338 (N.D. Cal. 1995). *Compaq* makes clear that "discovery is virtually always ordered once the movant has established that the secret information is both relevant and necessary." *Id.* As discussed above, the requested information is highly relevant to Chevron's claims and is critical to answering questions the RICO defendants cannot (or will not) answer.

**F.    An Additional Protective Order Is Unnecessary.**

AW seeks a protective order to protect allegedly confidential information that it admits "would include the internal strategies of campaigns directed against [Chevron]." Dkt. 44 at 15. But an additional protective order is unnecessary and improper because the protective order in the underlying litigation governs third-party discovery and addresses legitimate confidentiality concerns. *See* Dkt. 4 Ex. FF ¶¶ 2-3 (permitting a non-party to designate information as "Confidential Information" subject to restrictions on its use and disclosure). AW has not provided a "good cause" justification as to why an additional protective order is necessary to comply with the subpoena. *See* Fed. R. Civ. P. 26(c). Therefore an additional protective order here is unnecessary to move forward with the deposition process.

### III.    CONCLUSION

For the foregoing reasons, as well as those stated in Chevron's Opposition to AW's Administrative Motion to Enlarge Time and Chevron's Opposition to AW's Motion to Quash and/or Modify Chevron's Subpoena to Produce Documents, Chevron respectfully requests that the Court require AW to produce Soltani for deposition as its Rule 30(b)(6) representative as soon as possible, and certainly no later than April 19, 2013.

Dated:  March 25, 2013                              Respectfully submitted,

                                                                        GIBSON, DUNN & CRUTCHER LLP

                                                                        By:    */s/ Ethan D. Dettmer*
                                                                                    Ethan D. Dettmer

                                                                        *Attorneys for Plaintiff Chevron Corporation*